1   MICHAEL R. MATTHIAS, Bar No. 57728
    *mmatthias@bakerlaw.com*
2   GABRIEL E. DRUCKER, Bar No. 254448
    *gdrucker@bakerlaw.com*
3   BAKER HOSTETLER LLP
    12100 Wilshire Boulevard, 15th Floor
4   Los Angeles, California 90025-7120
    Telephone:  310.820.8800
5   Facsimile:   310.820.8859

6   GRAIS & ELLSWORTH LLP
    DAVID J. GRAIS (*pro hac vice* to be submitted)
7   *dgrais@graisellsworth.com*
    MARK B. HOLTON (*pro hac vice* to be submitted)
8   *mholton@graisellsworth.com*
    MARY G. MENGE (*pro hac vice* to be submitted)
9   *mmenge@graisellsworth.com*
    1211 Avenue of the Americas
10  New York, New York 10036
    Telephone:  212.755.0010
11  Facsimile:   212.755.0052

12  Attorneys for Plaintiff
    Federal Deposit Insurance Corporation
13  as Receiver for Colonial Bank

14              **UNITED STATES DISTRICT COURT**

15             **CENTRAL DISTRICT OF CALIFORNIA**

16  FEDERAL DEPOSIT INSURANCE          | Case No.
    CORPORATION AS RECEIVER FOR        |
17  COLONIAL BANK,                     | **CV12·6911** ᴿ (ᴿᶻᵒ)
                                       |
18              Plaintiff,             | **COMPLAINT FOR VIOLATION
                                       | OF THE SECURITIES ACT OF
19          v.                         | 1933 (15 U.S.C. §§ 77k AND 77o)**
                                       |
20  COUNTRYWIDE SECURITIES             | **DEMAND FOR JURY TRIAL**
    CORPORATION; CWALT, INC.;          |
21  CWMBS, INC.; COUNTRYWIDE           |
    FINANCIAL CORPORATION; BANK        |
22  OF AMERICA CORPORATION;            |
    BARCLAYS CAPITAL INC.;             |
23  CITIGROUP GLOBAL MARKETS           |
    INC.; CREDIT SUISSE SECURITIES     |
24  (USA) LLC; DEUTSCHE BANK           |
    SECURITIES INC.; EDWARD D.         |
25  JONES & CO., L.P.; J.P. MORGAN     |
    SECURITIES LLC; MERRILL            |
26  LYNCH, PIERCE, FENNER & SMITH      |
    INC.; and RBS SECURITIES INC.;     |
27                                     |
                Defendants.            |
28

FILED
CLERK, U.S. DISTRICT COURT

AUG 1 0 2012

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

1    Plaintiff Federal Deposit Insurance Corporation as Receiver for Colonial Bank

2    for its Complaint against Countrywide Securities Corporation (**Countrywide**

3    **Securities**); CWALT, Inc. (**CWALT**); CWMBS, Inc. (**CWMBS**); Countrywide

4    Financial Corporation (**CFC**); Bank of America Corporation (**BAC**); Barclays

5    Capital Inc. (**Barclays**); Citigroup Global Markets Inc. (**Citigroup**); Credit Suisse

6    Securities (USA) LLC (formerly known as Credit Suisse First Boston LLC and

7    referred to in this Complaint as **Credit Suisse**); Deutsche Bank Securities Inc.

8    (**DBS**); Edward D. Jones & Co., L.P. (**Edward Jones**); J.P. Morgan Securities LLC

9    (formerly known as Bear, Stearns & Co. Inc. and referred to in this Complaint as

10   **Bear Stearns**), which is the successor by merger to J.P. Morgan Securities Inc. (in

11   that capacity referred to in this Complaint as **JP Morgan**); Merrill Lynch, Pierce,

12   Fenner & Smith Inc. (successor by merger to Banc of America Securities LLC,

13   which is referred to in this Complaint as **BAS**); and RBS Securities Inc. (formerly

14   known as Greenwich Capital Markets, Inc. and doing business as RBS Greenwich

15   Capital, and referred to in this Complaint as **RBS**), alleges as follows:

16                          **I. NATURE OF THIS ACTION**

17          1.    This is an action for damages caused by violation of the Securities Act

18   of 1933 (**1933 Act**) by the defendants. As alleged in detail below, defendants issued

19   and underwrote 11 securities known as "certificates," which were backed by

20   collateral pools of residential mortgage loans in ten securitizations. Colonial Bank

21   (**Colonial**) paid approximately $259 million for the 11 certificates. When they issued

22   or underwrote the certificates, the defendants made numerous statements of material

23   fact about the certificates and, in particular, about the credit quality of the mortgage

24   loans that backed them. Many of those statements were untrue. Moreover, the

25   defendants omitted to state many material facts that were necessary in order to make

26   their statements not misleading. For example, the defendants made untrue statements

27   or omitted important information about such material facts as the loan-to-value ratios

28   of the mortgage loans, the extent to which appraisals of the properties that secured

1  the loans were performed in compliance with professional appraisal standards, the

2  number of borrowers who did not live in the houses that secured their loans (that is,

3  the number of properties that were not primary residences), and the extent to which

4  the entities that made the loans disregarded their own standards in doing so.

5      2.      Based on an analysis of a random sample of the loans that backed the

6  certificates that Colonial purchased, the defendants made such untrue or misleading

7  statements about at least the following numbers of loans.

| Securitization No.[1] | Number of Loans about which Defendants Made Material Untrue or Misleading Statements[2] | Number of Loans that Backed the Certificates | Percentage of Loans about which Defendants Made Material Untrue or Misleading Statements |
|---|---|---|---|
| 1 | 312 | 436 | 71.6% |
| 2 | 1,716 | 2,837 | 60.5% |
| 3 | 2,111 | 4,040 | 52.3% |
| 4 | 2,365 | 3,307 | 71.5% |
| 5 | 1,598 | 2,841 | 56.2% |
| 6 | 3,329 | 6,528 | 51.0% |
| 7 | 405 | 589 | 68.8% |
| 8 | 858 | 1,208 | 71.0% |
| 9 | 1,446 | 2,440 | 59.3% |
| 10 | 363 | 459 | 79.1% |

20     3.      The certificates are "securities" within the meaning of the 1933 Act. The

21  defendants are liable under the following provisions of the 1933 Act:

---

[1]   Colonial purchased two certificates in Securitization No. 1.
[2]   The method of random sampling that Plaintiff used ensures that conclusions about the entire collateral pool have a margin of error of no more than plus or minus 6% at a confidence level of 95% (that is, one can be 95% certain that the true percentage in the collateral pool as a whole is within 6% of the percentage measured in the sample). For example, one can be 95% certain that the number of loans in Securitization No. 1 about which defendants made untrue or misleading statements or omissions is within 6% of 312, that is, between 293 and 331. The same margin of error should be applied to all information in the Complaint and accompanying Schedules that is based on a random sample of loans in a collateral pool.

- 3 -

1    *As issuers:* The following defendants, which issued the certificates that

2    Colonial purchased, are liable as "issuers" under Section 11 of the 1933 Act:

3    CWALT, which issued nine of the certificates; and CWMBS, which issued two of

4    the certificates.

5    *As underwriters:* The following defendants, which underwrote the certificates

6    that Colonial purchased, are liable as "underwriters" under Section 11 of the 1933

7    Act: Countrywide Securities, which underwrote nine of the certificates; Edward

8    Jones, which underwrote two of the certificates; DBS, which underwrote two of the

9    certificates; and Barclays, BAS, Bear Stearns, Citigroup, Credit Suisse, JP Morgan,

10   and RBS, each of which underwrote one of the certificates.

11   *As control person:* CFC is liable as a "controlling person" of CWALT,

12   CWMBS, and Countrywide Securities under Section 15 of the 1933 Act, 15 U.S.C. §

13   77o.

14   *As successor:* BAC is liable as the successor to each of CWALT, CWMBS,

15   Countrywide Securities, and CFC.

## II. PARTIES

17   4.    The Federal Deposit Insurance Corporation (**FDIC**) is a corporation

18   organized and existing under the laws of the United States of America. Under the

19   Federal Deposit Insurance Act, the FDIC is authorized to be appointed as receiver for

20   failed insured depository institutions. On August 14, 2009, the FDIC was duly

21   appointed the receiver for Colonial. Under the Federal Deposit Insurance Act, the

22   FDIC as receiver succeeds to, and is empowered to sue and complain in any court of

23   law to pursue, all claims held by banks for which it is the receiver. 12 U.S.C. §§

24   1819, 1821(d)(2)(A)(i). Thus, the FDIC as Receiver for Colonial has authority to

25   pursue claims held by Colonial, including the claims made against the defendants in

26   this action.

27   5.    Defendant Countrywide Securities is a corporation organized under the

28   laws of California with its principal place of business in California.

1      6.      Defendant CWALT is a corporation organized under the laws of

2  Delaware.

3      7.      Defendant CWMBS is a corporation organized under the laws of

4  Delaware.

5      8.      Defendant CFC is a corporation organized under the laws of Delaware.

6  It is the successor by merger to a corporation also named Countrywide Financial

7  Corporation, which will be referred to in this Complaint as **Old CFC**. Old CFC was

8  the public holding company for the entire group of Countrywide companies, which

9  will be referred to collectively in this Complaint as **Countrywide**. Old CFC existed

10 until it was merged on July 1, 2008, into a subsidiary of Bank of America

11 Corporation, which subsidiary was then renamed Countrywide Financial

12 Corporation. By that merger, CFC succeeded to all liabilities of Old CFC, which was

13 merged into CFC.

14     9.      Plaintiff is informed and believes, and based thereon alleges, that Old

15 CFC participated in the operations of Countrywide Securities, CWALT, and

16 CWMBS and had the power to control the conduct of Countrywide Securities,

17 CWALT, and CWMBS in the transactions involved in this Complaint. Under Section

18 15 of the 1933 Act, Old CFC directly or indirectly controlled Countrywide

19 Securities, CWALT, and CWMBS and would therefore have been liable (if it still

20 existed) to Plaintiff jointly and severally with and to the same extent as Countrywide

21 Securities, CWALT, and CWMBS. As a result of the merger of Old CFC into CFC,

22 this liability passed to CFC.

23     10.     Defendant BAC is a corporation organized under the laws of Delaware,

24 and is the public holding company for a group of Bank of America companies. BAC

25 and its subsidiaries will be referred to collectively in this Complaint as **Bank of**

26 **America**.

27     11.     Defendant Barclays is a corporation organized under the laws of

28 Connecticut.

- 5 -

12. Defendant Bear Stearns is a limited liability company organized under the laws of Delaware. Bear Stearns is the successor by merger to J. P. Morgan Securities Inc.

13. Defendant Citigroup is a corporation organized under the laws of New York.

14. Defendant Credit Suisse is a limited liability company organized under the laws of Delaware.

15. Defendant DBS is a corporation organized under the laws of Delaware.

16. Defendant Edward Jones is a limited partnership organized under the laws of Missouri.

17. Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. is a corporation organized under the laws of Delaware. It is the successor by merger to BAS. Merrill Lynch, Pierce, Fenner & Smith Inc. succeeded to all of the liabilities of BAS.

18. Defendant RBS is a corporation organized under the laws of Delaware.

### III. JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 22 of 1933 Act, 15 U.S.C. § 77v, because the claims asserted in this Complaint arise under Sections 11 and 15 of the 1933 Act, 15 U.S.C. §§ 77k and 77o.

20. Venue is proper in this Court pursuant to Section 22 of the 1933 Act, 15 U.S.C. § 77v, because the defendants are found in this district, are inhabitants of this district, and transact business in this district.

### IV. SECURITIZATION OF MORTGAGE LOANS

21. The securities that Colonial purchased are so-called **residential mortgage-backed securities**, or **RMBS**, created in a process known as **securitization**. Securitization begins with loans on which the borrowers are to make payments, usually monthly. The entity that makes the loans is known as the **originator** of the loans. The process by which the originator decides whether to make

- 6 -

1  particular loans is known as the **underwriting** of loans. The purpose of underwriting

2  is to ensure that loans are made only to borrowers of sufficient credit standing to

3  repay them and only against sufficient collateral. In the loan underwriting process,

4  the originator applies its **underwriting standards**.

5      22.    In general, residential mortgage lenders may hold some of the mortgage

6  loans they originate in their own portfolios and may sell other mortgage loans they

7  originate into securitizations.

8      23.    In a securitization, a large number of loans, usually of a similar type, are

9  grouped into a **collateral pool**. The originator of those loans sells them (and, with

10  them, the right to receive the cash flow from them) to a **trust**. The trust pays the

11  originator cash for the loans. The trust raises the cash to pay for the loans by selling

12  **securities**, usually called **certificates**, to investors such as Colonial. Each certificate

13  entitles its holder to an agreed part of the cash flow from the loans in the collateral

14  pool.

15      24.    In a simple securitization, the holder of each certificate is entitled to a

16  *pro rata* part of the overall monthly cash flow from the loans in the collateral pool.

17      25.    In a more complex securitization, the cash flow is divided into different

18  parts, usually called **tranches** ("tranche" is "slice" in French), and the certificates are

19  divided into different **classes**, each with different rights. Each class of certificates is

20  entitled to the cash flow in the tranche corresponding to that class.

21      26.    One way in which the cash flow is divided — and the rights of different

22  classes of certificates distinguished — is by priority of payment or, put differently,

23  risk of nonpayment. The most **senior** class of certificates usually is entitled to be paid

24  in full before the next most senior class, and so on. Conversely, losses from defaults

25  in payment of the loans in the collateral pool are allocated first to the most

26  **subordinate** class of certificates, then to the class above that, and so on. The interest

27  rate on each class of certificates is usually proportional to the amount of risk that that

28  class bears; the most senior certificates bear the least risk and thus pay the lowest rate

- 7 -

1    of interest, the most subordinate, the opposite. This hierarchy of rights to payment is

2    referred to as the **waterfall**.

3        27.    The risk of a particular class of certificate is a function of both the

4    riskiness of the loans in the collateral pool and the seniority of that class in the

5    waterfall. Even if the underlying loans are quite risky, the certificates may bear so

6    little of that risk that they may be rated as **triple-A**. (According to Moody's,

7    "[o]bligations rated Aaa are judged to be of the highest quality, with minimal credit

8    risk.") For example, assume a securitization of $100 million of risky loans, on which

9    the historical loss rate is 5%. Assume that there are two classes of certificates, a

10    senior class of $50 million and a subordinate class of $50 million. Even though the

11    underlying loans are quite risky, the senior class of certificates would be paid in full

12    as long as the $100 million of loans produced payments of at least $50 million plus

13    interest, that is, unless the loss rate on those loans exceeded 50%, fully ten times the

14    historical average. All of the certificates referred to in this Complaint were rated

15    triple-A when Colonial purchased them.

16        28.    Each securitization has a **sponsor**, the prime mover of the securitization.

17    Sometimes the sponsor is the originator or an affiliate. In originator-sponsored

18    securitizations, the collateral pool usually contains loans made by the originator that

19    is sponsoring the securitization. Other times, the sponsor may be an investment bank,

20    which purchases loans from one or more originators, aggregates them into a

21    collateral pool, sells them to a trust, and securitizes them. The sponsor arranges for

22    title to the loans to be transferred to an entity known as the **depositor**, which then

23    transfers title to the loans to the trust.

24        29.    The obligor of the certificates in a securitization is the trust that

25    purchases the loans in the collateral pool. Because a trust has few assets other than

26    the loans that it purchased, it may not be able to satisfy the liabilities of an issuer of

27    securities (the certificates). The law therefore treats the depositor as the **issuer** of a

28    residential mortgage-backed certificate.

30.   **Securities underwriters**, like Barclays, BAS, Bear Stearns, Citigroup, Countrywide Securities, Credit Suisse, DBS, Edward Jones, JP Morgan, and RBS, play a critical role in the process of securitization. They underwrite the sale of the certificates, that is, they purchase the certificates from the trust and then sell them to investors. Equally important, securities underwriters provide to potential investors the information that they need to decide whether to purchase certificates.

31.   Because the cash flow from the loans in the collateral pool of a securitization is the source of funds to pay the holders of the certificates issued by the trust, the credit quality of those certificates is dependent upon the credit quality of the loans in the collateral pool (and upon the place of each certificate in the waterfall). The most important information about the credit quality of those loans is contained in the files that the originator develops while making the loans, the so-called "loan files." For residential mortgage loans, each loan file normally contains comprehensive information from such important documents as the borrower's application for the loan, credit reports on the borrower, and an appraisal of the property that will secure the loan. The loan file may also include notes from the person who underwrote the loan about whether and how the loan complied with the originator's underwriting standards, including documentation of any "compensating factors" that justified any departure from those standards.

32.   Potential investors in certificates are not given access to loan files. Instead, the securities underwriters are responsible for gathering, verifying, and presenting to potential investors the information about the credit quality of the loans that will be deposited into the trust. They do so by using information about the loans that has been compiled into a database known as a **loan tape**. The securities underwriters use the loan tape to compile numerous statistics about the loans, which are presented to potential investors in a **prospectus supplement**, a disclosure document that the underwriters are required to file with the Securities and Exchange Commission. (Colonial did not have access to the loan tapes before it purchased the

- 9 -

1   certificates, but Plaintiff has reviewed data from the loan tapes in preparing this

2   Complaint.)

3        33.   As alleged in detail below, the information in the prospectus

4   supplements and other offering documents about the credit quality of the loans in the

5   collateral pools of the trusts contained many statements that were material to the

6   credit quality of those loans, but were untrue or misleading.

7   ## V. DEFENDANTS' MATERIAL UNTRUE OR MISLEADING
## STATEMENTS ABOUT THE CERTIFICATES

8

9        34.   Colonial purchased 11 certificates in ten securitizations (referred to in

10   this Complaint as Securitizations Nos. 1 through 10). Details of each securitization

11   and each certificate are stated in Item 34 of Schedules 1 through 10 of this

12   Complaint, which correspond to Securitizations Nos. 1 through 10. Plaintiff

13   incorporates into this paragraph 34 and alleges as though fully set forth in this

14   paragraph, the contents of Item 34 of the Schedules.

15        35.   The prospectus supplement for each of the ten securitizations is

16   available from the Securities and Exchange Commission's website. A URL for each

17   prospectus supplement is included in Item 34 of the Schedules. The prospectus

18   supplements are incorporated into this Complaint by reference.

19        36.   In general, Plaintiff drew and analyzed a random sample of 400 loans

20   from the collateral pool of each securitization in which Colonial purchased a

21   certificate.[3]

22        37.   Many of the statements of material fact that the defendants made in the

23   prospectus supplements were untrue or misleading. These untrue or misleading

24   statements included the following.

25

26

27   [3]   The group of loans that backed the certificates that Colonial purchased in
Securitization No. 1 only had 436 loans. For that group, Plaintiff analyzed the 194
28   loans on which data were available.

**A.**   **Untrue or Misleading Statements About the Loan-to-Value Ratios (LTVs) of the Mortgage Loans, and the Appraisals of the Properties, in the Collateral Pools**

   **1.**   **LTVs**

      **(a)**   **The materiality of LTVs**

38.   The loan-to-value ratio of a mortgage loan, or LTV, is the ratio of the amount of the mortgage loan to the lower of the appraised value or the sale price of the mortgaged property when the loan is made. For example, a loan of $300,000 secured by a property valued at $500,000 has an LTV of 60%; a loan of $450,000 on the same property has an LTV of 90%. LTV is one of the most crucial measures of the risk of a mortgage loan, and the LTVs of the mortgage loans in the collateral pool of a securitization are therefore one of the most crucial measures of the risk of certificates sold in that securitization. LTV is a primary determinant of the likelihood of default. The lower the LTV, the lower the likelihood of default. For example, the lower the LTV, the less likely it is that a decline in the value of the property will wipe out the owner's equity and thereby give the owner an incentive to stop making mortgage payments and abandon the property, a so-called strategic default. LTV also is a primary determinant of the severity of losses on a loan that defaults. The lower the LTV, the lower the severity of losses if the loan defaults. Loans with lower LTVs provide greater "cushion," thereby increasing the likelihood that the proceeds of foreclosure will cover the unpaid balance of the mortgage loan.

39.   Beyond these fundamental effects on the likelihood and severity of default, LTVs also affect prepayment patterns (that is, the number of borrowers who pay off their mortgage loans before maturity and when they do so) and therefore the expected lives of the loans. Prepayment patterns therefore affect many aspects of certificates that are material to the investors that purchase them, including the life of the certificate and the timing and amount of cash that the investor will receive during that life.

40.     In addition, rating agencies use LTVs to determine the proper structuring and credit enhancement necessary for securities, such as the certificates that Colonial purchased, to receive a particular rating. If the LTVs of the mortgage loans in the collateral pool of a securitization are incorrect, the ratings of certificates sold in that securitization will also be incorrect.

41.     An accurate denominator (that is, the value of the property) is essential to an accurate LTV. In particular, an inflated denominator will understate, sometimes greatly, the risk of a loan. To return to the example above, if the property whose actual value is $500,000 is valued incorrectly at $550,000, then the ostensible LTV of the $300,000 loan falls from 60% to 54.5%, and the ostensible LTV of the $450,000 loan falls from 90% to 81.8%. In either case, the LTV based on the incorrect appraised value understates the risk of the loan.

42.     For these reasons, a reasonable investor considers LTV critical to the decision whether to purchase a certificate in a securitization of mortgage loans. Even small differences in the weighted average LTVs of the mortgage loans in the collateral pool of a securitization have a significant effect on both the risk and the rating of each certificate sold in that securitization and, thus, are essential to the decision of a reasonable investor whether to purchase any such certificate.

**(b)     Untrue or misleading statements about the LTVs of the mortgage loans in the collateral pools of these securitizations**

43.     In the prospectus supplements, the defendants made material untrue or misleading statements about the LTVs of the mortgage loans in the collateral pools of these securitizations. Each such statement is identified in Item 43 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 43, and alleges as though fully set forth in this paragraph, the contents of Item 43 of the Schedules.

44.     The defendants made these statements as statements of fact. Plaintiff is informed and believes, and based thereon alleges, that the defendants intended that these statements be understood as statements of fact. Colonial did understand the

1    statements about the LTVs as statements of fact. Colonial had no access to appraisal
2    reports or other documents or information from which it could verify the LTVs of the
3    mortgage loans other than the statements that the defendants made about those LTVs.

**(c)    An automated valuation model demonstrates that the
defendants' statements about the LTVs were untrue
because they were based on overstated valuations of the
properties in the collateral pools.**

7        45.    The stated LTVs of many of the mortgage loans in the securitizations
8    were significantly lower than the true LTVs because the denominators (that is, the
9    value of the properties that secured those loans) that were used to determine the
10   disclosed LTVs were overstated to a material extent. The weighted-average LTVs
11   presented in the prospectus supplements were, therefore, untrue and misleading.

12       46.    Using a comprehensive, industry-standard automated valuation model
13   (**AVM**), it is possible to determine the true market value of a certain property as of a
14   specified date. An AVM is based on objective criteria like the condition of the
15   property and the actual sale prices of comparable properties in the same locale
16   shortly before the specified date, and is more consistent, independent, and objective
17   than other methods of appraisal. AVMs have been in widespread use for many years.
18   The AVM on which these allegations are based incorporates a database of 500
19   million sales covering ZIP codes that represent more than 97% of the homes,
20   occupied by more than 99% of the population, in the United States. Independent
21   testing services have determined that this AVM is the most accurate of all such
22   models.

23       47.    For many of the properties that secured the mortgage loans, the model
24   determined that the LTVs presented in the prospectus supplements were understated.
25   In particular, for many of the properties, the model determined that the denominator
26   (that is, the appraised value of the property as stated in the loan tape and compiled
27   into the tables in the prospectus supplement) that was used in the disclosed LTV was
28   105% or more of the true market value as determined by the model as of the date on

- 13 -

1   which each individual mortgage loan closed. (The model considered no transactions

2   that occurred after that date.) In contrast, the model determined that the denominator

3   that was used in the disclosed LTV was 95% or less of the true market value on a

4   much smaller number of properties. Thus, the number of properties on which the

5   value was overstated exceeded by far the number on which the value was

6   understated, and the aggregate amount overstated exceeded by far the aggregate

7   amount understated.

8       48.   For example, in Securitization No. 1, there were 436[4] mortgage loans

9   that backed the certificates that Colonial purchased. On 139 of the properties that

10   secured those loans, the model determined that the denominator that was used in the

11   disclosed LTV was 105% or more of the true market value and the amount by which

12   the stated values of those properties exceeded their true market values in the

13   aggregate was $25,213,984. The model determined that the denominator that was

14   used in the disclosed LTV was 95% or less of true market value on only 43

15   properties, and the amount by which the true market values of those properties

16   exceeded the values reported in the denominators was $4,849,117. Thus, the number

17   of properties on which the value was overstated exceeded by more than three times

18   the number on which the value was understated, and the aggregate amount overstated

19   was more than five times the aggregate amount understated.

20       49.   On one of the loans in Securitization No. 1, the amount of the loan was

21   $480,000 and the stated value of the property was $600,000, resulting in a stated

22   LTV of 80%. The model, however, determined that the true value of the property was

23   $421,000, resulting in a true LTV of 114%. Thus, the stated value was higher than

24   the true value by 42.5%, and the stated LTV was lower than the true LTV by 34%.

25   Both of these were huge discrepancies that were material to the credit quality of the

26   loan.

27      [4]  On the closing date of the securitization, there were 402 mortgage loans in the trust. After the closing date of the securitization, the trust purchased an additional 34

28   mortgage loans.

50.   The overstated values of 139 properties made virtually every statement by the defendants about the LTVs of the mortgage loans untrue or misleading. For example, the defendants stated that all mortgage loans had an LTV of 100% or less. In fact, 36 of the mortgage loans had LTVs of over 100%. Defendants also stated that the weighted-average LTV of the loans in the collateral pool was 74.65%. In fact, the weighted-average LTV of the loans was 92.3%. These differences were material for the reasons stated above.

51.   The results of the valuations by the automated model in this example are summarized in the following table.

| | |
|---|---:|
| Number of loans that backed the certificates | 436 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 139 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $25,213,984 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 43 |
| Aggregate amount by which the true market values of those properties exceeded their stated values | $4,849,117 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 36 |
| Weighted-average LTV, as stated by defendants | 74.65% |
| Weighted-average LTV, as determined by the model | 92.3% |

52.   The model produced similar results for the mortgage loans in the collateral pools of each securitization. Details of the results of the model for each securitization are stated in Item 52 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 52, and alleges as though fully set forth in this paragraph, the contents of Item 52 of the Schedules.

/ / /

/ / /

/ / /

- 15 -

**(d)**    **These statements also were misleading because the defendants omitted to state that there were additional liens on a material number of the properties that secured the mortgage loans in the collateral pools.**

53.    As mentioned above, the LTV of a mortgage loan is a key determinant of the likelihood that the mortgagor will default in payment of the mortgage. The lower the LTV, the less likely that a decline in the value of the property will wipe out the owner's equity and thereby give the owner an incentive to stop making mortgage payments and abandon the property. Because LTV affects the behavior of borrowers so profoundly, accurate LTVs are essential to predicting defaults and prepayments by borrowers. Also, as mentioned above, LTV affects the severity of loss on those loans that do default. The power of LTV to predict defaults, prepayments, and severities is a major reason why reasonable investors consider the LTVs of mortgage loans important to the decision whether to purchase a certificate in the securitization of those loans.

54.    The predictive power of the LTV of a mortgage loan is much reduced if there are additional liens on the same property. Additional liens reduce the owner's equity in the property and thereby increase the owner's incentive to stop making mortgage payments and abandon the property if the value of the property falls below the combined amount of all of the liens on the property (a strategic default). Additional liens also exacerbate delinquencies and defaults because they complicate the servicing of mortgage loans and the management of delinquencies and defaults. Servicers of the first-lien mortgage must then deal not only with the borrower, but also with the servicer of the second-lien mortgage. For example, the servicer of a single mortgage may want to grant a borrower forbearance while the borrower is unemployed and allow him or her to add missed payments to the principal of the loan and to resume payments when he or she is employed again. But the servicer of the second-lien mortgage may refuse such forbearance and initiate foreclosure and thereby force the borrower into default on the first mortgage as well.

- 16 -

1    55.    According to land records, many of the properties that secured mortgage

2    loans in the collateral pools of the securitizations were subject to liens in addition to

3    the lien of the mortgage in the pool at the time of the closing of these securitizations.[5]

4    The defendants failed to disclose in the prospectus supplements any of these

5    additional liens. These additional liens increased the risk that those owners would

6    default in payment of the mortgage loans.

7    56.    To take an example, of the 436 properties that secured the mortgage

8    loans that backed the certificates that Colonial purchased in Securitization No. 1, at

9    least 164 were subject to liens in addition to the lien represented by the mortgage in

10    the collateral pool. The defendants did not disclose in the prospectus supplement that

11    those liens existed. Defendants stated that the weighted-average LTV of the

12    properties was 74.65%, when, solely because of the additional liens on these 164

13    properties, the weighted-average combined LTV was 80.8%.[6] This is a significant

14    difference.

15    57.    On one of the loans, the original balance of the mortgage loan was

16    $524,000, the represented value of the property was $655,250, and the reported LTV

17    was 80%. On the date of the closing of this securitization, however, there were

18    undisclosed additional liens on this property of $131,055. Thus, when all liens on the

19    property were taken into account, the combined LTV of the loan was 100%, which

20    was 20% higher than the stated LTV on that loan. This was a huge discrepancy that

21    was material to the credit quality of the loan. In many cases, the amount of the

22    undisclosed additional liens was much greater than the owner's ostensible equity,

23    putting the owner "under water" on the day on which this securitization closed.

24

25    [5]    In order to ensure that this calculation did not include liens that were paid off

26    but were not promptly removed from land records, the additional liens referred to in
      this Complaint and the Schedules do not include liens that were originated on or

27    before the date on which each mortgage loan in the pools was closed.
      [6]    The combined LTV is the ratio of all loans on a property to the value of the

28    property.

- 17 -

58.   Details of the undisclosed additional liens in the securitizations are stated in Item 58 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 58, and alleges as though fully set forth in this paragraph, the contents of Item 58 of the Schedules. Plaintiff is informed and believes, and based thereon alleges, that discovery will demonstrate that the number of loans with additional liens is substantially higher than those disclosed in the Schedules.

59.   Because the defendants did not disclose the existence or the amounts of these additional liens, all of the statements that they made about the LTVs of the mortgage loans were misleading.

### 2.   Appraisals

60.   As discussed above in paragraph 41, an accurate denominator (value of the mortgaged property) is essential to calculating an accurate LTV. An accurate appraisal of the property, in turn, is essential to identifying an accurate denominator.

61.   In connection with these securitizations, there was undisclosed upward bias in appraisals of properties that secured mortgage loans and consequent understatement of the LTVs of those loans. This upward bias in appraisals caused the denominators that were used to calculate the LTVs of many mortgage loans to be overstated and, in turn, the LTVs to be understated. The defendants' statements regarding the LTVs of the mortgage loans in the collateral pools were misleading because they omitted to state that the appraisals of a material number of the properties that secured those loans were biased upwards. In addition, the defendants stated that the appraisals conformed to the Uniform Standards of Professional Appraisal Practice (**USPAP**), the professional standards that govern appraisers and appraisals (or to the standards of Fannie Mae and Freddie Mac, which required compliance with USPAP). Those statements were false because upwardly biased appraisals do not conform to USPAP.

COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 (15 U.S.C. §§ 77k AND 77o)

      **(a)**    **The statements that the defendants made about the LTVs of the mortgage loans in the collateral pools were misleading because they omitted to state that the appraisals of a large number of the properties that secured those loans were biased upward, so that stated LTVs based on those appraisals were lower than the true LTVs of those mortgage loans.**

62.     The defendants omitted to state that the appraisals in these securitizations used inaccurate property descriptions, ignored recent sales of the subject and comparable properties, and used sales of properties that were not comparable, all in order to inflate the values of the appraised properties. The appraisals used to compute the LTVs of many of the mortgage loans in the collateral pools were biased upwards. As alleged in paragraphs 46 through 52, in each trust, the number of properties for which the value was overstated exceeded by far the number for which the value was understated, and the aggregate amount overstated exceeded by far the aggregate amount understated. These ratios for each trust are summarized in the following table:

| Securitization No. | Ratio of Number of Properties Whose Value Was Overstated to Number Whose Value Was Understated | Ratio of Amount of Overvaluation to Amount of Undervaluation |
|---|---|---|
| 1 | 3.3 | 5.2 |
| 2 | 2.3 | 2.3 |
| 3 | 1.4 | 1.2 |
| 4 | 2.7 | 3.6 |
| 5 | 6.2 | 4.9 |
| 6 | 5.0 | 4.3 |
| 7 | 6.5 | 5.3 |
| 8 | 11.6 | 11.5 |
| 9 | 2.8 | 2.3 |
| 10 | 8.8 | 14.3 |

These lopsided results demonstrate the upward bias in appraisals of properties that secured the mortgage loans in the collateral pools.

63.     Plaintiff is informed and believes, and based thereon alleges, that a material number of the upwardly biased appraisals were not statements of the appraisers' actual findings of the values of the properties based on their objective valuations.

**(b)     The statements by the defendants about compliance with USPAP were untrue because the appraisals of a large number of the properties that secured the mortgage loans were biased upward.**

64.     Appraisers and appraisals are governed by USPAP, which is promulgated by the Appraisal Standards Board. The Preamble to USPAP states that its purpose "is to promote and maintain a high level of public trust in appraisal practice." Both Fannie Mae and Freddie Mac require that appraisals comply with USPAP.

65.     USPAP includes the following provisions:

(a)     USPAP Standards Rule 2-1(b)(iii) requires that "Each written or oral real property appraisal report must clearly and accurately set forth the appraisal in a manner that will not be misleading."

(b)     USPAP Standards Rule 1-4(a) provides that "When a sales comparison approach is necessary for credible assignment results, an appraiser must analyze such comparable sales data as are available to indicate a value conclusion."

(c)     USPAP Standards Rule 1-4(b) provides that "When a cost approach is necessary for credible assignment results, an appraiser must:

(i)     develop an opinion of site value by an appropriate appraisal method or technique;

(ii)     analyze such comparable cost data as are available to estimate the cost new of the improvements (if any); and

(iii)     analyze such comparable data as are available to estimate the difference between the cost new and the present worth of the improvements (accrued depreciation)."

- 20 -

66.     The Appraisal Standards Board, which promulgates USPAP, also issues Advisory Opinions. Although the Advisory Opinions do not establish new standards or interpret USPAP, they "are issued to illustrate the applicability of appraisal standards in specific situations." Advisory Opinion 1 discussing "Sales History" states that "The requirement for the appraiser to analyze and report sales history and related information is fundamental to the appraisal process. Just as the appraiser must analyze pending and recent sales of comparable properties, the appraiser must take into account all pending and recent sales of the subject property itself."

67.     In the prospectus supplements, the defendants made statements that the appraisals of properties that secured the mortgage loans in the collateral pools were made in compliance with USPAP or with the appraisal standards of Fannie Mae and Freddie Mac, which required compliance with USPAP. Details of each such statement are stated in Item 67 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 67, and alleges as though fully set forth in this paragraph, the contents of Item 67 of the Schedules.

68.     Plaintiff is informed and believes, and based thereon alleges, that a material number of mortgage loans in the collateral pools had appraisals conducted that deviated from USPAP.

69.     Each of the statements referred to in paragraph 67 was untrue because the appraisals of a material number of the properties referred to in each such statement did not conform to USPAP.

70.     By each of the untrue and misleading statements referred to in paragraphs 43 and 67 above, the defendants materially understated the risk of the certificates that they issued or underwrote.

/ / /

/ / /

/ / /

- 21 -

**B.   Untrue or Misleading Statements About the Occupancy Status of the Properties That Secured the Mortgage Loans in the Collateral Pools**

**1.   The materiality of occupancy status**

71.   Residential real estate is usually divided into primary residences, second homes, and investment properties. Mortgages on primary residences are less likely to default than mortgages on non-owner-occupied residences and therefore are less risky. Occupancy status also influences prepayment patterns.

72.   Occupancy status (that is, whether the property that secures a mortgage is to be the primary residence of the borrower, a second home, or an investment property) is an important measure of the risk of a mortgage loan. The percentage of loans in the collateral pool of a securitization that are not secured by mortgages on primary residences is an important measure of the risk of certificates sold in that securitization. Other things being equal, the higher the percentage of loans not secured by primary residences, the greater the risk of the certificates. A reasonable investor considers occupancy status important to the decision whether to purchase a certificate in a securitization of mortgage loans.

**2.   Untrue or misleading statements about the occupancy status of the properties that secured the mortgage loans in the collateral pools of these securitizations**

73.   In the prospectus supplements, the defendants made statements about the number of properties in the collateral pools of the securitizations that were the primary residences of their owners. To return to the example of Securitization No. 1, the defendants stated that of the 402 initial mortgage loans that backed the certificates that Colonial purchased, at least 369 were secured by primary residences and 33 were not. Details of each such statement in the securitizations are stated in Item 73 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 73, and alleges as though fully set forth in this paragraph, the contents of Item 73 of the Schedules.

- 22 -

74.     These statements were untrue or misleading because (i) the stated number of mortgage loans secured by primary residences was higher than the actual number of loans in that category or (ii) the stated number of mortgage loans not secured by primary residences was lower than the actual number of loans in that category.

> **3.      Basis of the allegations above that these statements about the occupancy status of the properties that secured the mortgage loans in the collateral pools were untrue or misleading**

75.     Because they are less risky than other mortgage loans, mortgage loans on primary residences usually have more favorable terms, including lower interest rates and more lenient underwriting standards, than mortgage loans on second homes and investment properties. Applicants for loans on second homes and investment properties therefore have an incentive to state that the property will be their primary residence even when it will not. Plaintiff is informed and believes, and based thereon alleges, that borrowers of many securitized loans did so.

76.     A significant number of the properties in the collateral pools of the securitizations that were stated to be primary residences actually were not. Moreover, Plaintiff is informed and believes, and based thereon alleges, that there is additional evidence of occupancy fraud in the loan files of many more of the mortgage loans in the collateral pools.

77.     With respect to some of the properties that were stated to be primary residences, the borrower instructed local tax authorities to send the bills for the taxes on the property to the borrower at an address other than the property itself. This is strong evidence that the mortgaged property was not the borrower's primary residence.

78.     In some states and counties, the owner of a property is able to designate whether that property is his or her "homestead," which may reduce the taxes on that property or exempt the property from assets available to satisfy the owner's creditors, or both. An owner may designate only one property, which he or she must occupy, as

- 23 -

1  his or her homestead. The fact that an owner in one of these jurisdictions does not

2  designate a property as his or her homestead when he or she can do so is strong

3  evidence that the property was not his or her primary residence. With respect to some

4  of the properties that were stated to be primary residences, the owner could have but

5  did not designate the property as his or her homestead. That omission is strong

6  evidence that the property was not the borrower's primary residence.

7      79.   When a borrower actually occupies a newly mortgaged property, he or

8  she normally notifies entities that send bills to him or her (such as credit card

9  companies, utility companies, and local merchants) to send his or her bills to the

10  address of the newly mortgaged property. Six months after the closing of the

11  mortgage is ample time to complete this process. Six months after the closing of the

12  mortgage, if the borrower is still receiving his or her bills at a different address, it is

13  very likely that the borrower does not occupy the mortgaged property. For each

14  securitization, a credit reporting agency specializing in mortgage loans compared the

15  addresses in the borrowers' credit reports to the addresses of the mortgaged

16  properties six months after the closing of the mortgage loans. Many borrowers whose

17  mortgage loans were secured by properties that were stated in the loan tapes to be

18  owner-occupied did not receive any bills at the address of the mortgaged property but

19  did receive their bills at another address or addresses. It is very likely that each of

20  these borrowers did not occupy the mortgaged property.

21      80.   In Securitization No. 1, 56 owners of properties that were stated to be

22  primary residences instructed local tax authorities to send the bills for the taxes on

23  those properties to them at different addresses; 99 owners of properties that were

24  stated to be primary residences could have, but did not, designate those properties as

25  their homesteads; and 4 owners of properties that were stated to be primary

26  residences did not receive any of their bills there six months after the mortgages were

27  originated. Eliminating duplicates, for one or more of these reasons, 139 of the 369

28  properties that were stated to be primary residences actually were not. Thus, the

1   number of properties that were not primary residences was not 33, as defendants

2   stated, but at least 172, a material difference. The numbers of such loans in the

3   collateral pools of the securitizations are stated in Item 80 of the Schedules of this

4   Complaint. Plaintiff incorporates into this paragraph 80, and alleges as though fully

5   set forth in this paragraph, the contents of Item 80 of the Schedules.

6       81.    By each of the untrue and misleading statements referred to in paragraph

7   73, the defendants materially understated the risk of the certificates that they issued

8   or underwrote.

9    **C.   Untrue or Misleading Statements About the Underwriting**
         **Standards of the Originators of the Mortgage Loans in the**
10        **Collateral Pools**

11            **1.    The materiality of underwriting standards and the extent of**
                  **an originator's disregard of them**
12

13      82.    Originators of mortgage loans have written standards by which they

14   underwrite applications for loans. An important purpose of underwriting is to ensure

15   that the originator makes mortgage loans only in compliance with those standards

16   and that its underwriting decisions are properly documented. An even more

17   fundamental purpose of underwriting mortgage loans is to ensure that loans are made

18   only to borrowers with credit standing and financial resources to repay the loans, and

19   only against collateral with value, condition, and marketability sufficient to secure

20   the loans. An originator's underwriting standards, and the extent to which the

21   originator does not follow its standards, are important indicators of the risk of

22   mortgage loans made by that originator and of certificates sold in a securitization in

23   which mortgage loans made by that originator are part of the collateral pool. A

24   reasonable investor considers the underwriting standards of originators of mortgage

25   loans in the collateral pool of a securitization, and whether an originator disregards

26   its standards, important to the decision whether to purchase a certificate in that

27   securitization.

28

- 25 -

**2.    Untrue or misleading statements about the underwriting standards of originators of the mortgage loans**

83.    In the prospectus supplements, the defendants made statements about the underwriting standards of the originators of the mortgage loans in the collateral pools. Details of each such statement are stated in Item 83 of the Schedules of this Complaint. They included statements that the originators made mortgage loans in compliance with their underwriting standards and made exceptions to those standards only when compensating factors were present. Plaintiff incorporates into this paragraph 83, and alleges as though fully set forth in this paragraph, the contents of Item 83 of the Schedules.

84.    Plaintiff is informed and believes, and based thereon alleges, that these statements were untrue or misleading because the defendants omitted to state that: (a) the originators were disregarding those underwriting standards; (b) the originators were making extensive exceptions to those underwriting standards when no compensating factors were present; (c) the originators were making wholesale, rather than case-by-case, exceptions to those underwriting standards; (d) the originators were making mortgage loans that borrowers could not repay; and (e) the originators were failing frequently to follow quality-assurance practices necessary to detect and prevent fraud intended to circumvent their underwriting standards.

**3.    Basis of the allegations that these statements about the underwriting standards of the originators of the mortgage loans in the collateral pools were untrue or misleading**

**(a)    The deterioration in undisclosed credit characteristics of mortgage loans made by these originators**

85.    Plaintiff is informed and believes, and based thereon alleges, that before and during the time of these securitizations, Countrywide Home Loans, Inc. (**CHL**), which originated or acquired most of the loans in the securitizations, disregarded its stated underwriting standards. As a result, securitized mortgage loans made between 2004 and the dates of these securitizations have experienced high rates of

- 26 -

1 | delinquency and default.

2 |     86.    The high rates of delinquency and default were caused not so much by

3 | any deterioration in credit characteristics of the loans that were expressly embodied

4 | in underwriting standards and disclosed to investors, but rather by deterioration in

5 | credit characteristics that were not disclosed to investors.

6 |     87.    Plaintiff is informed and believes that what was true about recently

7 | securitized mortgage loans in general was true in particular of loans originated by the

8 | entities that originated the loans in the collateral pools of these securitizations, as the

9 | following figures demonstrate. Taking the originator CHL, Figure 1 shows the rising

10 | incidence of early payment defaults (or **EPDs**), that is, the percent of loans (by

11 | outstanding principal balance) that were originated and sold into securitizations by

12 | CHL and that became 60 or more days delinquent within six months after they were

13 | made. An EPD is strong evidence that the originator did not follow its underwriting

14 | standards in making the loan. Underwriting standards are intended to ensure that

15 | loans are made only to borrowers who can and will make their mortgage payments.

16 | Because an EPD occurs so soon after the mortgage loan was made, it is much more

17 | likely that the default occurred because the borrower could not afford the payments

18 | in the first place (and thus that the underwriting standards were not followed), than

19 | because of changed external circumstances unrelated to the underwriting of the

20 | mortgage loan (such as that the borrower lost his or her job). The bars in Figure 1

21 | depict the incidence of EPDs in loans originated by CHL that were sold into

22 | securitizations. The steady increase in EPDs is further evidence that the deterioration

23 | in the credit quality of those loans was caused by disregard of underwriting

24 | standards.

25 | / / /

26 | / / /

27 | / / /

28 |



Figure 1: Percent of Loans Originated by Countrywide Home Loans, Inc. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination

88.    Figure 2 shows the weighted-average disclosed LTVs of the same loans and weighted-average disclosed credit scores of the borrowers. These were nearly constant, showing that the deterioration in the credit quality of the loans was caused not by these disclosed factors, but rather by undisclosed factors.



Figure 2: Percent of Loans Originated by Countrywide Home Loans, Inc. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

- 28 -

**(b)** **The poor performance of the loans in these pools demonstrates that the originators disregarded their underwriting guidelines when making these loans.**

89. As noted above, an EPD is evidence that the originator may have disregarded its underwriting standards in making the loan. The mortgage loans in some of the collateral pools of these securitizations experienced EPDs. These EPDs are evidence that the originators of those loans may have disregarded their underwriting standards when making those loans. The number and percent of the loans in each pool that suffered EPDs are stated in Item 89 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 89, and alleges as though fully set forth in this paragraph, the contents of Item 89 of the Schedules.

90. A high rate of delinquency at any time in a group of mortgage loans is also evidence that the originators of those loans may have disregarded their underwriting standards in making the loans. A common measure of serious delinquency is the number of loans on which the borrowers were ever 90 or more days delinquent in their payments. The mortgage loans in the collateral pools have experienced very high rates of delinquencies by this measure. These high rates of delinquencies are strong evidence that the originators of those loans may have disregarded their underwriting standards when making those loans. The number and percent of the loans in each pool that suffered delinquencies of 90 days or more are stated in Item 90 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 90, and alleges as though fully set forth in this paragraph, the contents of Item 90 of the Schedules.

91. A second common measure of delinquency is the number of loans on which the borrowers are 30 or more days delinquent at a given point in time. The mortgage loans in the collateral pools have experienced very high rates of delinquencies by this measure. These high rates of delinquencies are strong evidence that the originators of those loans may have disregarded their underwriting standards when making those loans. The number and percent of the loans in each pool that

- 29 -

1   were 30 or more days delinquent on January 31, 2012, are stated in Item 91 of the

2   Schedules of this Complaint. Plaintiff incorporates into this paragraph 91, and alleges

3   as though fully set forth in this paragraph, the contents of Item 91 of the Schedules.

4                  **(c)**      **Other evidence shows that Countrywide Home Loans,**

5                            **Inc. disregarded its underwriting standards.**

6        92.    In addition to the statistical data cited above, other evidence shows that

7   CHL (which originated or acquired most of the loans in the collateral pools of the ten

8   securitizations), did not follow its stated underwriting standards.

9        93.    Many loans that Countrywide originated were outside its already lax

10   underwriting standards, because Countrywide frequently disregarded even those

11   standards and made loans that borrowers could not afford to pay. *See* Complaint at 4,

12   *S.E.C. v. Mozilo*, No. CV 09–3994–JFW (MANx) (C.D. Cal. 2009). In a

13   memorandum dated December 13, 2007, the enterprise risk assessment officer at

14   Countrywide stated that "borrower repayment capacity was not adequately assessed

15   by the bank during the underwriting process for home equity mortgage loans." *Id.* at

16   23-24. In an email dated June 1, 2006, Countrywide's Chairman and CEO Angelo

17   Mozilo wrote that borrowers "are going to experience a payment shock which is

18   going to be difficult if not impossible for them to manage." *Id.* at 37.

19        94.    Moreover, Countrywide "viewed borrowers as nothing more than the

20   means for producing more loans, originating loans with little or no regard to

21   borrowers' long-term ability to afford them." Complaint at 5, *California v.*

22   *Countrywide Financial Corp.*, No. LC083076 (Cal. Super. 2008). Indeed, "to

23   increase market share, [Countrywide] dispensed with many standard underwriting

24   guidelines . . . to place unqualified borrowers in loans which ultimately they could

25   not afford." Complaint at 5, *Washington v. Countrywide Financial Corp.*, No. 09-2-

26   01690-6 (Wash. Super. 2009).

27        95.    Plaintiff is informed and believes, and based thereon alleges, that

28   Countrywide did not adhere to its own underwriting standards, but instead

1  abandoned, ignored, or disregarded them. According to internal Countrywide

2  documents, Mozilo admitted that loans "had been originated 'through our channels

3  with disregard for process [and] compliance with guidelines.'" Complaint at 20-21,

4  *S.E.C. v. Mozilo*, No. CV 09–3994–JFW (MANx) (C.D. Cal. 2009). Moreover,

5  Countrywide did whatever it took to sell as many loans as it could, as quickly as

6  possible, including by disregarding its underwriting standards. *See* Complaint at 5,

7  *California v. Countrywide Financial Corp.*, No. LC083076 (Cal. Super. 2008).

8      96.    Plaintiff is informed and believes, and based thereon alleges, that

9  Countrywide made exceptions to its underwriting standards where no compensating

10  factors existed, resulting in higher rates of default, and used as "compensating

11  factors" variables such as a borrower's credit score and LTV, which had already been

12  used to determine that the loan did not fall within the guidelines. Complaint at 20-21,

13  *S.E.C. v. Mozilo*, No. CV 09–3994–JFW (MANx) (C.D. Cal. 2009). Such

14  "compensating factors" did not actually compensate for anything and did not "offset"

15  any risk.

16      97.    According to the Financial Crisis Inquiry Commission, Countrywide

17  made loans that it knew borrowers could not afford to pay. In its final report, the

18  FCIC noted that "Countrywide recognized that many of the loans they were

19  originating could result in 'catastrophic consequences'" because the borrowers could

20  not afford to pay. FINANCIAL CRISIS INQUIRY COMMISSION, THE FINANCIAL INQUIRY

21  REPORT xxii (Public Affairs Reports, 2011).

22      98.    Finally, Plaintiff is informed and believes, and based thereon alleges,

23  that Countrywide did not apply its underwriting standards in accordance with all

24  federal, state, and local laws. Countrywide has entered into agreements to settle

25  charges of violation of predatory lending, unfair competition, false advertising, and

26  banking laws with the attorneys general of at least 38 states, including Alaska,

27  Arizona, California, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho,

28  Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Michigan,

- 31 -

Mississippi, Montana, Nebraska, Nevada, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Dakota, Tennessee, Virginia, Washington, West Virginia, Wisconsin, and Wyoming. The attorneys general of these states alleged that Countrywide violated state predatory lending laws by (i) making loans it could not have reasonably expected borrowers to be able to repay; (ii) using high pressure sales and advertising tactics designed to steer borrowers towards high-risk loans; and (iii) failing to disclose to borrowers important information about the loans, including the costs and difficulties of refinancing, the availability of lower cost products, the existence and nature of prepayment penalties, and that advertised low interest rates were merely "teaser" rates that would adjust upwards dramatically as soon as one month after closing. Eighty-eight percent of the mortgages that were covered by the settlement with the attorneys general were sold into securitization trusts, like the ten in which Colonial purchased the certificates.

99.     By each of the untrue and misleading statements referred to in paragraph 83 above, the defendants materially understated the risk of the certificates that they issued or underwrote. Moreover, Plaintiff is informed and believes, and based thereon alleges, that discovery will yield additional evidence that the originators disregarded their underwriting guidelines when making the mortgage loans in the collateral pools of these securitizations.

**D.     The Large Number of Mortgage Loans in the Collateral Pools About Which the Defendants Made Material Untrue or Misleading Statements Made Their Statements About the Ratings of Colonial's Certificates Untrue and Misleading.**

100.    In the prospectus supplements, the defendants made statements about the ratings of the certificates by ratings agencies. They stated that the ratings agencies rated each such certificate triple-A. Details of each such statement are stated in Item 100 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 100, and alleges as though fully set forth in this paragraph, the contents of Item 100

- 32 -

1    of the Schedules.

2         101.   The ratings were important to the decision of any reasonable investor

3    whether to purchase the certificates. Many investors, including Colonial, have

4    investment policies that require a certain minimum rating for all investments. The

5    policy of Colonial was to purchase only certificates that were rated at least double-A.

6         102.   These statements by the defendants about the ratings of the certificates

7    they issued or underwrote were misleading because the defendants omitted to state

8    that the ratings were affected by all of the material untrue or misleading statements

9    about specific mortgage loans in the collateral pools. These include:

10        (a)    loans whose LTVs were materially understated as shown by the AVM;

11        (b)    loans whose LTVs were misleading as a result of undisclosed additional

12   liens;

13        (c)    loans for which the properties were stated to be owner-occupied, but

14   were not; and

15        (d)    loans that suffered EPDs, strong evidence that the originators may have

16   disregarded the underwriting standards in making those loans.

17        103.   In Securitization No. 1, there were 139 loans whose LTVs were

18   materially understated as shown by the AVM, 164 loans whose LTVs were

19   misleading because of undisclosed additional liens, and 139 loans for which the

20   properties were stated to be owner-occupied but were not. Eliminating duplicates,

21   there were 312 loans (or 71.6% of the loans that backed the certificates that Colonial

22   purchased) about which defendants made untrue or misleading statements. The

23   numbers of such loans in the collateral pools of the securitizations are stated in Item

24   103 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph

25   103, and alleges as though fully set forth in this paragraph, the contents of Item 103

26   of the Schedules.

27        104.   Plaintiff is informed and believes, and based thereon alleges, that loan

28   files and other documents available only through discovery will prove that those

- 33 -

1  statements were untrue or misleading with respect to many more loans as well.

2      105.  By these untrue and misleading statements, the defendants materially

3  understated the risk of the certificates that they issued or underwrote.

4  ## VI. LIABILITY OF CFC AS CONTROL PERSON

5      106.  CWALT and CWMBS were special purpose entities formed for the sole

6  purpose of purchasing mortgage loans, filing registration statements with the SEC,

7  forming issuing trusts, assigning mortgage loans and all of their rights and interests

8  in such mortgage loans to the trustee for the benefit of the certificateholders, and

9  depositing the underlying mortgage loans into the issuing trusts.

10      107.  CWALT was responsible for preparing and filing four of the shelf

11  registration statements pursuant to which nine of the certificates were offered for

12  sale. CWMBS was responsible for preparing and filing two of the shelf registration

13  statements pursuant to which two of the certificates were offered for sale. CWALT

14  and CWMBS were wholly-owned subsidiaries of Old CFC.

15      108.  Countrywide Securities was a securities broker-dealer and underwriter.

16  It was a wholly-owned subsidiary of Countrywide Capital Markets, Inc., which in

17  turn was a wholly-owned subsidiary of Old CFC.

18      109.  Old CFC was a publicly-traded holding company which, through its

19  subsidiaries, engaged in mortgage lending, the securitization of mortgage loans, and

20  other finance-related businesses. Old CFC managed its mortgage lending and

21  securities businesses in an integrated fashion. These activities included Old CFC's

22  practice of originating, purchasing, and warehousing mortgage loans, using certain

23  Countrywide subsidiaries; securitizing those same loans into mortgage-backed

24  securities, using depositors CWALT and CWMBS, among other subsidiaries; and

25  underwriting and selling mortgage-backed securities to third parties, using

26  Countrywide Securities.

27      110.  Countrywide Securities was part of Old CFC's Capital Markets

28  Segment, which Old CFC used, among other things, to conduct conduit activities and

1  to trade and underwrite securities. The operations, expenditures, and revenues of the

2  Capital Markets Segment and Countrywide Securities were included in Old CFC's

3  accounting statements and reflected in its filings with the SEC.

4       111.  At all relevant times, the offices of CWALT, CWMBS, and

5  Countrywide Securities were located in the same building as Old CFC's corporate

6  headquarters in Calabasas, California. Officers of Old CFC met frequently with

7  officers and directors of CWALT, CWMBS, and Countrywide Securities to direct

8  and coordinate the subsidiaries' securitization business and activities.

9       112.  Until September 2006, Stanford L. Kurland was the President and Chief

10 Operating Officer of Old CFC. He also served as Chairman of the Board and as

11 President and a director of CWALT and CWMBS. During the relevant time, N.

12 Joshua Adler was the President, Chief Executive Officer, and a director of CWALT

13 and CWMBS. In these roles, Kurland and Adler were able to control and exert power

14 over the general and day-to-day practices and policies of CWALT and CWMBS,

15 including the issuance of the certificates that are the subject of the Complaint.

16 Kurland signed the shelf registration statements pursuant to which CWALT issued

17 the certificates in Securitizations Nos. 1, 2, 3, 4, 6, 9, and 10. Kurland also signed the

18 shelf registration statements pursuant to which CWMBS issued the certificate in

19 Securitization No. 7. Adler signed the shelf registration statement pursuant to which

20 CWALT issued the certificate in Securitization No. 5. Adler also signed the shelf

21 registration statement pursuant to which CWMBS issued the certificate in

22 Securitization No. 8.

23      113.  Ranjit M. Kripalani served as Executive Vice President of Old CFC as

24 well as President and Executive Managing Director of Old CFC's Capital Markets

25 Segment. At the same time, Kripalani served as President of Countrywide Capital

26 Markets Inc. and as President and Chief Executive Officer of Countrywide

27 Securities, further ensuring Old CFC's control and power over the general and day-

28 to-day practices and policies of Countrywide Securities.

114.   Plaintiff is informed and believes, and based thereon alleges, that additional officers and directors of Old CFC served as officers or directors of CWALT, CWMBS, and Countrywide Securities, and worked closely with those subsidiaries in order to establish and maintain Old CFC's control and power over the general and day-to-day practices and policies of the subsidiaries and Countrywide's conduit business, including the issuance and sale of the certificates that are the subject of the Complaint.

115.   In sum, as a result of its structure and the organization of its business, as well as its ownership and placement of key personnel, Old CFC had the power to control the general affairs and day-to-day practices and policies of CWALT, CWMBS, and Countrywide Securities, including the power directly or indirectly to control or influence those entities' policies related to the issuance, underwriting, and sale of the certificates that are the subject of the Complaint.

116.   As a result, Old CFC, as control person, was liable to Plaintiff jointly and severally with and to the same extent as CWALT, CWMBS, and Countrywide Securities. This liability passed to CFC when Old CFC merged into CFC.

## VII.  LIABILITY OF DEFENDANT BANK OF AMERICA CORPORATION AND ITS SUBSIDIARIES AS SUCCESSORS TO CFC, COUNTRYWIDE SECURITIES, CWALT, AND CWMBS

117.   Bank of America Corporation (**BAC**) and its subsidiaries (BAC and its subsidiaries are referred to together in this Complaint as **Bank of America**) have taken the assets of CFC and other Countrywide entities into the operating companies of Bank of America while leaving their liabilities in moribund companies that have few or no operations or assets. The full extent of BAC's and Bank of America's conduct is not known because of the sparse public disclosures that BAC has made about those transactions. Based on the facts alleged below, BAC and its subsidiaries are liable for the claims asserted in this Complaint as successors to CFC, Countrywide Securities, CWALT, and CWMBS, because (a) the consideration that Bank of America paid to Countrywide for the latter's assets was inadequate, (b) there

- 36 -

was continuity of ownership between Bank of America and Countrywide, (c)

Countrywide ceased ordinary business soon after Bank of America purchased its

assets, (d) there was continuity of management, personnel, physical location, assets,

and general business operations between Bank of America and Countrywide, and (e)

Bank of America assumed the liabilities necessary for the uninterrupted continuation

of Countrywide's business. In addition, Bank of America assumed Countrywide's

mortgage repurchase and tort liabilities.

118.   At all relevant times, BAC was a public company whose stock was

traded on the New York Stock Exchange.

119.   On January 11, 2008, BAC and Old CFC entered into an Agreement and

Plan of Merger (referred to in this Complaint as the **Merger Agreement**) pursuant to

which Old CFC would be merged into Red Oak Merger Corporation, a wholly-

owned subsidiary of BAC formed to accomplish the merger. Old CFC would then

cease to exist, and Red Oak would continue as the surviving company.

120.   Under the Merger Agreement, the shareholders of Old CFC would

receive, and ultimately did receive, 0.1822 shares of BAC stock for each share of Old

CFC, thereby maintaining those shareholders' ownership interest in the businesses of

Old CFC.

121.   After the merger, Red Oak was to be renamed Countrywide Financial

LLC but was in fact renamed Countrywide Financial Corporation (which is CFC),

the same name as the publicly-traded Countrywide entity (Old CFC) that ceased to

exist upon the completion of the merger.

122.   In a Form 8-K filing also dated January 11, 2008, BAC disclosed that

the Merger Agreement was between Old CFC and BAC, the public company, not any

subsidiary or affiliate of BAC.

123.   In a press release accompanying the Form 8-K, BAC stated that Bank of

America intended initially to operate Countrywide separately under the Countrywide

brand and that integration of Countrywide's operations with the operations of Bank

- 37 -

1  of America would occur in 2009.

2      124.   On February 22, 2008, an article appeared in the periodical *Corporate*

3  *Counsel* about the litigation that Countrywide then faced and its possible implications

4  for Bank of America. In the article, a spokesperson for Bank of America

5  acknowledged that Bank of America had "bought the company [Old CFC] and all of

6  its assets and liabilities[,] . . . was aware of the claims and potential claims against the

7  company and [had] factored these into the purchase."

8      125.   On May 28, 2008, BAC filed a Form 8-K and issued a press release

9  stating that Bank of America was creating a new banking management structure and

10  that a long-time Bank of America officer, Barbara Desoer, would become president

11  of the new consumer real estate operations of "Countrywide Financial Corporation

12  and Bank of America when they are combined." The press release also stated that

13  Desoer would be based in Countrywide's principal offices in Calabasas, California.

14      126.   BAC and Old CFC consummated the merger on July 1, 2008. As a

15  result, Old CFC ceased to exist. By operation of law, as a consequence of the merger,

16  Red Oak (soon thereafter renamed Countrywide Financial Corporation, which is

17  defendant CFC) assumed the liabilities of Old CFC.

18      127.   In a July 1, 2008, Form 8-K and press release, Desoer, the president of

19  Bank of America's consumer real estate unit, stated that it was time to "begin to

20  combine the two companies and prepare to introduce our new name and way of

21  operating." The release also confirmed that the combined entity would be based in

22  Calabasas, California, the former principal offices of Countrywide. Plaintiff is

23  informed and believes, and based thereon alleges, that Bank of America's consumer

24  real estate unit has been and remains housed in the offices formerly occupied by

25  Countrywide. For example, Desoer moved into the office formerly used by Angelo

26  Mozilo, the former CEO of Old CFC. Moreover, Bank of America retained a

27  substantial number of former employees of Countrywide to operate its consumer real

28  estate unit. Indeed, in October 2008, Desoer stated that the combined company had

- 38 -

1  named a mix of Bank of America and Countrywide executives to leadership roles.

2  128.  On October 29, 2008, Countrywide Securities withdrew its registration

3  as a broker dealer from the Financial Industry Regulatory Authority. Without this

4  registration, Countrywide Securities was unable to continue in the business in which

5  it had primarily been engaged (securities dealing and underwriting). Therefore, as of

6  October 29, 2008, Countrywide Securities effectively ceased doing business, too.

7  129.  In its annual report for the fiscal year ended December 31, 2008, BAC

8  disclosed that the fair value of the non-cash assets obtained and liabilities assumed

9  through the merger with Countrywide were $157.4 billion and $157.8 billion,

10  respectively.

11  130.  Contemporaneously with the merger, BAC announced that certain

12  Countrywide entities would sell specified assets to specific Bank of America entities.

13  According to BAC, the consideration paid for these assets was approximately $32

14  billion in cash or cash equivalents. According to BAC's disclosures, approximately

15  $125 billion in non-cash assets would be left in CFC and not conveyed pursuant to

16  these asset sales, which were completed on or about July 3, 2008.

17  131.  On October 6, 2008, BAC filed a Form 8-K announcing, among other

18  things, that CFC and another former subsidiary of Old CFC, Countrywide Home

19  Loans, Inc. (**CHL**), would transfer all or substantially all of their assets to unnamed

20  subsidiaries of BAC in exchange for the assumption of approximately $21 billion of

21  Countrywide debt. In contrast to the relatively detailed disclosures that BAC made

22  about the merger and the first round of asset sales, BAC and Bank of America

23  offered virtually no details about these contemplated asset sales. Plaintiff is informed

24  and believes, and based thereon alleges, that the intended effect of these transactions

25  was to further integrate into the operations of Bank of America the Countrywide

26  assets, while leaving the liabilities with CFC and CHL.

27  132.  On November 7, 2008, BAC filed a Form 8-K announcing, among other

28  things, that in connection with the integration of Countrywide's operations into Bank

of America's other business operations, CFC and CHL had transferred substantially all of their assets to BAC. Again, Bank of America disclosed almost no details of these transactions. Plaintiff is informed and believes, and based thereon alleges, that, primarily as a result of these transfers of assets, CFC and CHL are now moribund organizations, with few, if any, assets or operations. This conclusion is confirmed by Bruce Bingham, a business valuation expert who attempted to value CFC in a report sent to The Bank of New York Mellon, which is the trustee of numerous trusts containing Countrywide-issued mortgage-backed securities. Mr. Bingham concluded that CFC had negative earnings, minimal operating revenues, and no viable operations. The operational status of Countrywide Securities (as well as all other Countrywide entities) is comparable to that of CFC and CHL.

133.   Plaintiff is informed and believes, and based thereon alleges, that transferees of Countrywide's assets may have included other subsidiaries of BAC rather than, or in addition to, BAC. Because of the sparse disclosures about these transactions, it is impossible to be certain which Bank of America entities were involved.

134.   As the principal consideration for the asset sales on November 7, 2008, BAC assumed debt securities and related guarantees of Countrywide in an aggregate amount of $16.6 billion. BAC assumed much of this debt through the amendment of indenture agreements substituting BAC as the issuer and/or guarantor of the securities subject to the indentures.

135.   According to Bank of America's own figures, Bank of America obtained approximately $125 billion in assets in exchange for the assumption of $16.6 billion in debt. Therefore, Plaintiff is informed and believes, and based thereon alleges, that the consideration given for Countrywide's assets was not commensurate with the value of the assets that Bank of America obtained. Presumably, Bank of America will contest these figures. Yet, Bank of America itself has acknowledged the difficulty in proving the actual value transferred and received. In *MBIA Insurance*

- 40 -

*Corp. v. Countrywide Home Loans, Inc.*, Index No. 602825/08, pending in the Supreme Court of the State of New York for the County of New York, at a hearing held on June 27, 2012, counsel for Bank of America informed the court that to resolve the "difficult" and "complicated" valuation issue, extensive expert testimony would be required.

136.   On April 27, 2009, Bank of America issued a press release announcing the rebranding of CHL operations as Bank of America Home Loans. Bank of America stated that the new brand would represent the combined operations of Bank of America's mortgage and home equity business and CHL. Bank of America further explained that it was in the process of rebranding Countrywide's "locations, account statements, marketing materials and advertising" and that the "full systems conversion" would be completed later that year.

137.   As of September 21, 2009, liability for the deposits in Countrywide Bank, N.A. was assumed by Bank of America, N.A. On November 9, 2009, online account services for Countrywide mortgages were consolidated with Bank of America's Online Banking website. *See, e.g.*, Mortgage Loan Officer Locator, http://www.home.countrywide.com (last visited August 9, 2012).

138.   Old CFC's website now redirects visitors to the Bank of America website. *See* http://www.countrywide.com, *redirected to* www8.bankofamerica.com/home-loans/overview.go (last visited August 9, 2012).

139.   By the complex and sparsely-disclosed transactions described above, Bank of America has combined Countrywide's operations with its own business operations and proceeded to operate them.

140.   Bank of America operates its combined consumer real estate unit out of the common headquarters of Old CFC, CHL, Countrywide Securities, CWMBS, and CWALT. Plaintiff is informed and believes, and based thereon alleges, that Bank of America employs many former employees of Countrywide to operate this combined unit.

- 41 -

141.   Plaintiff is informed and believes, and based thereon alleges, that Bank of America's rebranded consumer real estate business, Bank of America Home Loans, now operates out of more than 1,000 former Countrywide offices nationwide.

142.   Public statements by Old CFC and Bank of America reflect that the companies intended that their business operations be combined and understood and anticipated that Bank of America would be responsible for the liabilities of Old CFC and Countrywide. In its press release announcing the merger, BAC declared that it planned to operate Countrywide separately under the Countrywide brand for a limited period only, with integration to occur in 2009. In its 2008 annual report, BAC stated that as a "combined company," Bank of America would be recognized as a responsible lender. Similarly, representatives of Old CFC stated that the "combination" with Bank of America would create one of the most powerful mortgage franchises in the world.

143.   On at least two occasions, two different Chief Executive Officers of BAC publicly acknowledged that BAC intended to assume the liabilities of Countrywide when it acquired Countrywide's assets. One CEO acknowledged in January 2008 that BAC "looked at every aspect of the deal, from their [Countrywide's] assets to potential lawsuits." On an earnings conference call on November 16, 2010, another CEO stated that BAC "would pay for the things that Countrywide did."

144.   Bank of America has, in fact, made a practice of taking responsibility for Countrywide liabilities. For example, on October 6, 2008, Bank of America settled lawsuits brought against Countrywide companies by state attorneys general by agreeing to modify loans for 390,000 borrowers, valued at more than $8 billion.

145.   Similarly, on January 3, 2011, Bank of America paid $2.8 billion to Fannie Mae and Freddie Mac to settle claims for billions of dollars in hundreds of thousands of loans that went sour after Fannie Mae and Freddie Mac bought them from Countrywide. In exchange for the payments, Fannie Mae and Freddie Mac

1    agreed to drop their demands that Bank of America buy back Countrywide

2    mortgages.

3        146.   On May 26, 2011, Bank of America agreed to pay approximately $22

4    million to settle charges that it improperly had foreclosed on the homes of active-

5    duty members of the United States military. In a press release announcing the

6    settlement, Bank of America noted that most of the mortgage loans at issue had been

7    made by Countrywide before Bank of America's merger with Countrywide and that

8    most of the improper foreclosure activity also had been Countrywide's. Nevertheless,

9    Bank of America said that it was responsible to "make things right."

10       147.   In a proposed settlement of Countrywide liabilities announced on June

11   29, 2011, Bank of America agreed to pay $8.5 billion for the benefit of investors in

12   Countrywide trusts to resolve, among other things, claims against Countrywide for

13   breach of representations and warranties made about the mortgage loans in the trusts

14   and for violating prudent standards of care in servicing those loans. The release of

15   Bank of America contemplated by this settlement expressly includes claims against

16   Bank of America for successor liability.

17       148.   Because BAC continues to operate the businesses of Countrywide, it

18   had to assume the liabilities necessary to continue those operations, and Plaintiff is

19   informed and believes, and based thereon alleges, that it did so.

20       149.   In addition to paying for Countrywide's liabilities, Bank of America

21   also has asserted claims as the successor to Countrywide. For example, in a

22   proceeding in the United States Bankruptcy Court for the District of Nebraska, *In re*

23   *Peter J. Kerby*, Case No. 97-81961, BAC's attorney-in-fact filed a motion on behalf

24   of "Bank of America Corporation successor to Countrywide Home Loans." In the

25   limited power of attorney by which BAC appointed that attorney-in-fact (which was

26   also submitted to the Bankruptcy Court), a Vice President and Senior Recovery

27   Manager of BAC executed the power of attorney on behalf of "Bank of America

28   Corporation successor to Countrywide Home Loans." Attached to the power of

- 43 -

1   attorney were several pages, including the signature page, of the Merger Agreement.
2   BAC later filed an amended motion and again submitted the power of attorney to the
3   Bankruptcy Court. This time, attached to the power of attorney was a "Bank of
4   America Corporation Hierarchy [R]eport," which listed 21 subsidiaries of CFC.
5   There is a handwritten star next to the entry for "Countrywide Home Loans, Inc."

6      150.   Similarly, on September 9, 2010, an amended proof of claim for
7   approximately $21.5 million was filed in *In re Alliance Bancorp, Inc.*, Case No. 07-
8   10943, pending in the United States Bankruptcy Court for the District of Delaware.
9   In this amended proof of claim, the creditor is identified as "Countrywide Home
10  Loans, Inc. (through its successor, Bank of America, NA)." And in the Attachment to
11  the Amended Proof of Claim, which was also filed with the bankruptcy court, the
12  creditor is identified as "Countrywide Home Loans, Inc. ('Countrywide'), through its
13  successor by merger, Bank of America." Finally, footnote 1 of the Attachment states
14  that "[r]eference to 'Countrywide' includes reference to affiliates thereof and who
15  together have claims against Alliance Inc., through Countrywide's successor by
16  merger, Bank of America."

17     151.   Thus, Bank of America is trying to accomplish exactly what the
18  doctrine of successor liability is meant to prevent – claiming to be a successor to
19  Countrywide when asserting claims while simultaneously denying that it is a
20  successor to Countrywide when resisting claims against it.

21              **VIII. STATUTE OF LIMITATIONS**

22     152.   All of the claims in this Complaint are timely. Plaintiff became receiver
23  for Colonial on August 14, 2009. Under 12 U.S.C. § 1821(d)(14), the statute of
24  limitations on all of Colonial's claims asserted in this Complaint that had not expired
25  as of August 14, 2009, is extended to no less than three years from that date. This
26  Complaint was filed less than three years from August 14, 2009.

27     153.   The statute of limitations applicable to the claims asserted in this
28  Complaint had not expired as of August 14, 2009, because a reasonably diligent

- 44 -

1    plaintiff would not have discovered until later than August 14, 2008, facts that show

2    that the particular statements referred to in Items 34, 43, 67, 73, 83, and 100 of the

3    Schedules to this Complaint were untrue or misleading. Those are statements about

4    the 24,685 specific mortgage loans in the collateral pools of the securitizations

5    involved in this action, not about residential mortgage loans or any type of residential

6    mortgage loan (e.g., prime, Alt-A, subprime, etc.) in general. A reasonably diligent

7    plaintiff did not have access until after August 14, 2008, to facts about those specific

8    loans that show that the statements that defendants made about those specific loans

9    were untrue or misleading. A reasonably diligent plaintiff did not have access to the

10   loan files compiled by the originators of those specific mortgage loans nor to records

11   maintained by the servicers of those specific mortgage loans (from either or both of

12   which a reasonably diligent plaintiff may have discovered facts that show that the

13   statements that defendants made about those specific loans were untrue or

14   misleading) because originators and servicers of loans and securitization trustees do

15   not make those files available to certificateholders. Moreover, on and prior to August

16   14, 2008, there were not available to a reasonably diligent plaintiff, even at

17   considerable expense, data about those specific loans that show that the statements

18   that defendants made about those specific loans were untrue or misleading. Such data

19   became available for the first time in early 2010.

20        154.   When Colonial purchased the certificates involved in this action, all of

21   them were rated triple-A, the highest possible rating, by at least two of Fitch,

22   Moody's, and Standard & Poor's, all Nationally Recognized Statistical Rating

23   Organizations (**NRSROs**) accredited by the Securities and Exchange Commission.

24   Sponsors of securitizations submitted to the NRSROs the same information about the

25   loans in the collateral pools of proposed securitizations that they included in the

26   prospectus supplements for those securitizations, including in particular statements of

27   the type referred to in Items 34, 43, 67, 73, 83, and 100 of the Schedules to this

28   Complaint. The NRSROs used and relied on that information in rating the certificates

- 45 -

1    to be issued in each securitization.

2        155.   The NRSROs monitored the certificates that they rated after those
3    certificates were issued. If an NRSRO discovers facts that show that there was an
4    untrue or misleading statement about a material fact in the information submitted to it
5    for its use in rating a certificate, then the NRSRO will withdraw its rating of that
6    certificate while it considers the impact of the untrue or misleading statement, or it
7    will downgrade the rating of the certificate, usually to a rating below investment
8    grade.

9        156.   As noted above, all of the certificates involved in this action were rated
10   triple-A at issuance by at least two of Fitch, Moody's, and Standard & Poor's. Not
11   one of those NRSROs withdrew any of those ratings, or downgraded any of them to
12   below investment grade, before August 14, 2008. The date on which each certificate
13   was first downgraded below investment grade is stated in Item 34 of the Schedules.

14       157.   If a reasonably diligent plaintiff would have discovered before August
15   14, 2008, facts that show that the particular statements referred to in Items 34, 43, 67,
16   73, 83, and 100 of the Schedules to this Complaint were untrue or misleading, then
17   the NRSROs, which were monitoring the certificates and are much more
18   sophisticated than a reasonably diligent plaintiff, would also have discovered such
19   facts and withdrawn or downgraded their ratings on the certificates to below
20   investment grade. The fact that none of the NRSROs did so demonstrates that, before
21   August 14, 2008, a reasonably diligent plaintiff could not have discovered facts that
22   show that those statements were untrue or misleading.

23       158.   Even if a reasonably diligent plaintiff would have discovered before
24   August 14, 2008, facts that show that the particular statements referred to in Items
25   34, 43, 67, 73, 83, and 100 of the Schedules to this Complaint were untrue or
26   misleading, the claims in this action would still be timely. As a purchaser of the
27   certificates, Colonial was, and Plaintiff as Receiver for Colonial is, a member of the
28   proposed class in *Luther v. Countrywide Financial Corporation*, Superior Court of

- 46 -

1    the State of California, County of Los Angeles, No. BC 380698, filed on November

2    14, 2007. The pendency of *Luther* has tolled the running of the statute of limitations

3    on the claims in this Complaint.

4       159.   Seven of the securitizations from which Colonial purchased certificates,

5    Securitizations Nos. 1 through 5, 9, and 10, were included in the original Class

6    Action Complaint filed in *Luther* on November 14, 2007. None of those

7    securitizations has been dismissed from *Luther*.

8       160.   Three of the securitizations from which Colonial purchased certificates,

9    Securitizations Nos. 6 through 8, were included in the original Class Action

10    Complaint filed in *Washington State Plumbing & Pipefitting Pension Trust v.*

11    *Countrywide Financial Corporation*, Superior Court for the State of California,

12    County of Los Angeles, No. BC 392571, filed on June 12, 2008. That action was

13    consolidated with *Luther*, and those securitizations are included in the Consolidated

14    Class Action Complaint filed on October 16, 2008. None of those securitizations has

15    been dismissed from *Luther*.

16                   **IX. CLAIMS FOR RELIEF**

17       **A.**    **Untrue or Misleading Statements in a Registration Statement Under**
                **Section 11 of the 1933 Act**

18

19       161.   Plaintiff hereby incorporates by reference, as though fully set forth,

20    paragraphs 1 through 160.

21       162.   CWALT is the depositor of Securitizations Nos. 1 through 6, 9, and 10,

22    and therefore is the issuer of nine of the certificates. In doing the acts alleged,

23    CWALT violated Section 11 of the 1933 Act in connection with issuing the

24    certificates in Securitizations Nos. 1 through 6, 9, and 10.

25       163.   CWMBS is the depositor of Securitizations Nos. 7 and 8 and therefore is

26    the issuer of two of the certificates. In doing the acts alleged, CWMBS violated

27    Section 11 of the 1933 Act in connection with issuing the certificates in

28    Securitizations Nos. 7 and 8.

164.   Countrywide Securities underwrote the certificates in Securitizations Nos. 1 through 8. In doing the acts alleged, Countrywide Securities violated Section 11 of the 1933 Act in connection with underwriting the certificates in Securitizations Nos. 1 through 8.

165.   DBS underwrote the certificates in Securitizations Nos. 2 and 9. In doing the acts alleged, DBS violated Section 11 of the 1933 Act in connection with underwriting the certificates in Securitizations Nos. 2 and 9.

166.   Edward Jones underwrote the certificates in Securitizations Nos. 2 and 3. In doing the acts alleged, Edward Jones violated Section 11 of the 1933 Act in connection with underwriting the certificates in Securitizations Nos. 2 and 3.

167.   Bear Stearns underwrote the certificate in Securitization No. 3. In doing the acts alleged, Bear Stearns violated Section 11 of the 1933 Act in connection with underwriting the certificate in Securitization No. 3.

168.   Credit Suisse underwrote the certificate in Securitization No. 5. In doing the acts alleged, Credit Suisse violated Section 11 of the 1933 Act in connection with underwriting the certificate in Securitization No. 5.

169.   Citigroup underwrote the certificate in Securitization No. 6. In doing the acts alleged, Citigroup violated Section 11 of the 1933 Act in connection with underwriting the certificate in Securitization No. 6.

170.   RBS underwrote the certificate in Securitization No. 8. In doing the acts alleged, RBS violated Section 11 of the 1933 Act in connection with underwriting the certificate in Securitization No. 8.

171.   JP Morgan underwrote the certificate in Securitization No. 9. In doing the acts alleged, JP Morgan violated Section 11 of the 1933 Act in connection with underwriting the certificate in Securitization No. 9.

172.   Barclays underwrote the certificate in Securitization No. 10. In doing the acts alleged, Barclays violated Section 11 of the 1933 Act in connection with underwriting the certificate in Securitization No. 10.

173.   BAS underwrote the certificate in Securitization No. 10. In doing the acts alleged, BAS violated Section 11 of the 1933 Act in connection with underwriting the certificate in Securitization No. 10.

174.   The certificates in these securitizations were issued pursuant or traceable to registration statements. Details of each registration statement and each certificate are stated in Item 34 of the Schedules.

175.   The registration statements, as amended by the prospectus supplements, contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. These untrue and misleading statements included all of the untrue and misleading statements described in paragraphs 38 through 105.

176.   Colonial purchased each certificate before the issuer made generally available an earning statement covering a period of at least twelve months.

177.   Plaintiff expressly excludes from this claim any allegation that could be construed as alleging fraud or intentional or reckless conduct. This claim is based solely on allegations of strict liability or negligence under the 1933 Act.

178.   Colonial did not know when it purchased the certificates that the statements in the registration statements, as amended by the prospectus supplements, were untrue or misleading.

179.   When it failed on August 14, 2009, Colonial had not discovered that the defendants made untrue or misleading statements about the certificates. Plaintiff discovered that the defendants made untrue or misleading statements about each security in the course of its investigation in 2012.

180.   Colonial has suffered a loss on each of these certificates.

181.   Plaintiff is entitled to recover damages as described in 15 U.S.C. § 77k(e).

**B.    Liability as a Controlling Person Under Section 15 of the 1933 Act**

182.   Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 181.

183.   Old CFC, by or through stock ownership, agency, and as otherwise described above, controlled CWALT, CWMBS, and Countrywide Securities within the meaning of Section 15 of the 1933 Act.

184.   In doing the acts alleged, CWALT and CWMBS violated Section 11 of the 1933 Act by issuing the certificates.

185.   In doing the acts alleged, Countrywide Securities violated Section 11 of the 1933 Act by underwriting nine of the certificates.

186.   As a result of the merger of Old CFC and Bank of America, Old CFC's control person liability passed to CFC.

187.   CFC is therefore jointly and severally liable with and to the same extent as CWALT, CWMBS, and Countrywide Securities.

**C.    Liability as Successor to Countrywide Securities, CWALT, CWMBS, and CFC**

188.   This claim is alleged against defendant BAC.

189.   Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 187 of this Complaint.

190.   For the reasons described above, BAC is jointly and severally liable for any and all injury and damages resulting from the conduct of Countrywide Securities, CWALT, CWMBS, and CFC, because BAC is the successor-in-interest to Countrywide Securities, CWALT, CWMBS, and CFC.

191.   BAC became the successor-in-interest to Countrywide Securities, CWALT, CWMBS, and CFC because (a) through the transactions that took place between July 1, 2008, and November 7, 2008, it gave inadequate consideration to Countrywide; (b) there was continuity of ownership between Bank of America and Countrywide; (c) Countrywide ceased ordinary business soon after the merger

- 50 -

1  transaction was consummated; (d) there was continuity of management, personnel,

2  physical location, assets, and general business operations between Bank of America

3  and Countrywide; and (e) Bank of America assumed the liabilities ordinarily

4  necessary for the uninterrupted continuation of Countrywide's business. BAC is also

5  a successor-in-interest to Countrywide because Bank of America assumed

6  Countrywide's mortgage repurchase and tort liabilities.

7      192.   BAC is therefore jointly and severally liable with and to the same extent

8  as Countrywide Securities, CWALT, CWMBS, and CFC.

9                              **PRAYER FOR RELIEF**

10      WHEREFORE, Plaintiff prays for judgment against defendants for damages in

11  an amount to be determined at trial, but not less than $125 million, plus attorneys'

12  fees, costs of court, and pre- and post-judgment interest at the appropriate allowable

13  rates. Plaintiff further requests that the Court order any and all other relief at law and

14  in equity to which Plaintiff is entitled.

15                                      Respectfully submitted,

16

17  Dated: August 10, 2012             BAKER & HOSTETLER LLP

18                                     By _____
                                          Michael R. Matthias
19                                        Gabriel E. Drucker

20                                     David J. Grais
                                       Mark B. Holton
21                                     Mary G. Menge
                                       Grais & Ellsworth LLP
22                                     1211 Avenue of the Americas
                                       New York, New York 10036
23                                     Phone: 212.755.0100

24                                     *Attorneys for Federal Deposit Insurance*
                                       *Corporation as Receiver for Colonial Bank*
25

26

27

28

COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 (15 U.S.C. §§ 77k AND 77o)

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial of its claims by jury to the extent authorized by law.

Dated: August 10, 2012                    BAKER & HOSTETLER LLP

By _____
        Michael R. Matthias
        Gabriel E. Drucker

David J. Grais
Mark B. Holton
Mary G. Menge
Grais & Ellsworth LLP
1211 Avenue of the Americas
New York, New York 10036
Phone: 212.755.0100

*Attorneys for Federal Deposit Insurance
Corporation as Receiver for Colonial Bank*

601472479

COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 (15 U.S.C. §§ 77k AND 77o)

# SCHEDULE 1

## SCHEDULE 1 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CWALT, Countrywide Securities, CFC, and BAC.

**Item 34.    Details of trust and certificate(s).**

**(a)    Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2006-J5 was a securitization in July 2006 of 764 mortgage loans, in four groups.[1] CWALT was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by Countrywide Home Loans, Inc., American Home Mortgage Corp., MortgageIT, Inc., Decision One Mortgage Company LLC, Greenpoint Mortgage Funding Incorporated, and various undisclosed originators. Of the 402 initial mortgage loans in loan group 1, approximately 98.22% were originated by Countrywide Home Loans, Inc., approximately 1.02% were originated by American Home Mortgage Corp., approximately 0.06% were originated by MortgageIT, Inc., and approximately 0.69% were originated by Decision One Mortgage Company LLC. CWALT 2006-J5 Pros. Sup. S-4, S-38.

**(b)    Description of the certificate(s) that Colonial purchased:** Countrywide Securities was the underwriter of the securities that Colonial purchased. Colonial purchased two senior certificates in this securitization, in

---

[1]    CWALT 2006-J5 was a prefunded securitization. CWALT 2006-J5 Pros. Sup. S-5. On the closing date of the securitization there were 764 mortgage loans in the trust (the "Initial Mortgage Loans"), and 402 Initial Mortgage Loans in loan group 1. CWALT 2006-J5 Pros. Sup. S-38, S-46, S-54, S-62. After the closing date of the securitization, the trust purchased an additional 34 mortgage loans in group 1. The data contained in the charts and tables in this schedule include the additional 34 mortgage loans that were added to loan group 1, unless otherwise indicated.

class 1-A-5, for which Colonial paid $24,316,747 plus accrued interest on December 19, 2006, and $25,554,688 plus accrued interest on February 16, 2007. Colonial's certificates were primarily paid by the 436 mortgage loans in loan group 1.

(c)     **Ratings of the certificate(s) when Colonial purchased them:** Moody's: Aaa; Standard & Poor's: AAA.

(d)     **Current ratings of the certificate(s):** Moody's: Caa3; Standard & Poor's: D.

(e)     **Date on which the certificate(s) were downgraded below investment grade:** October 27, 2008.

(f)     **URL of prospectus supplement for this securitization:** http://sec.gov/Archives/edgar/data/1269518/000119312506158058/d424b5.htm

(g)     **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificates that Colonial purchased, were issued pursuant or traceable to a registration statement filed by CWALT with the SEC on form S-3 on February 7, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 43.     Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, CWALT and Countrywide Securities made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

As of the initial cut-off date, the weighted average original LTV ratio of the mortgage loans in loan group 1 was 74.65%. CWALT 2006-J5 Pros. Sup. S-6.

(a)     "No Initial Mortgage Loan in any loan group had a Loan-to-Value Ratio at origination or on the closing date of more than 100%." CWALT 2006-J5 Pros. Sup. S-36.

(b)     On pages S-33 to S-67 of the prospectus supplement ("The Mortgage Pool"), CWALT and Countrywide Securities presented tables of statistics about the Initial Mortgage Loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000.00, $50,000.01 to $100,000.00, $100,000.01 to $150,000.00, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 12 such tables in "The Mortgage Pool" section for the Initial Mortgage Loans in loan group 1. In each table the number of categories into which the loans were divided ranged from 3 to 39. Thus, in "The Mortgage Pool" section, CWALT and Countrywide Securities made many untrue or misleading statements about the original LTVs of the Initial Mortgage Loans in loan group 1. CWALT 2006-J5 Pros. Sup. S-38 to S-45.

(c)     "As of the initial cut-off date, the weighted average original Loan-to-Value Ratio of the Initial Mortgage Loans in loan group 1 was approximately 74.65%." CWALT 2006-J5 Pros. Sup. S-41.

**Item 52.**     **Details of the results of the AVM analysis for the loans that backed the certificates:**

| | |
|---|---:|
| Number of loans that backed the certificates (loan group 1) | 436 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 139 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $25,213,984 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 43 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $4,849,117 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 36 |
| Weighted-average LTV, as stated by defendants | 74.65% |
| Weighted-average LTV, as determined by the model | 92.3% |

**Item 58.**     **Undisclosed additional liens in loan group 1:**

    **(a)**     **Minimum number of properties with additional liens:** 164

    **(b)**     **Weighted average CLTV with additional liens:** 80.8%

**Item 67.**     **Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, CWALT and Countrywide Securities made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by Countrywide Home Loans, Inc.: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2006-J5 Pros. Sup. S-74.

In the prospectus supplement, CWALT and Countrywide Securities made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by American Home

Mortgage Corp.: "Every mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation." CWALT 2006-J5 Pros. Sup. S-80.

In the prospectus supplement, CWALT and Countrywide Securities made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by MortgageIT, Inc.: "Every MortgageIT mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation." CWALT 2006-J5 Pros. Sup. S-82.

**Item 73.     Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, CWALT and Countrywide Securities made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)     In "The Mortgage Pool" section of the prospectus supplement, described in Item 43, CWALT and Countrywide Securities presented a table entitled "Occupancy Types" for the Initial Mortgage Loans in loan group 1. This table divided the Initial Mortgage Loans in Loan Group 1 into the categories "Primary Residence," "Investment Property," and "Secondary Residence." This table contained untrue or misleading statements about, among other data, the number of Initial Mortgage Loans, the aggregate principal balance outstanding, and the percent of the Initial Mortgage Loans in loan group 1 in each of these categories. CWALT 2006-J5 Pros. Sup. S-44.

(b)     In the "Occupancy Types" table, CWALT and Countrywide Securities stated that of the 402 Initial Mortgage Loans in loan group 1, 369

were secured by primary residences and 33 were not. CWALT 2006-J5 Pros. Sup. S-44.

**Item 80.     Details of properties in loan group 1 that were stated to be owner-occupied, but were not:**

    **(a)     Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 56**

    **(b)     Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead: 99**

    **(c)     Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address: 4**

    **(d)     Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 139**

**Item 83.     Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-72 through S-78 of the prospectus supplement, CWALT and Countrywide Securities made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference.

One of these statements was that: "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWALT 2006-J5 Pros. Sup. S-73.

Another one of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2006-J5 Pros. Sup. S-73.

On pages S-78 through S-81 of the prospectus supplement, CWALT and Countrywide Securities made statements about the underwriting guidelines of American Home Mortgage Corp. All of those statements are incorporated herein by reference.

One of these statements was that: "American Home underwrites a borrower's creditworthiness based solely on information that American Home believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring." CWALT 2006-J5 Pros. Sup. S-79.

Another one of these statements was that: "Exceptions to the underwriting standards are permitted where compensating factors are present." CWALT 2006-J5 Pros. Sup. S-79.

Another one of these statements was that: "[E]xceptions to American Home's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception." CWALT 2006-J5 Pros. Sup. S-81.

On pages S-81 through S-84 of the prospectus supplement, CWALT and Countrywide Securities made statements about the underwriting guidelines of MortgageIT, Inc. All of those statements are incorporated herein by reference.

One of these statements was that: "MortgageIT underwrites a borrower's creditworthiness based solely on information that MortgageIT believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring." CWALT 2006-J5 Pros. Sup. S-82.

Another one of these statements was that: "[E]xceptions to these underwriting guidelines are considered, so long as the borrower has other reasonable compensating factors, on a case-by-case basis." CWALT 2006-J5 Pros. Sup. S-84.

**Item 90.**   **90+ days delinquencies in loan group 1:**

   **(a)**   **Number of the mortgage loans that suffered 90+ days delinquencies:** 201

   **(b)**   **Percent of the mortgage loans that suffered 90+ days delinquencies:** 46.1%

**Item 91.**   **30+ days delinquencies in loan group 1:**

   **(a)**   **Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 146

   **(b)**   **Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 33.5%

**Item 100.**   **Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-8 through S-9 and S-161 through S-162 of the prospectus supplement, CWALT and Countrywide Securities made statements about the ratings assigned to the certificates issued in this securitization. CWALT and Countrywide Securities stated that Colonial's certificates were rated Aaa by Moody's Investors Service, Inc., and AAA by Standard & Poor's. CWALT 2006-J5 Pros. Sup. S-8. These were the highest ratings available from these two rating agencies.

CWALT and Countrywide Securities also stated: "The offered certificates will not be offered unless they are assigned the indicated ratings by Standard & Poor's . . . and Moody's Investors Service, Inc. . . ." CWALT 2006-J5 Pros. Sup. S-9.

CWALT and Countrywide Securities also stated: "It is a condition to the issuance of the senior certificates . . . that they be rated 'AAA' by Standard & Poor's . . . and 'Aaa' by Moody's Investors Service, Inc. . . ." CWALT 2006-J5 Pros. Sup. S-161.

**Item 103.**     **Summary of loans in loan group 1 about which the defendants made untrue or misleading statements:**

    **(a)**     **Number of loans whose LTVs were materially understated as shown by the AVM:** 139

    **(b)**     **Number of loans whose LTVs were misleading because of undisclosed additional liens:** 164

    **(c)**     **Number of loans for which the properties were stated to be owner-occupied but were not:** 139

    **(d)**     **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 312

    **(e)**     **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 71.6%

# SCHEDULE 2

# SCHEDULE 2 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CWALT, DBS, Countrywide Securities, Edward Jones, CFC, and BAC.

**Item 34.    Details of trust and certificate(s).**

(a)    **Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2005-52CB was a securitization in September 2005 of 2,223 mortgage loans, in one pool.[1] CWALT was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by Countrywide Home Loans, Inc. CWALT 2005-52CB Pros. Sup. S-4, S-16; S-28.

(b)    **Description of the certificate(s) that Colonial purchased:** Countrywide Securities, DBS, and Edward Jones were the underwriters of the security that Colonial purchased. Colonial purchased a senior certificate in this securitization, in class 1-A-4, for which Colonial paid $36,706,674 plus accrued interest on January 12, 2006.

(c)    **Ratings of the certificate(s) when Colonial purchased them:** Fitch: AAA; Moody's: Aaa; Standard & Poor's: AAA.

(d)    **Current ratings of the certificate(s):** Fitch: CC; Moody's: Caa1; Standard & Poor's: CCC.

---

[1]    CWALT 2005-52CB was a securitization with a supplemental loan account that enabled it to purchase additional mortgage loans. CWALT 2005-52CB Pros. Sup. S-5; S-27. On the closing date of the securitization there were 2,223 mortgage loans in the trust (the "Initial Mortgage Loans"). After the closing date of the securitization, the trust purchased an additional 614 mortgage loans. The data contained in the charts and tables in this schedule include the additional 614 mortgage loans that were added to the trust, unless otherwise indicated.

(e)     **Date on which the certificate(s) were downgraded below investment grade:** February 20, 2009.

(f)     **URL of prospectus supplement for this securitization:** http://www.sec.gov/Archives/edgar/data/1269518/000095013605006200/file 001.htm.

(g)     **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by CWALT with the SEC on form S-3 on June 17, 2005. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 43.     Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, CWALT, Countrywide Securities, DBS, and Edward Jones made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)     "No Initial Mortgage Loan had a Loan-to-Value Ratio at origination of more than 100.00%." CWALT 2005-52CB Pros. Sup. S-17.

(b)     In the section of the prospectus supplement entitled "The Mortgage Pool," CWALT, Countrywide Securities, DBS, and Edward Jones presented tables of statistics about the Initial Mortgage Loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000.00, $50,000.01 to $100,000.00, $100,000.01 to

$150,000.00, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 10 such tables in "The Mortgage Pool" section for the Initial Mortgage Loans in the collateral pool. In each table the number of categories into which the loans were divided ranged from 3 to 41. Thus, in "The Mortgage Pool" section, CWALT, Countrywide Securities, DBS, and Edward Jones made many untrue or misleading statements about the original LTVs of the Initial Mortgage Loans in the collateral pool. CWALT 2005-52CB Pros. Sup. S-19 to S-25.

     (c)    "As of the initial cut-off date, the weighted average original Loan-to-Value Ratio of the Initial Mortgage Loans was approximately 71.22%." CWALT 2005-52CB Pros. Sup. S-22.

**Item 52.    Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate | 2,837 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 1,631 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $39,270,435 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 340 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $16,772,927 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 177 |
| Weighted-average LTV, as stated by defendants | 71.22% |
| Weighted-average LTV, as determined by the model | 78.9% |

**Item 58.**    **Undisclosed additional liens:**

    **(a)**    **Minimum number of properties with additional liens:** 915

    **(b)**    **Weighted-average CLTV with additional liens:** 75.8%

**Item 67.**    **Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, CWALT, Countrywide Securities, DBS, and Edward Jones made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by Countrywide Home Loans, Inc.: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2005-52CB Pros. Sup. S-30.

**Item 73.**    **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, CWALT, Countrywide Securities, DBS, and Edward Jones made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

    (a)    In "The Mortgage Pool" section of the prospectus supplement, described in Item 43, CWALT, Countrywide Securities, DBS, and Edward Jones presented a table entitled "Occupancy Types." This table divided the Initial Mortgage Loans in the collateral pool into the categories "Primary Residence," "Investment Property," and "Secondary Residence." This table contained untrue or misleading statements about, among other data, the number of Initial Mortgage Loans, the aggregate principal balance outstanding, and the percent of the Initial Mortgage Loans in each of these categories. CWALT 2005-52CB Pros. Sup. S-25.

(b)   In the "Occupancy Types" table, CWALT, Countrywide Securities, DBS, and Edward Jones stated that of the 2,223 Initial Mortgage Loans in the collateral pool, 1,900 were secured by primary residences and 323 were not. CWALT 2005-52CB Pros. Sup. S-25.

**Item 80.   Details of properties that were stated to be owner-occupied, but were not:**

    **(a)   Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 184

    **(b)   Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 305

    **(c)   Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 213

    **(d)   Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 574

**Item 83.   Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-28 through S-33 of the prospectus supplement, CWALT, Countrywide Securities, DBS, and Edward Jones made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference.

One of these statements was that: "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWALT 2005-52CB Pros. Sup. S-29.

Another one of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if

compensating factors are demonstrated by a prospective borrower." CWALT 2005-52CB Pros. Sup. S-29.

**Item 89.**    **Early payment defaults:**

   **(a)**    **Number of the mortgage loans that suffered EPDs:** 5

   **(b)**    **Percent of the mortgage loans that suffered EPDs:** 0.2 %

**Item 90.**    **90+ days delinquencies:**

   **(a)**    **Number of the mortgage loans that suffered 90+ days delinquencies:** 508

   **(b)**    **Percent of the mortgage loans that suffered 90+ days delinquencies:** 18%

**Item 91.**    **30+ days delinquencies in this securitization:**

   **(a)**    **Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 446

   **(b)**    **Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 15.7%

**Item 100.**    **Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-3 and S-87 through S-88 of the prospectus supplement, CWALT, Countrywide Securities, DBS, and Edward Jones made statements about the ratings assigned to the certificates issued in this securitization. CWALT, Countrywide Securities, DBS, and Edward Jones stated that Colonial's certificate was rated AAA by Fitch Ratings, Aaa by Moody's Investors Service, Inc., and AAA by Standard & Poor's Ratings Services. CWALT 2005-52CB Pros. Sup. S- 3. These were the highest ratings available from these three rating agencies.

CWALT, Countrywide Securities, DBS, and Edward Jones also stated: "The classes of certificates listed below will not be offered unless they are assigned the following ratings by Fitch, Inc. . . . Moody's . . . and . . . Standard & Poor's . . ." CWALT 2005-52CB Pros. Sup. S-3.

CWALT, Countrywide Securities, DBS, and Edward Jones also stated: "It is a condition to the issuance of the offered certificates that they be rated the respective ratings set forth on page S-3 of the Summary of this prospectus supplement . . . ." CWALT 2005-52CB Pros. Sup. S-87.

**Item 103.** **Summary of loans about which the defendants made untrue or misleading statements:**

    **(a)**    **Number of loans whose LTVs were materially understated as shown by the AVM:** 1,631

    **(b)**    **Number of loans whose LTVs were misleading because of undisclosed additional liens:** 915

    **(c)**    **Number of loans for which the properties were stated to be owner-occupied but were not:** 574

    **(d)**    **Number of loans that suffered EPDs:** 5

    **(e)**    **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 1,716

    **(f)**    **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 60.5%

# SCHEDULE 3

## SCHEDULE 3 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CWALT, Bear Stearns, Countrywide Securities, Edward Jones, CFC, and BAC.

**Item 34.     Details of trust and certificate(s).**

(a)     **Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2005-13CB was a securitization in March 2005 of 3,241 mortgage loans, in one pool[1], as of the closing date. CWALT was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by Countrywide Home Loans, Inc. CWALT 2005-13CB Pros. Sup. S-26.

(b)     **Description of the certificate(s) that Colonial purchased:** Bear Stearns, Countrywide Securities, and Edward Jones were the underwriters of the security that Colonial purchased. Colonial purchased a senior certificate in this securitization, in class A-8, for which Colonial paid $23,357,419 plus accrued interest on February 6, 2007.

(c)     **Ratings of the certificate(s) when Colonial purchased them:** Moody's: Aaa; Standard & Poor's: AAA.

(d)     **Current ratings of the certificate(s):** Moody's: Caa1; Standard & Poor's: CC.

---

[1]     CWALT 2005-13CB was a securitization with a supplemental loan account that enabled it to purchase additional mortgage loans. CWALT 2005-13CB Pros. Sup. S-4, S-14. On the closing date of the securitization there were 3,241 mortgage loans in the trust (the "Initial Mortgage Loans"). After the closing date of the securitization, the trust purchased an additional 799 mortgage loans. The data contained in the charts and tables in this schedule include the additional 799 mortgage loans.

(e)     **Date on which the certificate(s) were downgraded below investment grade:** April 12, 2010.

(f)     **URL of prospectus supplement for this securitization:** http://sec.gov/Archives/edgar/data/1269518/000095012905002842/v07117b 5e424b5.txt

(g)     **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by CWALT with the SEC on form S-3 on August 5, 2004. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 43.     Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, CWALT, Bear Stearns, Countrywide Securities, and Edward Jones made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)     "As of the initial cut-off date, the weighted average original Loan-to-Value ratio of the Initial Mortgage Loans was approximately 69.99%." CWALT 2005-13CB Pros. Sup. S-20.

(b)     "No Initial Mortgage Loan had a Loan-to-Value Ratio at origination of more than 100.00%." CWALT 2005-13CB Pros. Sup. S-15.

(c)     In the section of the prospectus supplement entitled "The Mortgage Pool," CWALT, Bear Stearns, Countrywide Securities, and Edward Jones presented tables of statistics about the Initial Mortgage Loans in the collateral pool. Each table focused on a certain characteristic of the

loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000.00, $50,000.01 to $100,000.00, $100,000.01 to $150,000.00, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratios." There were 10 such tables in "The Mortgage Pool" section for the Initial Mortgage Loans in the collateral pool. In each table the number of categories into which the loans were divided ranged from 3 to 66. Thus, in "The Mortgage Pool" section, CWALT, Bear Stearns, Countrywide Securities, and Edward Jones made many untrue or misleading statements about the original LTVs of the Initial Mortgage Loans in the collateral pool. CWALT 2005-13CB Pros. Sup. S-17 to S-23.

**Item 52.     Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---|
| Number of loans that backed the certificate | 4,040 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 939 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $55,402,834 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 657 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $45,274,542 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 131 |
| Weighted-average LTV, as stated by defendants | 69.99% |
| Weighted-average LTV, as determined by the model | 73.8% |

**Item 58.** **Undisclosed additional liens:**

    **(a)** **Minimum number of properties with additional liens:** 747

    **(b)** **Weighted average CLTV with additional liens:** 70.6%

**Item 67.** **Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, CWALT, Bear Stearns, Countrywide Securities, and Edward Jones made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by Countrywide Home Loans, Inc.: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2005-13CB Pros. Sup. S-28.

**Item 73.** **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, CWALT, Bear Stearns, Countrywide Securities, and Edward Jones made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

    (a) In "The Mortgage Pool" section of the prospectus supplement, described in Item 43, CWALT, Bear Stearns, Countrywide Securities, and Edward Jones presented a table entitled "Occupancy Types." This table divided the Initial Mortgage Loans in the collateral pool into the categories "Primary Residence," "Investment Property," and "Secondary Residence." This table contained untrue or misleading statements about, among other data, the number of Initial Mortgage Loans, the aggregate principal balance outstanding, and the percent of Initial Mortgage Loans in each of these categories. CWALT 2005-13CB Pros. Sup. S-22.

(b)    In the "Occupancy Types" table, CWALT, Bear Stearns, Countrywide Securities, and Edward Jones stated that of the 3,241 Initial Mortgage Loans in the initial collateral pool, 2,797 were secured by primary residences and 444 were not. CWALT 2005-13CB Pros. Sup. S-22.

**Item 80.    Details of properties that were stated to be owner-occupied, but were not:**

(a)    **Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 323

(b)    **Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 586

(c)    **Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 253

(d)    **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 960

**Item 83.    Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-26 through S-31 of the prospectus supplement, CWALT, Bear Stearns, Countrywide Securities, and Edward Jones made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference.

One of these statements was that: "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWALT 2005-13CB Pros. Sup. S-27.

Another one of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if

compensating factors are demonstrated by a prospective borrower." CWALT
2005-13CB Pros. Sup. S-27.

**Item 89.   Early payment defaults:**

    **(a)   Number of the mortgage loans that suffered EPDs:** 6

    **(b)   Percent of the mortgage loans that suffered EPDs:** 0.1%

**Item 90.   90+ days delinquencies:**

    **(a)   Number of the mortgage loans that suffered 90+ days
delinquencies:** 485

    **(b)   Percent of the mortgage loans that suffered 90+ days
delinquencies:** 12.0%

**Item 91.   30+ days delinquencies in this securitization:**

    **(a)   Number of the mortgage loans that were 30+ days
delinquent on January 31, 2012:** 424

    **(b)   Percent of the mortgage loans that were 30+ days
delinquent on January 31, 2012:** 10.5%

**Item 100.   Statements about the ratings of the certificate(s) that
Colonial purchased:**

On pages S-3 and S-81 through S-82 of the prospectus supplement,
CWALT, Bear Stearns, Countrywide Securities, and Edward Jones made
statements about the ratings assigned to the certificates issued in this
securitization. CWALT, Bear Stearns, Countrywide Securities, and Edward
Jones stated that Colonial's certificate was rated AAA by Standard & Poor's
and Aaa by Moody's. CWALT 2005-13CB Pros. Sup. S-3. These were the
highest ratings available from these two rating agencies.

CWALT, Bear Stearns, Countrywide Securities, and Edward Jones
also stated: "The classes of certificates listed below will not be offered
unless they are assigned the following ratings by Standard & Poor's . . . and
Moody's . . . ." CWALT 2005-13CB Pros. Sup. S-3.

CWALT, Bear Stearns, Countrywide Securities, and Edward Jones also stated: "It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's . . . and 'Aaa' by Moody's . . . ." CWALT 2005-13CB Pros. Sup. S-81.

**Item 103.     Summary of loans about which the defendants made untrue or misleading statements:**

    **(a)     Number of loans whose LTVs were materially understated as shown by the AVM:** 939

    **(b)     Number of loans whose LTVs were misleading because of undisclosed additional liens:** 747

    **(c)     Number of loans for which the properties were stated to be owner-occupied but were not:** 960

    **(d)     Number of loans that suffered EPDs:** 6

    **(e)     Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 2,111

    **(f)     Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 52.3%

# SCHEDULE 4

# SCHEDULE 4 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CWALT, Countrywide Securities, CFC, and BAC.

**Item 34.**     **Details of trust and certificate(s).**

(a)     **Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2006-2CB was a securitization in January 2006 of 3,307 mortgage loans, in one pool. CWALT was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by Countrywide Home Loans, Inc. CWALT 2006-2CB Pros. Sup. S-4 and S-24.

(b)     **Description of the certificate(s) that Colonial purchased:** Countrywide Securities was the underwriter of the security that Colonial purchased. Colonial purchased a senior certificate in this securitization, in class A-9, for which Colonial paid $9,608,000 plus accrued interest on September 5, 2007.

(c)     **Ratings of the certificate(s) when Colonial purchased them:** Fitch: AAA; Moody's: Aaa.

(d)     **Current ratings of the certificate(s):** Fitch: D; Moody's: Caa2.

(e)     **Date on which the certificate(s) were downgraded below investment grade:** December 17, 2008.

(f)     **URL of prospectus supplement for this securitization:** http://sec.gov/Archives/edgar/data/1269518/000095012906000810/v16185b 5e424b5.txt

(g)     **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate

that Colonial purchased, were issued pursuant or traceable to a registration statement filed by CWALT with the SEC on form S-3 on June 17, 2005. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 43.   Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, CWALT and Countrywide Securities made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)   The weighted-average original LTV ratio as of the cut-off date of all of the loans in the collateral pool was 76.57%. CWALT 2006-2CB Pros. Sup. S-5.

(b)   "No mortgage loan had a Loan-to-Value Ratio at origination of more than 95.00%." CWALT 2006-2CB Pros. Sup. S-25.

(c)   In the section of the prospectus supplement entitled "The Mortgage Pool," CWALT and Countrywide Securities presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 12 such tables in "The Mortgage Pool" section for all of the loans in the collateral pool. In each table the number of categories into which the loans

were divided ranged from 2 to 40. Thus, in "The Mortgage Pool" section, CWALT and Countrywide Securities made many untrue or misleading statements about the original LTVs of all of the loans in the collateral pool. CWALT 2006-2CB Pros. Sup. S-27 to S-35.

(d)   "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the mortgage loans was approximately 76.57%." CWALT 2006-2CB Pros. Sup. S-31.

**Item 52.    Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate | 3,307 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 1,199 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $69,312,570 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 446 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $19,442,673 |
| Number of loans with LTVs over 95%, as stated by defendants | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 372 |
| Weighted-average LTV, as stated by defendants | 76.57% |
| Weighted-average LTV, as determined by the model | 83.9% |

**Item 58.    Undisclosed additional liens:**

(a)   **Minimum number of properties with additional liens:** 1,414

(b)   **Weighted-average CLTV with additional liens:** 82.7%

**Item 67.    Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, CWALT and Countrywide Securities made the following statement about the appraisals of the properties that

secured the mortgage loans originated or acquired by Countrywide Home Loans, Inc.: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2006-2CB Pros. Sup. S-39.

### Item 73. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:

In the prospectus supplement, CWALT and Countrywide Securities made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)     In "The Mortgage Pool" section of the prospectus supplement, described in Item 43, CWALT and Countrywide Securities presented a table entitled "Occupancy Types." This table divided all of the mortgage loans in the collateral pool into the categories "Primary Residence," "Investment Property," and "Secondary Residence." This table contained untrue or misleading statements about, among other things, the number of mortgage loans, the aggregate principal balance outstanding, and the percent of the mortgage pool in each of these categories. CWALT 2006-2CB Pros. Sup. S-33.

(b)     In the "Occupancy Types" table, CWALT and Countrywide Securities stated that of the 3,307 mortgage loans in the collateral pool, 2,760 were secured by primary residences and 547 were not. CWALT 2006-2CB Pros. Sup. S-33.

### Item 80. Details of properties that were stated to be owner-occupied, but were not:

(a)     **Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 256

(b)     **Number of loans for which the owner of the property could have, but did not, designate the property as his or her**

homestead: 356

(c) **Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 157

(d) **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 595

**Item 83.  Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-37 through S-42 of the prospectus supplement, CWALT and Countrywide Securities made statements about the underwriting process of Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference.

One of these statements was that: "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWALT 2006-2CB Pros. Sup. S-38.

Another one of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2006-2CB Pros. Sup. S-38.

**Item 89.  Early payment defaults:**

(a) **Number of the mortgage loans that suffered EPDs:** 10

(b) **Percent of the mortgage loans that suffered EPDs:** 0.3%

**Item 90.  90+ days delinquencies:**

(a) **Number of the mortgage loans that suffered 90+ days delinquencies:** 1,233

(b) **Percent of the mortgage loans that suffered 90+ days delinquencies:** 37.3%

**Item 91.      30+ days delinquencies:**

    **(a)      Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 1,043

    **(b)      Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 31.5%

**Item 100.     Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-6 through S-7 and S-92 of the prospectus supplement, CWALT and Countrywide Securities made statements about the ratings assigned to the certificates issued in this securitization. CWALT and Countrywide Securities stated that Colonial's certificate was rated AAA by Fitch Ratings and Aaa by Moody's Investors Service, Inc. CWALT 2006-2CB Pros. Sup. S-6. These were the highest ratings available from these two rating agencies.

CWALT and Countrywide Securities also stated: "The offered certificates will not be offered unless they are assigned the indicated ratings by Fitch Ratings . . . [and] by. . . Moody's Investors Service, Inc." CWALT 2006-2CB Pros. Sup. S-7.

CWALT and Countrywide Securities also stated: "It is a condition to the issuance of the senior certificates . . . that they be rated 'AAA' by Fitch Ratings, Inc. . . . and 'Aaa' by Moody's Investors Service, Inc. . . . " CWALT 2006-2CB Pros. Sup. S-92.

**Item 103.     Summary of loans about which the defendants made untrue or misleading statements:**

    **(a)      Number of loans whose LTVs were materially understated as shown by the AVM:** 1,199

    **(b)      Number of loans whose LTVs were misleading because of undisclosed additional liens:** 1,414

    **(c)      Number of loans for which the properties were stated to be owner-occupied but were not:** 595

(d)     **Number of loans that suffered EPDs:** 10

(e)     **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 2,365

(f)     **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 71.5%

# SCHEDULE 5

## SCHEDULE 5 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CWALT, Countrywide Securities, Credit Suisse, CFC, and BAC.

**Item 34.     Details of trust and certificate(s).**

(a)     **Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2007-15CB was a securitization in May 2007 of 2,841 mortgage loans, in one pool. CWALT was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by Countrywide Home Loans, Inc. CWALT 2007-15CB Pros. Sup. S-4, S-33.

(b)     **Description of the certificate(s) that Colonial purchased:** Countrywide Securities and Credit Suisse were the underwriters of the security that Colonial purchased. Colonial purchased a senior certificate in this securitization, in class A-12, for which Colonial paid $12,255,818 plus accrued interest on September 11, 2007.

(c)     **Ratings of the certificate(s) when Colonial purchased them:** Moody's: Aaa; Standard & Poor's: AAA.

(d)     **Current ratings of the certificate(s):** Moody's: Caa3; Standard & Poor's: CCC.

(e)     **Date on which the certificate(s) were downgraded below investment grade:** February 20, 2009.

(f)     **URL of prospectus supplement for this securitization:** http://sec.gov/Archives/edgar/data/1269518/000114420407031131/v077843_424b5.htm

(g)     **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by CWALT with the SEC on form S-3 on February 28, 2007. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 43.     Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, CWALT, Countrywide Securities, and Credit Suisse made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)     As of the cut-off date, the weighted average original LTV ratio of the mortgage loans was 61.99%. CWALT 2007-15CB Pros. Sup. S-5.

(b)     "No mortgage loan had a Loan-to-Value Ratio at origination of more than 100%." CWALT 2007-15CB Pros. Sup. S-30.

(c)     In Annex A of the prospectus supplement ("The Mortgage Pool"), CWALT, Countrywide Securities, and Credit Suisse presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000.00, $50,000.01 to $100,000.00, $100,000.01 to $150,000.00, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-

to-Value Ratio." There were 13 such tables in "The Mortgage Pool" section for the loans in the collateral pool. In each table the number of categories into which the loans were divided ranged from 3 to 49. Thus, in "The Mortgage Pool" section, CWALT, Countrywide Securities, and Credit Suisse made many untrue or misleading statements about the original LTVs of the loans in the collateral pool. CWALT 2007-15CB Pros. Sup. A-1 to A-11.

(d)     "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the mortgage loans was approximately 61.99%." CWALT 2007-15CB Pros. Sup. A-5.

(e)     "As of the cut-off date, the weighted average original Combined Loan-to-Value Ratio of the mortgage loans was approximately 66.63%." CWALT 2007-15CB Pros. Sup. A-6.

**Item 52.     Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---|
| Number of loans that backed the certificate | 2,841 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 1,136 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $76,155,520 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 185 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $15,426,698 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 142 |
| Weighted-average LTV, as stated by defendants | 61.99% |
| Weighted-average LTV, as determined by the model | 74.3% |

**Item 67.   Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, CWALT, Countrywide Securities, and Credit Suisse made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by Countrywide Home Loans, Inc.: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2007-15CB Pros. Sup. S-35.

**Item 73.   Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, CWALT, Countrywide Securities, and Credit Suisse made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)    In "The Mortgage Pool" section of the prospectus supplement, described in Item 43, CWALT, Countrywide Securities, and Credit Suisse presented a table entitled "Occupancy Types." This table divided all of the mortgage loans in the collateral pool into the categories "Primary Residence," "Investment Property," and "Secondary Residence." This table contained untrue or misleading statements about, among other data, the number of mortgage loans, the aggregate principal balance outstanding, and the percent of the mortgage loans in each of these categories. CWALT 2007-15CB Pros. Sup. A-8.

(b)    In the "Occupancy Types" table, CWALT, Countrywide Securities, and Credit Suisse stated that of the 2,841 mortgage loans in the collateral pool, 2,499 were secured by primary residences and 342 were not. CWALT 2007-15CB Pros. Sup. A-8.

**Item 80.**  **Details of properties that were stated to be owner-occupied, but were not:**

   **(a)**  **Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 227

   **(b)**  **Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 440

   **(c)**  **Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 249

   **(d)**  **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 760

**Item 83.**  **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-33 through S-38 of the prospectus supplement CWALT, Countrywide Securities, and Credit Suisse made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference.

One of these statements was that: "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWALT 2007-15CB Pros. Sup. S-34.

Another one of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2007-15CB Pros. Sup. S-34.

**Item 89.**     **Early payment defaults:**

    **(a)**     **Number of the mortgage loans that suffered EPDs:** 6

    **(b)**     **Percent of the mortgage loans that suffered EPDs:** 0.2%

**Item 90.**     **90+ days delinquencies:**

    **(a)**     **Number of the mortgage loans that suffered 90+ days delinquencies:** 715

    **(b)**     **Percent of the mortgage loans that suffered 90+ days delinquencies:** 25.2%

**Item 91.**     **30+ days delinquencies:**

    **(a)**     **Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 585

    **(b)**     **Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 20.6%

**Item 100.**     **Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-6 through S-8 and S-99 of the prospectus supplement, CWALT, Countrywide Securities, and Credit Suisse made statements about the ratings assigned to the certificates issued in this securitization. CWALT, Countrywide Securities, and Credit Suisse stated that Colonial's certificate was rated Aaa by Moody's Investors Service, Inc., and AAA by Standard and Poor's. CWALT 2007-15CB Pros. Sup. S-6. These were the highest ratings available from these two rating agencies.

CWALT, Countrywide Securities, and Credit Suisse also stated: "The offered certificates will not be offered unless they are assigned the indicated ratings by Standard and Poor's . . . and Moody's Investors Service, Inc. . . . ." CWALT 2007-15CB Pros. Sup. S-8.

CWALT, Countrywide Securities, and Credit Suisse also stated: "It is a condition to the issuance of the offered certificates that they be

assigned the respective ratings set forth in the Summary of this prospectus supplement." CWALT 2007-15CB Pros. Sup. S-99.

**Item 103.**   **Summary of loans about which the defendants made untrue or misleading statements:**

    (a)    **Number of loans whose LTVs were materially understated as shown by the AVM:** 1,136

    (b)    **Number of loans for which the properties were stated to be owner-occupied but were not:** 760

    (c)    **Number of loans that suffered EPDs:** 6

    (d)    **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 1,598

    (e)    **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 56.2%

# SCHEDULE 6

## SCHEDULE 6 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CWALT, Countrywide Securities, Citigroup, CFC, and BAC.

**Item 34.      Details of trust and certificate(s).**

(a)      **Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2007-5CB was a securitization in February 2007 of 7,174 mortgage loans, in two groups. CWALT was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by Countrywide Home Loans, Inc. CWALT 2007-5CB Pros. Sup. S-4 and S-38.

(b)      **Description of the certificate(s) that Colonial purchased:** Countrywide Securities and Citigroup were the underwriters of the security that Colonial purchased. Colonial purchased a senior certificate in this securitization, in class 1-A-4, for which Colonial paid $28,950,000 plus accrued interest on September 28, 2007. Colonial's certificate was primarily paid by the 6,528 mortgage loans in loan group 1.

(c)      **Ratings of the certificate(s) when Colonial purchased them:** Fitch: AAA; Moody's: Aaa; Standard & Poor's: AAA.

(d)      **Current ratings of the certificate(s):** Fitch: D; Moody's: Caa3; Standard & Poor's: CCC.

(e)      **Date on which the certificate(s) were downgraded below investment grade:** December 16, 2008.

(f)      **URL of prospectus supplement for this securitization:** http://www.sec.gov/Archives/edgar/data/1269518/000114420407010851/v0 67214_424b5.htm

(g)      **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate

that Colonial purchased, were issued pursuant or traceable to a registration statement filed by CWALT with the SEC on form S-3 on February 7, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 43.    Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, CWALT, Countrywide Securities, and Citigroup made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)    As of the cut-off date, the weighted average original LTV ratio of the mortgage loans in loan group 1 was 70.09%. CWALT 2007-5CB Pros. Sup. S-5.

(b)    "No mortgage in loan [sic] any loan group had a Loan-to-Value Ratio at origination of more than 100%." CWALT 2007-5CB Pros. Sup. S-35.

(c)    In Annex I of the prospectus supplement ("The Mortgage Pool"), CWALT, Countrywide Securities, and Citigroup presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000.00, $50,000.01 to $100,000.00, $100,000.01 to $150,000.00, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 13 such tables in "The Mortgage Pool" section for the loans in loan group 1. In each table the number of categories into which the loans were divided

ranged from 3 to 90. Thus, in "The Mortgage Pool" section, CWALT, Countrywide Securities, and Citigroup made many untrue or misleading statements about the original LTVs of the loans in loan group 1. CWALT 2007-5CB Pros. Sup. A-1 to A-12.

(d) "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the mortgage loans in loan group 1 was approximately 70.09%." CWALT 2007-5CB Pros. Sup. A-6.

(e) "As of the cut-off date, the weighted average original Combined Loan-to-Value Ratio of the mortgage loans in loan group 1 was approximately 76.12%." CWALT 2007-5CB Pros. Sup. A-7.

**Item 52.    Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate (loan group 1) | 6,528 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 2,366 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $131,477,058 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 473 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $30,270,220 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 359 |
| Weighted-average LTV, as stated by defendants | 70.09% |
| Weighted-average LTV, as determined by the model | 79.7% |

**Item 67.    Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, CWALT, Countrywide Securities, and Citigroup made the following statement about the appraisals of the

properties that secured the mortgage loans originated or acquired by Countrywide Home Loans, Inc.: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2007-5CB Pros. Sup. S-39.

**Item 73.      Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, CWALT, Countrywide Securities, and Citigroup made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)      In Annex I of the prospectus supplement, described in Item 43, CWALT, Countrywide Securities, and Citigroup presented a table entitled "Occupancy Types" for loan group 1. This table divided the mortgage loans in loan group 1 into the categories "Primary Residence," "Investment Property," and "Secondary Residence." This table contained untrue or misleading statements about, among other data, the number of mortgage loans, the aggregate principal balance outstanding, and the percent of the mortgage loans in loan group 1 in each of these categories. CWALT 2007-5CB Pros. Sup. A-10.

(b)      In the "Occupancy Types" table, CWALT, Countrywide Securities, and Citigroup stated that of the 6,528 mortgage loans in loan group 1, 5,309 were secured by primary residences and 1,219 were not. CWALT 2007-5CB Pros. Sup. A-10.

**Item 80.      Details of properties in loan group 1 that were stated to be owner-occupied, but were not:**

**(a)      Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 490

(b)     **Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 881

(c)     **Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 506

(d)     **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 1,485

**Item 83.     Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-38 through S-43 of the prospectus supplement, CWALT, Countrywide Securities, and Citigroup made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference.

One of these statements was that: "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWALT 2007-5CB Pros. Sup. S-39.

Another one of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2007-5CB Pros. Sup. S-39.

**Item 89.     Early payment defaults in loan group 1:**

(a)     **Number of the mortgage loans that suffered EPDs:** 39

(b)     **Percent of the mortgage loans that suffered EPDs:** 0.6%

**Item 90.     90+ days delinquencies in loan group 1:**

(a)     **Number of the mortgage loans that suffered 90+ days delinquencies:** 2,230

**(b)     Percent of the mortgage loans that suffered 90+ days delinquencies:** 34.2%

**Item 91.     30+ days delinquencies in loan group 1:**

**(a)     Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 1,903

**(b)     Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 29.2%

**Item 100.     Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-6 through S-9 and S-129 through S-130 of the prospectus supplement, CWALT, Countrywide Securities, and Citigroup made statements about the ratings assigned to the certificates issued in this securitization. CWALT, Countrywide Securities, and Citigroup stated that Colonial's certificate was rated AAA by Fitch Ratings, Aaa by Moody's Investors Service, Inc., and AAA by Standard & Poor's. CWALT 2007-5CB Pros. Sup. S-6. These were the highest ratings available from these three rating agencies.

CWALT, Countrywide Securities, and Citigroup also stated: "The offered certificates will not be offered unless they are assigned the indicated ratings by Fitch Ratings, Moody's Investors Service, Inc. and Standard & Poor's. . . ." CWALT 2007-5CB Pros. Sup. S-9.

CWALT, Countrywide Securities, and Citigroup also stated: "It is a condition to the issuance of the offered certificates that they be assigned the respective ratings set forth in the Summary of this prospectus supplement." CWALT 2007-5CB Pros. Sup. S-129.

**Item 103.     Summary of loans in loan group 1 about which the defendants made untrue or misleading statements:**

**(a)     Number of loans whose LTVs were materially understated as shown by the AVM:** 2,366

    (b)    **Number of loans for which the properties were stated to be owner-occupied but were not:** 1,485

    (c)    **Number of loans that suffered EPDs:** 39

    (d)    **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 3,329

    (e)    **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 51.0%

# SCHEDULE 7

# SCHEDULE 7 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CWMBS, Countrywide Securities, CFC, and BAC.

**Item 34.     Details of trust and certificate(s).**

(a)     **Description of the trust:** CHL Mortgage Trust, Pass-Through Certificates, Series 2006-14 was a securitization in July 2006 of 589 mortgage loans, in one pool. CWMBS was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by Countrywide Home Loans, Inc. CWHL 2006-14 Pros. Sup. S-32.

(b)     **Description of the certificate(s) that Colonial purchased:** Countrywide Securities was the underwriter of the security that Colonial purchased. Colonial purchased a senior certificate in this securitization, in class A-5, for which Colonial paid $37,697,000 plus accrued interest on December 5, 2006.

(c)     **Ratings of the certificate(s) when Colonial purchased them:** Fitch: AAA; Moody's: Aaa.

(d)     **Current ratings of the certificate(s):** Fitch: C; Moody's: Caa2.

(e)     **Date on which the certificate(s) were downgraded below investment grade:** May 5, 2009.

(f)     **URL of prospectus supplement for this securitization:** http://sec.gov/Archives/edgar/data/906410/000095013406014475/v22484b5 e424b5.txt

(g)     **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate

that Colonial purchased, were issued pursuant or traceable to a registration statement filed by CWMBS with the SEC on form S-3 on February 8, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 43.    Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, CWMBS and Countrywide Securities made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)    As of the cut-off date, the weighted average original LTV ratio of the mortgage loans was 73.78%. CWHL 2006-14 Pros. Sup. S-5.

(b)    "No mortgage loan had a Loan-to-Value Ratio at origination or on the closing date of more than 95.00%." CWHL 2006-14 Pros. Sup. S-23.

(c)    In the section of the prospectus supplement entitled "the Mortgage Pool," CWMBS and Countrywide Securities presented a table entitled "Original Loan-to-Value Ratios." This table divided the loans in the collateral pool into 10 categories of original LTV (for example, 50.00% and below, 50.01% to 55.00%, 55.01% to 60.00%, 60.01% to 65.00%, etc.). The table contained untrue or misleading statements about the number of mortgage loans, the unpaid principal balance, and the percent of principal balance outstanding in each of these categories. CWHL 2006-14 Pros. Sup. S-27.

(d)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the mortgage loans was approximately 73.78%." CWHL 2006-14 Pros. Sup. S-27.

**Item 52.**   **Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate | 589 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 211 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $35,720,772 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 32 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $6,736,684 |
| Number of loans with LTVs over 95%, as stated by defendants | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 71 |
| Weighted-average LTV, as stated by defendants | 73.78% |
| Weighted-average LTV, as determined by the model | 87.3% |

**Item 58.**   **Undisclosed additional liens:**

    **(a)**   **Minimum number of properties with additional liens:** 196

    **(b)**   **Weighted average CLTV with additional liens:** 76.8%

**Item 67.**   **Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, CWMBS and Countrywide Securities made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by Countrywide Home Loans, Inc.: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWHL 2006-14 Pros. Sup. S-34.

**Item 73.     Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, CWMBS and Countrywide Securities made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)     In the "Mortgage Pool" section of the prospectus supplement, described in Item 43, CWMBS and Countrywide Securities presented a table entitled "Occupancy Types." This table divided all of the mortgage loans in the collateral pool into the categories "Primary Residence" and "Secondary Residence." This table contained untrue or misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of mortgage loans in each of these categories. CWHL 2006-14 Pros. Sup. S-29.

(b)     In the "Occupancy Types" table, CWMBS and Countrywide Securities stated that of the 589 mortgage loans in the collateral pool, 543 were secured by primary residences and 46 were not. CWHL 2006-14 Pros. Sup. S-29.

**Item 80.     Details of properties that were stated to be owner-occupied, but were not:**

**(a)     Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 57**

**(b)     Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead: 109**

**(c)     Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address: 31**

**(d)     Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 153**

**Item 83.      Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-32 through S-33 of the prospectus supplement, CWMBS and Countrywide Securities made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference.

One of these statements was that: "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWHL 2006-14 Pros. Sup. S-33.

Another one of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWHL 2006-14 Pros. Sup. S-33.

**Item 90.      90+ days delinquencies:**

    **(a)      Number of the mortgage loans that suffered 90+ days delinquencies:** 99

    **(b)      Percent of the mortgage loans that suffered 90+ days delinquencies:** 16.8%

**Item 91.      30+ days delinquencies:**

    **(a)      Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 73

    **(b)      Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 12.4%

**Item 100.     Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-6 and S-80 of the prospectus supplement, CWMBS and Countrywide Securities made statements about the ratings assigned to the

certificates issued in this securitization. CWMBS and Countrywide Securities stated that Colonial's certificate was rated AAA by Fitch Ratings, and Aaa by Moody's. These were the highest ratings available from these two rating agencies.

CWMBS and Countrywide Securities also stated: "The offered certificates will not be offered unless they are assigned the indicated ratings by Fitch Ratings . . . and Moody's Investor Services, Inc. . . ." CWHL 2006-14 Pros. Sup. S-6.

CWMBS and Countrywide Securities also stated: "It is a condition to the issuance of the senior certificates . . . that they be rated 'AAA' by Fitch Ratings . . . and 'Aaa' by Moody's Investors Service, Inc. . . . ." CWHL 2006-14 Pros. Sup. S-80.

**Item 103.** **Summary of loans about which the defendants made untrue or misleading statements:**

  (a)  **Number of loans whose LTVs were materially understated as shown by the AVM:** 211

  (b)  **Number of loans whose LTVs were misleading because of undisclosed additional liens:** 196

  (c)  **Number of loans for which the properties were stated to be owner-occupied but were not:** 153

  (d)  **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 405

  (e)  **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 68.8%

# SCHEDULE 8

## SCHEDULE 8 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CWMBS, Countrywide Securities, RBS, CFC, and BAC.

**Item 34.     Details of trust and certificate(s).**

(a)     **Description of the trust:** CHL Mortgage Trust, Pass-Through Certificates, Series 2007-7 was a securitization in April 2007 of 1,208 mortgage loans, in one pool. CWMBS was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by Countrywide Home Loans, Inc. CWHL 2007-7 Pros. Sup. S-29.

(b)     **Description of the certificate(s) that Colonial purchased:** Countrywide Securities and RBS were the underwriters of the security that Colonial purchased. Colonial purchased a senior certificate in this securitization, in class A-9, for which Colonial paid $8,298,281 plus accrued interest on August 21, 2007.

(c)     **Ratings of the certificate(s) when Colonial purchased them:** Fitch: AAA; Standard & Poor's: AAA.

(d)     **Current ratings of the certificate(s):** Fitch: CC; Standard & Poor's: CCC.

(e)     **Date on which the certificate(s) were downgraded below investment grade:** April 8, 2009.

(f)     **URL of prospectus supplement for this securitization:** http://sec.gov/Archives/edgar/data/906410/000095012407002585/v29637e4 24b5.htm

(g)     **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate

that Colonial purchased, were issued pursuant or traceable to a registration statement filed by CWMBS with the SEC on form S-3 on February 28, 2007. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 43.    Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, CWMBS, Countrywide Securities, and RBS made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)    As of the cut-off date, the weighted average original LTV ratio of the mortgage loans was 72.19%. CWHL 2007-7 Pros. Sup. S-5.

(b)    In Annex A of the prospectus supplement entitled "The Mortgage Pool," CWMBS, Countrywide Securities, and RBS presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, current mortgage loan principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $400,000.01 to $450,000, $450,000.01 to $500,000, $500,000.01 to $550,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 12 such tables in Annex A for all of the loans in the collateral pool. In each table the number of categories into which the loans were divided ranged from 2 to 11. Thus, in Annex A, CWMBS, Countrywide Securities, and RBS made many untrue or misleading statements about the original LTVs of all of the loans in the

collateral pool. CWHL 2007-7 Pros. Sup. A-1 to A-8.

    (c)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the mortgage loans was approximately 72.19%." CWHL 2007-7 Pros. Sup. A-3.

    (d)    "As of the cut-off date, the weighted average original Combined Loan-to-Value Ratio of the mortgage loans was approximately 74.87%." CWHL 2007-7 Pros. Sup. A-4.

    (e)    "No mortgage loan had a Loan-to-Value Ratio at origination of more than 100.00%." CWHL 2007-7 Pros. Sup. S-26.

**Item 52.**     **Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate | 1,208 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 492 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $83,271,085 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 42 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $7,222,565 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 94 |
| Weighted-average LTV, as stated by defendants | 72.19% |
| Weighted-average LTV, as determined by the model | 85.3% |

**Item 67.**     **Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, CWMBS, Countrywide Securities, and RBS made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by Countrywide Home

Loans, Inc.: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWHL 2007-7 Pros. Sup. S-31.

**Item 73.    Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, CWMBS, Countrywide Securities, and RBS made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)    In Annex A of the prospectus supplement, described in Item 43, CWMBS, Countrywide Securities, and RBS presented a table entitled "Occupancy Types." This table divided all of the mortgage loans in the collateral pool into the categories "Primary Residence" and "Secondary Residence." This table contained untrue or misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of mortgage loans in each of these categories. CWHL 2007-7 Pros. Sup. A-6.

(b)    In the "Occupancy Types" table, CWMBS, Countrywide Securities, and RBS stated that of the 1,208 mortgage loans in the collateral pool, 1,156 were secured by primary residences and 52 were not. CWHL 2007-7 Pros. Sup. A-6.

**Item 80.    Details of properties that were stated to be owner-occupied, but were not:**

(a)    **Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 79

(b)    **Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 208

    (c)    **Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 82

    (d)    **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 302

**Item 83.**    **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-29 through S-31 of the prospectus supplement, CWMBS, Countrywide Securities, and RBS made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference.

One of these statements was that: "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWHL 2007-7 Pros. Sup. S-30.

Another one of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWHL 2007-7 Pros. Sup. S-30.

**Item 90.**    **90+ days delinquencies:**

    (a)    **Number of the mortgage loans that suffered 90+ days delinquencies:** 242

    (b)    **Percent of the mortgage loans that suffered 90+ days delinquencies:** 20%

**Item 91.**    **30+ days delinquencies:**

    (a)    **Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 179

    (b)    **Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 14.8%

**Item 100.    Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-6 through S-7 and S-86 of the prospectus supplement, CWMBS, Countrywide Securities, and RBS made statements about the ratings assigned to the certificates issued in this securitization. CWMBS, Countrywide Securities, and RBS stated that Colonial's certificate was rated AAA by Fitch Ratings and AAA by Standard & Poor's. CWHL 2007-7 Pros. Sup. S-6. These were the highest ratings available from these two rating agencies.

CWMBS, Countrywide Securities, and RBS also stated: "The offered certificates will not be offered unless they are assigned the indicated ratings by Fitch Ratings . . . and Standard & Poor's . . ." CWHL 2007-7 Pros. Sup. S-7.

CWMBS, Countrywide Securities, and RBS also stated: "It is a condition to the issuance of the offered certificates that they be assigned the respective ratings set forth in the Summary of this prospectus supplement." CWHL 2007-7 Pros. Sup. S-86.

**Item 103.    Summary of loans about which the defendants made untrue or misleading statements:**

    **(a)    Number of loans whose LTVs were materially understated as shown by the AVM:** 492

    **(b)    Number of loans for which the properties were stated to be owner-occupied but were not:** 302

    **(c)    Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 858

    **(d)    Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 71.0%

# SCHEDULE 9

# SCHEDULE 9 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CWALT, DBS, JP Morgan, CFC, and BAC.

**Item 34.    Details of trust and certificate(s).**

**(a)    Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2005-65CB was a securitization in November 2005 of 4,983 mortgage loans, in two groups. CWALT was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by Countrywide Home Loans, Inc. CWALT 2005-65CB Pros. Sup. S-4; S-15 and S-36.

**(b)    Description of the certificate(s) that Colonial purchased:** DBS and JP Morgan were underwriters of the security that Colonial purchased. Colonial purchased a senior certificate in this securitization, in class 2-A-4, for which Colonial paid $23,426,741 plus accrued interest on January 12, 2006. Colonial's certificate was primarily paid by the 2,440 mortgage loans in loan group 2.

**(c)    Ratings of the certificate(s) when Colonial purchased them**: Moody's: Aaa; Standard & Poor's: AAA; Dominion Bond Rating Service: AAA.

**(d)    Current ratings of the certificate(s):** Moody's: Caa2; Standard & Poor's: CC; Dominion Bond Rating Service: C.

**(e)    Date on which the certificate(s) were downgraded below investment grade:** February 20, 2009.

**(f)    URL of prospectus supplement for this securitization:** http://www.sec.gov/Archives/edgar/data/1269518/000095012905011497/v1 4709e424b5.txt.

(g)     **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by CWALT with the SEC on form S-3 on June 17, 2005. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 43.      Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, CWALT, DBS, and JP Morgan made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)     "No mortgage loan in any loan group had a Loan-to-Value Ratio at origination of more than 100.00%." CWALT 2005-65CB Pros. Sup. S-16.

(b)     In the section of the prospectus supplement entitled "The Mortgage Pool," CWALT, DBS, and JP Morgan presented tables of statistics about the mortgage loans in the collateral pool. CWALT 2005-65CB Pros. Sup. S-18 to S-34. Each table focused on a certain characteristic of the loans (for example, current mortgage loan principal balance) and divided the loans into categories based on that characteristic (for example, loans with a range of current mortgage loan principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 10 such tables in "The Mortgage Pool" section for the mortgage loans in

loan group 2. In each table, the number of categories into which the loans were divided ranged from 3 to 35. Thus, in "The Mortgage Pool" section, CWALT, DBS, and JP Morgan made many untrue or misleading statements about the original LTVs of the loans in loan group 2. CWALT 2005-65CB Pros. Sup. S-26 to S-34.

(c)     "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the mortgage loans in loan group 2 is approximately 70.57%." CWALT 2005-65CB Pros. Sup. S-30.

**Item 52.     Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate (loan group 2) | 2,440 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 695 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $36,679,073 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 250 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $15,980,015 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 128 |
| Weighted-average LTV, as stated by defendants | 70.57% |
| Weighted-average LTV, as determined by the model | 78.3% |

**Item 58.     Undisclosed additional liens in loan group 2:**

**(a)     Minimum number of properties with additional liens:** 567

**(b)     Weighted-average CLTV with additional liens:** 73.9%

**Item 67.      Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, CWALT, DBS, and JP Morgan made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by Countrywide Home Loans, Inc.: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2005-65CB Pros. Sup. S-38.

**Item 73.      Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, CWALT, DBS, and JP Morgan made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)      In "The Mortgage Pool" section of the prospectus supplement, described in Item 43, CWALT, DBS, and JP Morgan presented a table entitled "Occupancy Types." This table divided all of the mortgage loans in loan group 2 into the categories "Primary Residence," "Investment Property," and "Secondary Residence." This table contained untrue or misleading statements about, among other data, the number of mortgage loans, the aggregate principal balance outstanding, and the percent of mortgage loans in loan group 2 in each of these categories. CWALT 2005-65CB Pros. Sup. S-33.

(b)      In the "Occupancy Types" table, CWALT, DBS, and JP Morgan stated that of 2,440 mortgage loans in loan group 2, 2,008 were secured by primary residences, and 432 were not. CWALT 2005-65CB Pros. Sup. S-33.

**Item 80.**   **Details of properties in loan group 2 that were stated to be owner-occupied, but were not:**

(a)   **Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 201

(b)   **Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 323

(c)   **Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 146

(d)   **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 592

**Item 83.**   **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-36 to S-41 of the prospectus supplement, CWALT, DBS, and JP Morgan made statements about the underwriting guidelines of Countrywide Home Loans, Inc., which originated or acquired all of the mortgage loans in the collateral pool of this securitization. All of those statements are incorporated herein by reference.

One of these statements was that: "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWALT 2005-65CB Pros. Sup. S-37.

Another one of those statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2005-65CB Pros. Sup. S-37.

**Item 90.**   **90+ days delinquencies in loan group 2:**

    **(a)**   **Number of the mortgage loans that suffered 90+ days delinquencies:** 475

    **(b)**   **Percent of the mortgage loans that suffered 90+ days delinquencies:** 19.5%

**Item 91.**   **30+ days delinquencies in loan group 2:**

    **(a)**   **Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 431

    **(b)**   **Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 17.7%

**Item 100.**   **Statements about the ratings of the certificate(s) that the Colonial purchased:**

On page S-3 through S-4, and S-98 through S-99 of the prospectus supplement, CWALT, DBS, and JP Morgan made statements about the ratings assigned to the certificates issued in this securitization. CWALT, DBS, and JP Morgan stated that Colonial's certificate was rated AAA by Standard & Poor's, Aaa by Moody's Investors Service, and AAA by Dominion Bond Rating Service. CWALT 2005-65CB Pros. Sup. S-3. These were the highest ratings available from these three rating agencies.

CWALT, DBS, and JP Morgan also stated that: "The classes of certificates listed below will not be offered unless they are assigned the following ratings by Standard & Poor's . . .  Moody's . . . and Dominion Bond Rating Service . . . ." CWALT 2005-65CB Pros. Sup. S-3.

CWALT, DBS, and JP Morgan also stated that: "It is a condition to the issuance of the senior certificates that they be rated "AAA" each by Standard and Poor's . . . and Dominion Bond Rating Service . . . and 'Aaa' by Moody's . . . ." CWALT 2005-65CB Pros. Sup. S-98.

**Item 103.** **Summary of loans in loan group 2 about which the defendants made untrue or misleading statements:**

    **(a)** **Number of loans whose LTVs were materially understated as shown by the AVM:** 695

    **(b)** **Number of loans whose LTVs were misleading because of undisclosed additional liens:** 567

    **(c)** **Number of loans for which the properties were stated to be owner-occupied but were not:** 592

    **(d)** **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 1,446

    **(e)** **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 59.3%

# SCHEDULE 10

# SCHEDULE 10 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CWALT, BAS, Barclays, CFC, and BAC.

**Item 34.     Details of trust and certificate(s).**

(a)     **Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2006-29T1 was a securitization in August 2006 of 1,083 mortgage loans, in three groups.[1] CWALT was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by Countrywide Home Loans, Inc. CWALT 2006-29T1 Pros. Sup. S-4; S-66.

(b)     **Description of the certificate(s) that Colonial purchased:** BAS and Barclays were underwriters of the security that Colonial purchased. Colonial purchased a senior certificate in class 3-A-7 of this securitization, for which Colonial paid $28,487,879 plus accrued interest on June 5, 2007. Colonial's certificate was primarily paid by the 459 mortgage loans in loan group 3.

(c)     **Ratings of the certificate(s) when Colonial purchased them:** Fitch: AAA; S&P: AAA.

(d)     **Current ratings of the certificate(s):** Fitch: D; Standard & Poor's: D.

---

[1] CWALT 2006-29T1 was a prefunded securitization. CWALT 2006-29T1 Pros. Sup. S-5. On the closing date of the securitization there were 1,083 mortgage loans in the trust (the "Initial Mortgage Loans"), and 374 Initial Mortgage Loans in loan group 3. CWALT 2006-29T1 Pros. Sup. S-40 to S-62. After the closing date of the securitization, the trust purchased an additional 85 mortgage loans in loan group 3. The data contained in the charts and tables in this schedule include those additional 85 mortgage loans that were added to loan group 3, unless otherwise indicated.

(e)     **Date on which the certificate(s) were downgraded below investment grade:** September 22, 2008.

(f)     **URL of prospectus supplement for this securitization:** http://www.sec.gov/Archives/edgar/data/1269518/000095012406005015/v2 3274b5e424b5.txt

(g)     **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by CWALT with the SEC on form S-3 on February 7, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 43.     Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, CWALT, BAS, and Barclays made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)     "No Initial Mortgage Loan in any loan group had a Loan-to-Value Ratio at origination or on the closing date of more than 100.00%." CWALT 2006-29T1 Pros. Sup. S-37.

(b)     In the section of the prospectus supplement entitled "The Mortgage Pool," CWALT, BAS, and Barclays presented tables of statistics about the Initial Mortgage Loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $400,000.01 to

$450,000.00, $450,000.01 to $500,000.00, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 12 such tables in "The Mortgage Pool" section for the Initial Mortgage Loans in loan group 3. In each table the number of categories into which the loans were divided ranged from 2 to 14. Thus, in "The Mortgage Pool" section, CWALT, BAS, and Barclays made many untrue or misleading statements about the original LTVs of the Initial Mortgage Loans in loan group 3. CWALT 2006-29T1 Pros. Sup. S-56 to S-62.

(c) "As of the initial cut-off date, the weighted average original Loan-to-Value Ratio of the Initial Mortgage Loans in loan group 3 was approximately 75.10%." CWALT 2006-29T1 Pros. Sup. S-58.

**Item 52.** **Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate (loan group 3) | 459 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 196 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $38,463,334 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 22 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $2,694,133 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 66 |
| Weighted-average LTV, as stated by defendants | 75.10% |
| Weighted-average LTV, as determined by the model | 98.8% |

**Item 58.     Undisclosed additional liens in loan group 3:**

    **(a)     Minimum number of properties with additional liens:** 233

    **(b)     Weighted average CLTV with additional liens:** 83.3%

**Item 67.     Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, CWALT, BAS, and Barclays made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by Countrywide Home Loans, Inc.: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2006-29T1 Pros. Sup. S-68.

**Item 73.     Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, CWALT, BAS, and Barclays made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

    (a)     In "The Mortgage Pool" section of the prospectus supplement, described in Item 43, CWALT, BAS, and Barclays presented a table entitled "Occupancy Types." This table divided the mortgage loans in loan group 3 into the categories "Primary Residence," "Investment Property," and "Secondary Residence." This table contained untrue or misleading statements about, among other data, the number of initial mortgage loans, the aggregate principal balance outstanding, and the percent of the mortgage loans in loan group 3 in each of these categories. CWALT 2006-29T1 Pros. Sup. S-60.

    (b)     In the "Occupancy Types" table, CWALT, BAS, and Barclays stated that of the 374 Initial Mortgage Loans in loan group 3, 317 were secured by primary residences, and 57 were not. CWALT 2006-29T1 Pros.

Sup. S-60.

**Item 80.**    **Details of properties that were stated to be owner-occupied, but were not:**

    **(a)**    **Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 30

    **(b)**    **Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 66

    **(c)**    **Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 42

    **(d)**    **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 113

**Item 83.**    **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-66 through S-72 of the prospectus supplement, CWALT, BAS, and Barclays made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference.

One of these statements was that: "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWALT 2006-29T1 Pros. Sup. S-67.

Another one of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2006-29T1 Pros. Sup. S-68.

**Item 89.**    **Early payment defaults in loan group 3:**

    **(a)**    **Number of the mortgage loans that suffered EPDs:** 14

    **(b)**    **Percent of the mortgage loans that suffered EPDs:** 3.1%

**Item 90.**    **90+ days delinquencies in loan group 3:**

    **(a)**    **Number of the mortgage loans that suffered 90+ days delinquencies:** 217

    **(b)**    **Percent of the mortgage loans that suffered 90+ days delinquencies:** 47.3%

**Item 91.**    **30+ days delinquencies in loan group 3:**

    **(a)**    **Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 178

    **(b)**    **Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 38.8%

**Item 100.**    **Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-7 through S-10 and S-164 through S-165 of the prospectus supplement, CWALT, BAS, and Barclays made statements about the ratings assigned to the certificates issued in this securitization. CWALT, BAS, and Barclays stated that Colonial's certificate was rated AAA by Fitch Ratings and AAA by Standard & Poor's.

CWALT, BAS, and Barclays also stated: "The offered certificates will not be offered unless they are assigned the indicated ratings by Fitch Ratings . . . Standard & Poor's . . . and Moody's . . . ." CWALT 2006-29T1 Pros. Sup. S-10.

CWALT, BAS, and Barclays also stated: "It is a condition to the issuance of the offered certificates that they be assigned the respective ratings set forth in the Summary of this prospectus supplement." CWALT 2006-29T1 Pros. Sup. S-164.

**Item 103.** **Summary of loans in loan group 3 about which the defendants made untrue or misleading statements:**

    **(a)** **Number of loans whose LTVs were materially understated as shown by the AVM:** 196

    **(b)** **Number of loans whose LTVs were misleading because of undisclosed additional liens:** 233

    **(c)** **Number of loans for which the properties were stated to be owner-occupied but were not:** 113

    **(d)** **Number of loans that suffered EPDs:** 14

    **(e)** **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 363

    **(f)** **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 79.1%

601472722