

1  MICHAEL R. MATTHIAS, Bar No. 57728
   *mmatthias@bakerlaw.com*
2  GABRIEL E. DRUCKER, Bar No. 254448
   *gdrucker@bakerlaw.com*
3  BAKER & HOSTETLER LLP
   12100 Wilshire Boulevard, 15ᵗʰ Floor
4  Los Angeles, California 90025-7120
   Telephone:  310.820.8800
5  Facsimile:   310.820.8859

6  DAVID J. GRAIS (*pro hac vice*)
   *dgrais@graisellsworth.com*
7  MARK B. HOLTON (*pro hac vice*)
   *mholton@graisellsworth.com*
8  MARY G. MENGE (*pro hac vice*)
   *mmenge@graisellsworth.com*
9  GRAIS & ELLSWORTH LLP
   1211 Avenue of the Americas
10 New York, New York 10036
   Telephone:  212.755.0010
11 Facsimile:   212.755.0052

12 Attorneys for Plaintiff
   Federal Deposit Insurance Corporation
13 as Receiver for Colonial Bank

FILED
CLERK, U.S. DISTRICT COURT

NOV – 6 2012

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

14                **UNITED STATES DISTRICT COURT**

15                **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 16 FEDERAL DEPOSIT INSURANCE<br>CORPORATION AS RECEIVER FOR<br>17 COLONIAL BANK,<br>18              Plaintiff,<br>19        v.<br>20 COUNTRYWIDE SECURITIES<br>CORPORATION; CWALT, INC.;<br>CWMBS, INC.; COUNTRYWIDE<br>21 FINANCIAL CORPORATION; BANK<br>OF AMERICA CORPORATION;<br>22 BARCLAYS CAPITAL INC.;<br>CITIGROUP GLOBAL MARKETS<br>23 INC.; CREDIT SUISSE SECURITIES<br>(USA) LLC; DEUTSCHE BANK<br>24 SECURITIES INC.; EDWARD D.<br>JONES & CO., L.P.; J.P. MORGAN<br>25 SECURITIES LLC; MERRILL<br>LYNCH, PIERCE, FENNER &<br>26 SMITH INC.; and RBS SECURITIES<br>INC.,<br>27              Defendants. | Case No. 12-CV-06911-MRP (MANx)<br><br>[Judge:  Hon. Mariana R. Pfaelzer]<br><br>**FIRST AMENDED COMPLAINT<br>FOR VIOLATION OF THE<br>SECURITIES ACT OF 1933<br>(15 U.S.C. §§ 77k AND 77o)**<br><br>**DEMAND FOR JURY TRIAL** |

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1   Plaintiff Federal Deposit Insurance Corporation as Receiver for Colonial

2   Bank for its First Amended Complaint (**Complaint**) against Countrywide Securities

3   Corporation (**Countrywide Securities**); CWALT, Inc. (**CWALT**); CWMBS, Inc.

4   (**CWMBS**); Countrywide Financial Corporation (**CFC**); Bank of America

5   Corporation (**BAC**); Barclays Capital Inc. (**Barclays**); Citigroup Global Markets

6   Inc. (**Citigroup**); Credit Suisse Securities (USA) LLC (formerly known as Credit

7   Suisse First Boston LLC and referred to in this Complaint as **Credit Suisse**);

8   Deutsche Bank Securities Inc. (**DBS**); Edward D. Jones & Co., L.P. (**Edward**

9   **Jones**); J.P. Morgan Securities LLC (formerly known as Bear, Stearns & Co. Inc.

10  and referred to in this Complaint as **Bear Stearns**), which is the successor by

11  merger to J.P. Morgan Securities Inc. (in that capacity referred to in this Complaint

12  as **JP Morgan**); Merrill Lynch, Pierce, Fenner & Smith Inc. (successor by merger

13  to Banc of America Securities LLC, which is referred to in this Complaint as **BAS**);

14  and RBS Securities Inc. (formerly known as Greenwich Capital Markets, Inc. and

15  doing business as RBS Greenwich Capital, and referred to in this Complaint as

16  **RBS**), alleges as follows:

## I. NATURE OF THIS ACTION

17

18  1.   This is an action for damages caused by violation of the Securities Act

19  of 1933 (**1933 Act**) by the defendants. As alleged in detail below, defendants issued

20  and underwrote 11 securities known as "certificates," which were backed by

21  collateral pools of residential mortgage loans in ten securitizations. Colonial Bank

22  (**Colonial**) paid approximately $259 million for the 11 certificates. When they

23  issued or underwrote the certificates, the defendants made numerous statements of

24  material fact about the certificates and, in particular, about the credit quality of the

25  mortgage loans that backed them. Many of those statements were untrue. Moreover,

26  the defendants omitted to state many material facts that were necessary in order to

27  make their statements not misleading. For example, the defendants made untrue

28  statements or omitted important information about such material facts as the loan-

1  to-value ratios of the mortgage loans, the extent to which appraisals of the

2  properties that secured the loans were performed in compliance with professional

3  appraisal standards, the number of borrowers who did not live in the houses that

4  secured their loans (that is, the number of properties that were not primary

5  residences), and the extent to which the entities that made the loans disregarded

6  their own standards in doing so.

7        2.     The allegations in this Complaint are based on an investigation by

8  Plaintiff. That investigation included, for example: (i) review and analysis of the

9  offering materials for the certificates; (ii) review and analysis of thousands of pages

10  of documents relating to, among other things, the purchase of the certificates by

11  Colonial; (iii) review and analysis of media reports, congressional testimony, court

12  filings, and other publicly available information about the practices of the

13  defendants and of the originators of the mortgage loans that backed the certificates;

14  and (iv) review and analysis of performance, rating, and pricing data about the

15  securitizations involved in this Complaint.

16        3.     Plaintiff's investigation also included a forensic analysis of a random

17  sample of loans in the securitizations to determine whether the statements in the

18  prospectus supplements about the mortgage loans backing the certificates were

19  accurate. As part of that forensic review, Plaintiff purchased from a leading vendor

20  data relating to the loans underlying the securitizations. Plaintiff's analysis of that

21  data showed that defendants made such untrue or misleading statements about at

22  least the following numbers of loans.

23  / / /

24  / / /

25  / / /

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 (15 U.S.C. §§ 77k AND 77o)
12-CV-06911 MRP MANX

| Securitization No.[1] | Number of Loans about which Defendants Made Material Untrue or Misleading Statements[2] | Number of Loans that Backed the Certificates | Percentage of Loans about which Defendants Made Material Untrue or Misleading Statements |
|---|---|---|---|
| 1 | 312 | 436 | 71.6% |
| 2 | 1,716 | 2,837 | 60.5% |
| 3 | 2,111 | 4,040 | 52.3% |
| 4 | 2,365 | 3,307 | 71.5% |
| 5 | 1,598 | 2,841 | 56.2% |
| 6 | 3,329 | 6,528 | 51.0% |
| 7 | 405 | 589 | 68.8% |
| 8 | 858 | 1,208 | 71.0% |
| 9 | 1,446 | 2,440 | 59.3% |
| 10 | 363 | 459 | 79.1% |

4.     The certificates are "securities" within the meaning of the 1933 Act. The defendants are liable under the following provisions of the 1933 Act:

*As issuers:* The following defendants, which issued the certificates that Colonial purchased, are liable as "issuers" under Section 11 of the 1933 Act: CWALT, which issued nine of the certificates; and CWMBS, which issued two of the certificates.

*As underwriters:* The following defendants, which underwrote the certificates that Colonial purchased, are liable as "underwriters" under Section 11 of the 1933 Act: Countrywide Securities, which underwrote nine of the certificates; Edward Jones, which underwrote two of the certificates; DBS, which underwrote

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

_____

[1]   Colonial purchased two certificates in Securitization No. 1.
[2]   The method of random sampling that Plaintiff used ensures that conclusions about the entire collateral pool have a margin of error of no more than plus or minus 6% at a confidence level of 95% (that is, one can be 95% certain that the true percentage in the collateral pool as a whole is within 6% of the percentage measured in the sample). For example, one can be 95% certain that the number of loans in Securitization No. 1 about which defendants made untrue or misleading statements or omissions is within 6% of 312, that is, between 293 and 331. The same margin of error should be applied to all information in the Complaint and accompanying Schedules that is based on a random sample of loans in a collateral pool.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1    two of the certificates; and Barclays, BAS, Bear Stearns, Citigroup, Credit Suisse,

2    JP Morgan, and RBS, each of which underwrote one of the certificates.

3        *As control person:* CFC is liable as a "controlling person" of CWALT,

4    CWMBS, and Countrywide Securities under Section 15 of the 1933 Act, 15 U.S.C.

5    § 77o.

6        *As successor:* BAC is liable as the successor to each of CWALT, CWMBS,

7    Countrywide Securities, and CFC.

8    ## II. PARTIES

9        5.    The Federal Deposit Insurance Corporation (**FDIC**) is a corporation

10   organized and existing under the laws of the United States of America. Under the

11   Federal Deposit Insurance Act, the FDIC is authorized to be appointed as receiver

12   for failed insured depository institutions. On August 14, 2009, the FDIC was duly

13   appointed the receiver for Colonial. Under the Federal Deposit Insurance Act, the

14   FDIC as receiver succeeds to, and is empowered to sue and complain in any court

15   of law to pursue, all claims held by banks for which it is the receiver. 12 U.S.C. §§

16   1819, 1821(d)(2)(A)(i). Thus, the FDIC as Receiver for Colonial has authority to

17   pursue claims held by Colonial, including the claims made against the defendants in

18   this action.

19       6.    Defendant Countrywide Securities is a corporation organized under the

20   laws of California with its principal place of business in California.

21       7.    Defendant CWALT is a corporation organized under the laws of

22   Delaware.

23       8.    Defendant CWMBS is a corporation organized under the laws of

24   Delaware.

25       9.    Defendant CFC is a corporation organized under the laws of Delaware.

26   It is the successor by merger to a corporation also named Countrywide Financial

27   Corporation, which will be referred to in this Complaint as **Old CFC**. Old CFC was

28   the public holding company for the entire group of Countrywide companies, which

1   will be referred to collectively in this Complaint as **Countrywide**. Old CFC existed

2   until it was merged on July 1, 2008, into a subsidiary of Bank of America

3   Corporation, which subsidiary was then renamed Countrywide Financial

4   Corporation. By that merger, CFC succeeded to all liabilities of Old CFC, which

5   was merged into CFC.

6         10.    Plaintiff is informed and believes, and based thereon alleges, that Old

7   CFC participated in the operations of Countrywide Securities, CWALT, and

8   CWMBS and had the power to control the conduct of Countrywide Securities,

9   CWALT, and CWMBS in the transactions involved in this Complaint. Under

10   Section 15 of the 1933 Act, Old CFC directly or indirectly controlled Countrywide

11   Securities, CWALT, and CWMBS and would therefore have been liable (if it still

12   existed) to Plaintiff jointly and severally with and to the same extent as

13   Countrywide Securities, CWALT, and CWMBS. As a result of the merger of Old

14   CFC into CFC, this liability passed to CFC.

15         11.    Defendant BAC is a corporation organized under the laws of

16   Delaware, and is the public holding company for a group of Bank of America

17   companies. BAC and its subsidiaries will be referred to collectively in this

18   Complaint as **Bank of America**.

19         12.    Defendant Barclays is a corporation organized under the laws of

20   Connecticut.

21         13.    Defendant Bear Stearns is a limited liability company organized under

22   the laws of Delaware. Bear Stearns is the successor by merger to J. P. Morgan

23   Securities Inc.

24         14.    Defendant Citigroup is a corporation organized under the laws of New

25   York.

26         15.    Defendant Credit Suisse is a limited liability company organized under

27   the laws of Delaware.

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

16.     Defendant DBS is a corporation organized under the laws of Delaware.

17.     Defendant Edward Jones is a limited partnership organized under the laws of Missouri.

18.     Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. is a corporation organized under the laws of Delaware. It is the successor by merger to BAS. Merrill Lynch, Pierce, Fenner & Smith Inc. succeeded to all of the liabilities of BAS.

19.     Defendant RBS is a corporation organized under the laws of Delaware.

## III.   JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 22 of 1933 Act, 15 U.S.C. § 77v, because the claims asserted in this Complaint arise under Sections 11 and 15 of the 1933 Act, 15 U.S.C. §§ 77k and 77o.

21.     Venue is proper in this Court pursuant to Section 22 of the 1933 Act, 15 U.S.C. § 77v, because the defendants are found in this district, are inhabitants of this district, and transact business in this district.

## IV.   SECURITIZATION OF MORTGAGE LOANS

22.     The securities that Colonial purchased are so-called **residential mortgage-backed securities**, or **RMBS**, created in a process known as **securitization**. Securitization begins with loans on which the borrowers are to make payments, usually monthly. The entity that makes the loans is known as the **originator** of the loans. The process by which the originator decides whether to make particular loans is known as the **underwriting** of loans. The purpose of underwriting is to ensure that loans are made only to borrowers of sufficient credit standing to repay them and only against sufficient collateral. In the loan underwriting process, the originator applies its **underwriting standards**.

23.     In general, residential mortgage lenders may hold some of the mortgage loans they originate in their own portfolios and may sell other mortgage loans they originate into securitizations.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

24.     In a securitization, a large number of loans, usually of a similar type, are grouped into a **collateral pool**. The originator of those loans sells them (and, with them, the right to receive the cash flow from them) to a **trust**. The trust pays the originator cash for the loans. The trust raises the cash to pay for the loans by selling **securities**, usually called **certificates**, to investors such as Colonial. Each certificate entitles its holder to an agreed part of the cash flow from the loans in the collateral pool.

25.     In a simple securitization, the holder of each certificate is entitled to a *pro rata* part of the overall monthly cash flow from the loans in the collateral pool.

26.     In a more complex securitization, the cash flow is divided into different parts, usually called **tranches** ("tranche" is "slice" in French), and the certificates are divided into different **classes**, each with different rights. Each class of certificates is entitled to the cash flow in the tranche corresponding to that class.

27.     One way in which the cash flow is divided — and the rights of different classes of certificates distinguished — is by priority of payment or, put differently, risk of nonpayment. The most **senior** class of certificates usually is entitled to be paid in full before the next most senior class, and so on. Conversely, losses from defaults in payment of the loans in the collateral pool are allocated first to the most **subordinate** class of certificates, then to the class above that, and so on. The interest rate on each class of certificates is usually proportional to the amount of risk that that class bears; the most senior certificates bear the least risk and thus pay the lowest rate of interest, the most subordinate, the opposite. This hierarchy of rights to payment is referred to as the **waterfall**.

28.     The risk of a particular class of certificate is a function of both the riskiness of the loans in the collateral pool and the seniority of that class in the waterfall. Even if the underlying loans are quite risky, the certificates may bear so little of that risk that they may be rated as **triple-A**. (According to Moody's, "[o]bligations rated Aaa are judged to be of the highest quality, with minimal credit

- 8 -

1   risk.") For example, assume a securitization of $100 million of risky loans, on
2   which the historical loss rate is 5%. Assume that there are two classes of
3   certificates, a senior class of $50 million and a subordinate class of $50 million.
4   Even though the underlying loans are quite risky, the senior class of certificates
5   would be paid in full as long as the $100 million of loans produced payments of at
6   least $50 million plus interest, that is, unless the loss rate on those loans exceeded
7   50%, fully ten times the historical average. All of the certificates referred to in this
8   Complaint were rated triple-A when Colonial purchased them.

9          29.    Each securitization has a **sponsor**, the prime mover of the
10  securitization. Sometimes the sponsor is the originator or an affiliate. In originator-
11  sponsored securitizations, the collateral pool usually contains loans made by the
12  originator that is sponsoring the securitization. Other times, the sponsor may be an
13  investment bank, which purchases loans from one or more originators, aggregates
14  them into a collateral pool, sells them to a trust, and securitizes them. The sponsor
15  arranges for title to the loans to be transferred to an entity known as the **depositor**,
16  which then transfers title to the loans to the trust.

17         30.    The obligor of the certificates in a securitization is the trust that
18  purchases the loans in the collateral pool. Because a trust has few assets other than
19  the loans that it purchased, it may not be able to satisfy the liabilities of an issuer of
20  securities (the certificates). The law therefore treats the depositor as the **issuer** of a
21  residential mortgage-backed certificate.

22         31.    **Securities underwriters**, like Barclays, BAS, Bear Stearns, Citigroup,
23  Countrywide Securities, Credit Suisse, DBS, Edward Jones, JP Morgan, and RBS,
24  play a critical role in the process of securitization. They underwrite the sale of the
25  certificates, that is, they purchase the certificates from the trust and then sell them
26  to investors. Equally important, securities underwriters provide to potential
27  investors the information that they need to decide whether to purchase certificates.
28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

32.     Because the cash flow from the loans in the collateral pool of a securitization is the source of funds to pay the holders of the certificates issued by the trust, the credit quality of those certificates is dependent upon the credit quality of the loans in the collateral pool (and upon the place of each certificate in the waterfall). The most important information about the credit quality of those loans is contained in the files that the originator develops while making the loans, the so-called "loan files." For residential mortgage loans, each loan file normally contains comprehensive information from such important documents as the borrower's application for the loan, credit reports on the borrower, and an appraisal of the property that will secure the loan. The loan file may also include notes from the person who underwrote the loan about whether and how the loan complied with the originator's underwriting standards, including documentation of any "compensating factors" that justified any departure from those standards.

33.     Potential investors in certificates are not given access to loan files. Instead, the securities underwriters are responsible for gathering, verifying, and presenting to potential investors the information about the credit quality of the loans that will be deposited into the trust. They do so by using information about the loans that has been compiled into a database known as a **loan tape**. The securities underwriters use the loan tape to compile numerous statistics about the loans, which are presented to potential investors in a **prospectus supplement**, a disclosure document that the underwriters are required to file with the Securities and Exchange Commission. (Colonial did not have access to the loan tapes before it purchased the certificates, but Plaintiff has reviewed data from the loan tapes in preparing this Complaint.)

34.     As alleged in detail below, the information in the prospectus supplements and other offering documents about the credit quality of the loans in the collateral pools of the trusts contained many statements that were material to the credit quality of those loans, but were untrue or misleading.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

## V. DEFENDANTS' MATERIAL UNTRUE OR MISLEADING STATEMENTS ABOUT THE CERTIFICATES

35.    Colonial purchased 11 certificates in ten securitizations (referred to in this Complaint as Securitizations Nos. 1 through 10). Details of each securitization and each certificate are stated in Item 35 of Schedules 1 through 10 of this Complaint, which correspond to Securitizations Nos. 1 through 10. Plaintiff incorporates into this paragraph 35 and alleges as though fully set forth in this paragraph, the contents of Item 35 of the Schedules.

36.    The prospectus supplement for each of the ten securitizations is available from the Securities and Exchange Commission's website. A URL for each prospectus supplement is included in Item 35 of the Schedules. The prospectus supplements are incorporated into this Complaint by reference.

37.    In general, Plaintiff drew and analyzed a random sample of 400 loans from the collateral pool of each securitization in which Colonial purchased a certificate.[3]

38.    Many of the statements of material fact that the defendants made in the prospectus supplements were untrue or misleading. These untrue or misleading statements included the following.

### A.    Untrue or Misleading Statements About the Loan-to-Value Ratios (LTVs) of the Mortgage Loans, and the Appraisals of the Properties, in the Collateral Pools

#### 1.    LTVs

##### (a)    The materiality of LTVs

39.    The loan-to-value ratio of a mortgage loan, or LTV, is the ratio of the amount of the mortgage loan to the lower of the appraised value or the sale price of the mortgaged property when the loan is made. For example, a loan of $300,000 secured by a property valued at $500,000 has an LTV of 60%; a loan of $450,000

---

[3]    The group of loans that backed the certificates that Colonial purchased in Securitization No. 1 only had 436 loans. For that group, Plaintiff analyzed the 194 loans on which data were available.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

on the same property has an LTV of 90%. LTV is one of the most crucial measures of the risk of a mortgage loan, and the LTVs of the mortgage loans in the collateral pool of a securitization are therefore one of the most crucial measures of the risk of certificates sold in that securitization. LTV is a primary determinant of the likelihood of default. The lower the LTV, the lower the likelihood of default. For example, the lower the LTV, the less likely it is that a decline in the value of the property will wipe out the owner's equity and thereby give the owner an incentive to stop making mortgage payments and abandon the property, a so-called strategic default. LTV also is a primary determinant of the severity of losses on a loan that defaults. The lower the LTV, the lower the severity of losses if the loan defaults. Loans with lower LTVs provide greater "cushion," thereby increasing the likelihood that the proceeds of foreclosure will cover the unpaid balance of the mortgage loan.

40.     Beyond these fundamental effects on the likelihood and severity of default, LTVs also affect prepayment patterns (that is, the number of borrowers who pay off their mortgage loans before maturity and when they do so) and therefore the expected lives of the loans. Prepayment patterns therefore affect many aspects of certificates that are material to the investors that purchase them, including the life of the certificate and the timing and amount of cash that the investor will receive during that life.

41.     In addition, rating agencies use LTVs to determine the proper structuring and credit enhancement necessary for securities, such as the certificates that Colonial purchased, to receive a particular rating. If the LTVs of the mortgage loans in the collateral pool of a securitization are incorrect, the ratings of certificates sold in that securitization will also be incorrect.

42.     An accurate denominator (that is, the value of the property) is essential to an accurate LTV. In particular, an inflated denominator will understate, sometimes greatly, the risk of a loan. To return to the example above, if the

1   property whose actual value is $500,000 is valued incorrectly at $550,000, then the

2   ostensible LTV of the $300,000 loan falls from 60% to 54.5%, and the ostensible

3   LTV of the $450,000 loan falls from 90% to 81.8%. In either case, the LTV based

4   on the incorrect appraised value understates the risk of the loan.

5         43.    For these reasons, a reasonable investor considers LTV critical to the

6   decision whether to purchase a certificate in a securitization of mortgage loans.

7   Even small differences in the weighted average LTVs of the mortgage loans in the

8   collateral pool of a securitization have a significant effect on both the risk and the

9   rating of each certificate sold in that securitization and, thus, are essential to the

10  decision of a reasonable investor whether to purchase any such certificate.

11              **(b)    Untrue or misleading statements about the LTVs of**
12              **the mortgage loans in the collateral pools of these**
                **securitizations**

13        44.    In the prospectus supplements, the defendants made material untrue or

14  misleading statements about the LTVs of the mortgage loans in the collateral pools

15  of these securitizations. Each such statement is identified in Item 44 of the

16  Schedules of this Complaint. Plaintiff incorporates into this paragraph 44, and

17  alleges as though fully set forth in this paragraph, the contents of Item 44 of the

18  Schedules.

19        45.    The defendants made these statements as statements of fact. Plaintiff is

20  informed and believes, and based thereon alleges, that the defendants intended that

21  these statements be understood as statements of fact. Colonial did understand the

22  statements about the LTVs as statements of fact. Colonial had no access to

23  appraisal reports or other documents or information from which it could verify the

24  LTVs of the mortgage loans other than the statements that the defendants made

25  about those LTVs.

26  / / /

27  / / /

28  / / /

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

(c)     **An automated valuation model demonstrates that the
defendants' statements about the LTVs were untrue
because they were based on overstated valuations of
the properties in the collateral pools.**

46.     The stated LTVs of many of the mortgage loans in the securitizations
were significantly lower than the true LTVs because the denominators (that is, the
value of the properties that secured those loans) that were used to determine the
disclosed LTVs were overstated to a material extent. The weighted-average LTVs
presented in the prospectus supplements were, therefore, untrue and misleading.

47.     Using data that it purchased from a leading vendor, Plaintiff performed
a forensic review of the mortgage loans underlying the certificates to determine
whether statements in the prospectus supplements about the LTVs of those
mortgage loans were accurate. The forensic review used, among other things, a
comprehensive, industry-standard automated valuation model (**AVM**), by which it
is possible to determine the true market value of a certain property as of a specified
date. An AVM is based on objective criteria like the condition of the property and
the actual sale prices of comparable properties in the same locale shortly before the
specified date, and is more consistent, independent, and objective than other
methods of appraisal. AVMs are routinely used by mortgage lenders, including the
defendants. Indeed, the firm that provides this AVM currently provides this and
other AVMs to 18 of the 20 largest mortgage lenders in the United States. The
AVM on which Plaintiff's allegations are based incorporates a database of 500
million sales covering ZIP codes that represent more than 97% of the homes,
occupied by more than 99% of the population, in the United States. Independent
testing services have determined that this AVM is the most accurate of all such
models. Indeed, between the first quarter of 2010 and the second quarter of 2012,
the model's mean error rate, on a national basis, was no more than 2.5%.

48.     To use an AVM, one must know the addresses of the properties on
which the AVM is to be run. Until after August 14, 2008, however, it was not

- 14 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

possible for an investor in a mortgage-backed security to know either the addresses
of the mortgaged properties that backed that security or the names of the
mortgagors. Those addresses and names were available only from loan files,
servicing records, and similar documents, to which investors generally were not
given access. Well after August 14, 2008, the same vendor that provided the AVM
developed a method for cross-referencing information about the loans that backed a
mortgage-backed security with information in its other proprietary databases of
land and tax records. Only in this way was it possible to learn the addresses of those
properties and the names of those mortgagors and thereby to do a forensic review of
the mortgages on them.

49.     For many of the properties that secured the mortgage loans, the model
determined that the LTVs presented in the prospectus supplements were
understated. In particular, for many of the properties, the model determined that the
denominator (that is, the appraised value of the property as stated in the loan tape
and compiled into the tables in the prospectus supplement) that was used in the
disclosed LTV was 105% or more of the true market value as determined by the
model as of the date on which each individual mortgage loan closed. (The model
considered no transactions that occurred after that date.) In contrast, the model
determined that the denominator that was used in the disclosed LTV was 95% or
less of the true market value on a much smaller number of properties. Thus, the
number of properties on which the value was overstated exceeded by far the
number on which the value was understated, and the aggregate amount overstated
exceeded by far the aggregate amount understated.

50.     For example, in Securitization No. 1, there were 436[4] mortgage loans
that backed the certificates that Colonial purchased. On 139 of the properties that
secured those loans, the model determined that the denominator that was used in the

---

[4]     On the closing date of the securitization, there were 402 mortgage loans in
the trust. After the closing date of the securitization, the trust purchased an
additional 34 mortgage loans.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1   disclosed LTV was 105% or more of the true market value and the amount by

2   which the stated values of those properties exceeded their true market values in the

3   aggregate was $25,213,984. The model determined that the denominator that was

4   used in the disclosed LTV was 95% or less of true market value on only 43

5   properties, and the amount by which the true market values of those properties

6   exceeded the values reported in the denominators was $4,849,117. Thus, the

7   number of properties on which the value was overstated exceeded by more than

8   three times the number on which the value was understated, and the aggregate

9   amount overstated was more than five times the aggregate amount understated.

10        51.    On one of the loans in Securitization No. 1, the amount of the loan was

11   $480,000 and the stated value of the property was $600,000, resulting in a stated

12   LTV of 80%. The model, however, determined that the true value of the property

13   was $421,000, resulting in a true LTV of 114%. Thus, the stated value was higher

14   than the true value by 42.5%, and the stated LTV was lower than the true LTV by

15   34%. Both of these were huge discrepancies that were material to the credit quality

16   of the loan.

17        52.    The overstated values of 139 properties made virtually every statement

18   by the defendants about the LTVs of the mortgage loans untrue or misleading. For

19   example, the defendants stated that all mortgage loans had an LTV of 100% or less.

20   In fact, 36 of the mortgage loans had LTVs of over 100%. Defendants also stated

21   that the weighted-average LTV of the loans in the collateral pool was 74.65%. In

22   fact, the weighted-average LTV of the loans was 92.3%. These differences were

23   material for the reasons stated above.

24        53.    The results of the valuations by the automated model in this example

25   are summarized in the following table.

26   / / /

27   / / /

28   / / /

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- 16 -

| | |
|---|---|
| Number of loans that backed the certificates | 436 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 139 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $25,213,984 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 43 |
| Aggregate amount by which the true market values of those properties exceeded their stated values | $4,849,117 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 36 |
| Weighted-average LTV, as stated by defendants | 74.65% |
| Weighted-average LTV, as determined by the model | 92.3% |

54.    The model produced similar results for the mortgage loans in the collateral pools of each securitization. Details of the results of the model for each securitization are stated in Item 54 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 54, and alleges as though fully set forth in this paragraph, the contents of Item 54 of the Schedules.

        (d)    **These statements also were misleading because the defendants omitted to state that there were additional liens on a material number of the properties that secured the mortgage loans in the collateral pools.**

55.    As mentioned above, the LTV of a mortgage loan is a key determinant of the likelihood that the mortgagor will default in payment of the mortgage. The lower the LTV, the less likely that a decline in the value of the property will wipe out the owner's equity and thereby give the owner an incentive to stop making mortgage payments and abandon the property. Because LTV affects the behavior of borrowers so profoundly, accurate LTVs are essential to predicting defaults and prepayments by borrowers. Also, as mentioned above, LTV affects the severity of loss on those loans that do default. The power of LTV to predict defaults, prepayments, and severities is a major reason why reasonable investors consider the LTVs of mortgage loans important to the decision whether to purchase a certificate

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1    in the securitization of those loans.

2        56.    The predictive power of the LTV of a mortgage loan is much reduced

3    if there are additional liens on the same property. Additional liens reduce the

4    owner's equity in the property and thereby increase the owner's incentive to stop

5    making mortgage payments and abandon the property if the value of the property

6    falls below the combined amount of all of the liens on the property (a strategic

7    default). Additional liens also exacerbate delinquencies and defaults because they

8    complicate the servicing of mortgage loans and the management of delinquencies

9    and defaults. Servicers of the first-lien mortgage must then deal not only with the

10   borrower, but also with the servicer of the second-lien mortgage. For example, the

11   servicer of a single mortgage may want to grant a borrower forbearance while the

12   borrower is unemployed and allow him or her to add missed payments to the

13   principal of the loan and to resume payments when he or she is employed again.

14   But the servicer of the second-lien mortgage may refuse such forbearance and

15   initiate foreclosure and thereby force the borrower into default on the first mortgage

16   as well.

17       57.    According to land records, many of the properties that secured

18   mortgage loans in the collateral pools of the securitizations were subject to liens in

19   addition to the lien of the mortgage in the pool at the time of the closing of these

20   securitizations.[5] The defendants failed to disclose in the prospectus supplements

21   any of these additional liens. These additional liens increased the risk that those

22   owners would default in payment of the mortgage loans.

23       58.    To take an example, of the 436 properties that secured the mortgage

24   loans that backed the certificates that Colonial purchased in Securitization No. 1, at

25   least 164 were subject to liens in addition to the lien represented by the mortgage in

---

26   [5]   In order to ensure that this calculation did not include liens that were paid off
27   but were not promptly removed from land records, the additional liens referred to in
     this Complaint and the Schedules do not include liens that were originated on or
28   before the date on which each mortgage loan in the pools was closed.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

the collateral pool. The defendants did not disclose in the prospectus supplement that those liens existed. Defendants stated that the weighted-average LTV of the properties was 74.65%, when, solely because of the additional liens on these 164 properties, the weighted-average combined LTV was 80.8%.[6] This is a significant difference.

59.     On one of the loans, the original balance of the mortgage loan was $524,000, the represented value of the property was $655,250, and the reported LTV was 80%. On the date of the closing of this securitization, however, there were undisclosed additional liens on this property of $131,055. Thus, when all liens on the property were taken into account, the combined LTV of the loan was 100%, which was 20% higher than the stated LTV on that loan. This was a huge discrepancy that was material to the credit quality of the loan. In many cases, the amount of the undisclosed additional liens was much greater than the owner's ostensible equity, putting the owner "under water" on the day on which this securitization closed.

60.     Details of the undisclosed additional liens in the securitizations are stated in Item 60 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 60, and alleges as though fully set forth in this paragraph, the contents of Item 60 of the Schedules. Plaintiff is informed and believes, and based thereon alleges, that discovery will demonstrate that the number of loans with additional liens is substantially higher than those disclosed in the Schedules.

61.     Because the defendants did not disclose the existence or the amounts of these additional liens, all of the statements that they made about the LTVs of the mortgage loans were misleading.

### 2.     Appraisals

62.     As discussed above in paragraph 42, an accurate denominator (value of

---

[6]     The combined LTV is the ratio of all loans on a property to the value of the property.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

the mortgaged property) is essential to calculating an accurate LTV. An accurate appraisal of the property, in turn, is essential to identifying an accurate denominator.

63.     In connection with these securitizations, there was undisclosed upward bias in appraisals of properties that secured mortgage loans and consequent understatement of the LTVs of those loans. This upward bias in appraisals caused the denominators that were used to calculate the LTVs of many mortgage loans to be overstated and, in turn, the LTVs to be understated. The defendants' statements regarding the LTVs of the mortgage loans in the collateral pools were misleading because they omitted to state that the appraisals of a material number of the properties that secured those loans were biased upwards. In addition, the defendants stated that the appraisals conformed to the Uniform Standards of Professional Appraisal Practice (**USPAP**), the professional standards that govern appraisers and appraisals (or to the standards of Fannie Mae and Freddie Mac, which required compliance with USPAP). Those statements were false because upwardly biased appraisals do not conform to USPAP.

    (a) **The statements that the defendants made about the LTVs of the mortgage loans in the collateral pools were misleading because they omitted to state that the appraisals of a large number of the properties that secured those loans were biased upward, so that stated LTVs based on those appraisals were lower than the true LTVs of those mortgage loans.**

64.     The defendants omitted to state that the appraisals in these securitizations used inaccurate property descriptions, ignored recent sales of the subject and comparable properties, and used sales of properties that were not comparable, all in order to inflate the values of the appraised properties. The appraisals used to compute the LTVs of many of the mortgage loans in the collateral pools were biased upwards. As alleged in paragraphs 47 through 54, in each trust, the number of properties for which the value was overstated exceeded by far the number for which the value was understated, and the aggregate amount

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

overstated exceeded by far the aggregate amount understated. These ratios for each trust are summarized in the following table:

| Securitization No. | Ratio of Number of Properties Whose Value Was Overstated to Number Whose Value Was Understated | Ratio of Amount of Overvaluation to Amount of Undervaluation |
|---|---|---|
| 1 | 3.3 | 5.2 |
| 2 | 2.3 | 2.3 |
| 3 | 1.4 | 1.2 |
| 4 | 2.7 | 3.6 |
| 5 | 6.2 | 4.9 |
| 6 | 5.0 | 4.3 |
| 7 | 6.5 | 5.3 |
| 8 | 11.6 | 11.5 |
| 9 | 2.8 | 2.3 |
| 10 | 8.8 | 14.3 |

These lopsided results demonstrate the upward bias in appraisals of properties that secured the mortgage loans in the collateral pools.

65.     Plaintiff is informed and believes, and based thereon alleges, that a material number of the upwardly biased appraisals were not statements of the appraisers' actual findings of the values of the properties based on their objective valuations.

**(b)     The statements by the defendants about compliance with USPAP were untrue because the appraisals of a large number of the properties that secured the mortgage loans were biased upward.**

66.     Appraisers and appraisals are governed by USPAP, which is promulgated by the Appraisal Standards Board. The Preamble to USPAP states that its purpose "is to promote and maintain a high level of public trust in appraisal practice." Both Fannie Mae and Freddie Mac require that appraisals comply with USPAP.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

67.    USPAP includes the following provisions:

(a)    USPAP Standards Rule 2-1(b)(iii) requires that "Each written or oral real property appraisal report must clearly and accurately set forth the appraisal in a manner that will not be misleading."

(b)    USPAP Standards Rule 1-4(a) provides that "When a sales comparison approach is necessary for credible assignment results, an appraiser must analyze such comparable sales data as are available to indicate a value conclusion."

(c)    USPAP Standards Rule 1-4(b) provides that "When a cost approach is necessary for credible assignment results, an appraiser must:

(i)    develop an opinion of site value by an appropriate appraisal method or technique;

(ii)   analyze such comparable cost data as are available to estimate the cost new of the improvements (if any); and

(iii)  analyze such comparable data as are available to estimate the difference between the cost new and the present worth of the improvements (accrued depreciation)."

68.    The Appraisal Standards Board, which promulgates USPAP, also issues Advisory Opinions. Although the Advisory Opinions do not establish new standards or interpret USPAP, they "are issued to illustrate the applicability of appraisal standards in specific situations." Advisory Opinion 1 discussing "Sales History" states that "The requirement for the appraiser to analyze and report sales history and related information is fundamental to the appraisal process. Just as the appraiser must analyze pending and recent sales of comparable properties, the appraiser must take into account all pending and recent sales of the subject property itself."

69.    In the prospectus supplements, the defendants made statements that the appraisals of properties that secured the mortgage loans in the collateral pools were made in compliance with USPAP or with the appraisal standards of Fannie Mae

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

and Freddie Mac, which required compliance with USPAP. Details of each such statement are stated in Item 69 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 69, and alleges as though fully set forth in this paragraph, the contents of Item 69 of the Schedules.

70.   Plaintiff is informed and believes, and based thereon alleges, that a material number of mortgage loans in the collateral pools had appraisals conducted that deviated from USPAP.

71.   Each of the statements referred to in paragraph 69 was untrue because the appraisals of a material number of the properties referred to in each such statement did not conform to USPAP.

72.   By each of the untrue and misleading statements referred to in paragraphs 44 and 69 above, the defendants materially understated the risk of the certificates that they issued or underwrote.

**B.     Untrue or Misleading Statements About the Occupancy Status of the Properties That Secured the Mortgage Loans in the Collateral Pools**

**1.     The materiality of occupancy status**

73.   Residential real estate is usually divided into primary residences, second homes, and investment properties. Mortgages on primary residences are less likely to default than mortgages on non-owner-occupied residences and therefore are less risky. Occupancy status also influences prepayment patterns.

74.   Occupancy status (that is, whether the property that secures a mortgage is to be the primary residence of the borrower, a second home, or an investment property) is an important measure of the risk of a mortgage loan. The percentage of loans in the collateral pool of a securitization that are not secured by mortgages on primary residences is an important measure of the risk of certificates sold in that securitization. Other things being equal, the higher the percentage of loans not secured by primary residences, the greater the risk of the certificates. A reasonable investor considers occupancy status important to the decision whether to purchase a

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

certificate in a securitization of mortgage loans.

**2. Untrue or misleading statements about the occupancy status of the properties that secured the mortgage loans in the collateral pools of these securitizations**

75.     In the prospectus supplements, the defendants made statements about the number of properties in the collateral pools of the securitizations that were the primary residences of their owners. To return to the example of Securitization No. 1, the defendants stated that of the 402 initial mortgage loans that backed the certificates that Colonial purchased, at least 369 were secured by primary residences and 33 were not. Details of each such statement in the securitizations are stated in Item 75 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 75, and alleges as though fully set forth in this paragraph, the contents of Item 75 of the Schedules.

76.     These statements were untrue or misleading because (i) the stated number of mortgage loans secured by primary residences was higher than the actual number of loans in that category or (ii) the stated number of mortgage loans not secured by primary residences was lower than the actual number of loans in that category.

**3. Basis of the allegations above that these statements about the occupancy status of the properties that secured the mortgage loans in the collateral pools were untrue or misleading**

77.     Because they are less risky than other mortgage loans, mortgage loans on primary residences usually have more favorable terms, including lower interest rates and more lenient underwriting standards, than mortgage loans on second homes and investment properties. Applicants for loans on second homes and investment properties therefore have an incentive to state that the property will be their primary residence even when it will not. Plaintiff is informed and believes, and based thereon alleges, that borrowers of many securitized loans did so.

78.     A significant number of the properties in the collateral pools of the securitizations that were stated to be primary residences actually were not.

1   Moreover, Plaintiff is informed and believes, and based thereon alleges, that there is

2   additional evidence of occupancy fraud in the loan files of many more of the

3   mortgage loans in the collateral pools.

4       79.    The forensic review performed by Plaintiff also tested the accuracy of

5   the representations in the prospectus supplements about owner occupancy. With the

6   address of each property (which, as described above, was not available until well

7   after August 14, 2008) it was possible to look up data about that property in

8   proprietary databases owned by the same vendor. Those databases have inputs from

9   local land and tax records and retrospective credit reports, among others.

10      80.    The forensic review showed that, with respect to some of the

11   properties that were stated to be primary residences, the borrower instructed local

12   tax authorities to send the bills for the taxes on the property to the borrower at an

13   address other than the property itself. This is strong evidence that the mortgaged

14   property was not the borrower's primary residence.

15      81.    In some states and counties, the owner of a property is able to

16   designate whether that property is his or her "homestead," which may reduce the

17   taxes on that property or exempt the property from assets available to satisfy the

18   owner's creditors, or both. An owner may designate only one property, which he or

19   she must occupy, as his or her homestead. The fact that an owner in one of these

20   jurisdictions does not designate a property as his or her homestead when he or she

21   can do so is strong evidence that the property was not his or her primary residence.

22   With respect to some of the properties that were stated to be primary residences, the

23   owner could have but did not designate the property as his or her homestead. That

24   omission is strong evidence that the property was not the borrower's primary

25   residence.

26      82.    When a borrower actually occupies a newly mortgaged property, he or

27   she normally notifies entities that send bills to him or her (such as credit card

28   companies, utility companies, and local merchants) to send his or her bills to the

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

address of the newly mortgaged property. Six months after the closing of the mortgage is ample time to complete this process. Six months after the closing of the mortgage, if the borrower is still receiving his or her bills at a different address, it is very likely that the borrower does not occupy the mortgaged property. For each securitization, a credit reporting agency specializing in mortgage loans compared the addresses in the borrowers' credit reports to the addresses of the mortgaged properties six months after the closing of the mortgage loans. Many borrowers whose mortgage loans were secured by properties that were stated in the loan tapes to be owner-occupied did not receive any bills at the address of the mortgaged property but did receive their bills at another address or addresses. It is very likely that each of these borrowers did not occupy the mortgaged property.

83.    In Securitization No. 1, 56 owners of properties that were stated to be primary residences instructed local tax authorities to send the bills for the taxes on those properties to them at different addresses; 99 owners of properties that were stated to be primary residences could have, but did not, designate those properties as their homesteads; and 4 owners of properties that were stated to be primary residences did not receive any of their bills there six months after the mortgages were originated. Eliminating duplicates, for one or more of these reasons, 139 of the 369 properties that were stated to be primary residences actually were not. Thus, the number of properties that were not primary residences was not 33, as defendants stated, but at least 172, a material difference. The numbers of such loans in the collateral pools of the securitizations are stated in Item 83 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 83, and alleges as though fully set forth in this paragraph, the contents of Item 83 of the Schedules.

84.    By each of the untrue and misleading statements referred to in paragraph 75, the defendants materially understated the risk of the certificates that they issued or underwrote.

- 26 -

## C. Untrue or Misleading Statements About the Underwriting Standards of the Originators of the Mortgage Loans in the Collateral Pools

### 1. The materiality of underwriting standards and the extent of an originator's disregard of them

85.     Originators of mortgage loans have written standards by which they underwrite applications for loans. An important purpose of underwriting is to ensure that the originator makes mortgage loans only in compliance with those standards and that its underwriting decisions are properly documented. An even more fundamental purpose of underwriting mortgage loans is to ensure that loans are made only to borrowers with credit standing and financial resources to repay the loans, and only against collateral with value, condition, and marketability sufficient to secure the loans. An originator's underwriting standards, and the extent to which the originator does not follow its standards, are important indicators of the risk of mortgage loans made by that originator and of certificates sold in a securitization in which mortgage loans made by that originator are part of the collateral pool. A reasonable investor considers the underwriting standards of originators of mortgage loans in the collateral pool of a securitization, and whether an originator disregards its standards, important to the decision whether to purchase a certificate in that securitization.

### 2. Untrue or misleading statements about the underwriting standards of originators of the mortgage loans

86.     In the prospectus supplements, the defendants made statements about the underwriting standards of the originators of the mortgage loans in the collateral pools. Details of each such statement are stated in Item 86 of the Schedules of this Complaint. They included statements that the originators made mortgage loans in compliance with their underwriting standards and made exceptions to those standards only when compensating factors were present. Plaintiff incorporates into this paragraph 86, and alleges as though fully set forth in this paragraph, the

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1    contents of Item 86 of the Schedules.

2         87.    Plaintiff is informed and believes, and based thereon alleges, that these

3    statements were untrue or misleading because the defendants omitted to state that:

4    (a) the originators were disregarding those underwriting standards; (b) the

5    originators were making extensive exceptions to those underwriting standards when

6    no compensating factors were present; (c) the originators were making wholesale,

7    rather than case-by-case, exceptions to those underwriting standards; (d) the

8    originators were making mortgage loans that borrowers could not repay; and (e) the

9    originators were failing frequently to follow quality-assurance practices necessary

10   to detect and prevent fraud intended to circumvent their underwriting standards.

### 3.    Basis of the allegations that these statements about the underwriting standards of the originators of the mortgage loans in the collateral pools were untrue or misleading

### (a)    The deterioration in undisclosed credit characteristics of mortgage loans made by these originators

15        88.    Plaintiff is informed and believes, and based thereon alleges, that

16   before and during the time of these securitizations, Countrywide Home Loans, Inc.

17   (**CHL**), which originated or acquired most of the loans in the securitizations,

18   disregarded its stated underwriting standards. As a result, securitized mortgage

19   loans made between 2004 and the dates of these securitizations have experienced

20   high rates of delinquency and default.

21        89.    The high rates of delinquency and default were caused not so much by

22   any deterioration in credit characteristics of the loans that were expressly embodied

23   in underwriting standards and disclosed to investors, but rather by deterioration in

24   credit characteristics that were not disclosed to investors.

25        90.    Plaintiff is informed and believes that what was true about recently

26   securitized mortgage loans in general was true in particular of loans originated by

27   the entities that originated the loans in the collateral pools of these securitizations,

28   as the following figures demonstrate. Taking the originator CHL, Figure 1 shows

- 28 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1  the rising incidence of early payment defaults (or **EPDs**), that is, the percent of

2  loans (by outstanding principal balance) that were originated and sold into

3  securitizations by CHL and that became 60 or more days delinquent within six

4  months after they were made. An EPD is strong evidence that the originator did not

5  follow its underwriting standards in making the loan. Underwriting standards are

6  intended to ensure that loans are made only to borrowers who can and will make

7  their mortgage payments. Because an EPD occurs so soon after the mortgage loan

8  was made, it is much more likely that the default occurred because the borrower

9  could not afford the payments in the first place (and thus that the underwriting

10  standards were not followed), than because of changed external circumstances

11  unrelated to the underwriting of the mortgage loan (such as that the borrower lost

12  his or her job). The bars in Figure 1 depict the incidence of EPDs in loans

13  originated by CHL that were sold into securitizations. The steady increase in EPDs

14  is further evidence that the deterioration in the credit quality of those loans was

15  caused by disregard of underwriting standards.



Figure 1: Percent of Loans Originated by Countrywide Home Loans, Inc. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination

91.     Figure 2 shows the weighted-average disclosed LTVs of the same
loans and weighted-average disclosed credit scores of the borrowers. These were
nearly constant, showing that the deterioration in the credit quality of the loans was
caused not by these disclosed factors, but rather by undisclosed factors.



Figure 2: Percent of Loans Originated by Countrywide Home Loans, Inc.
or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of
Origination with Weighted-Average FICO and LTV

**(b)     The poor performance of the loans in these pools
demonstrates that the originators disregarded their
underwriting guidelines when making these loans.**

92.     As noted above, an EPD is evidence that the originator may have
disregarded its underwriting standards in making the loan. The mortgage loans in
some of the collateral pools of these securitizations experienced EPDs. These EPDs
are evidence that the originators of those loans may have disregarded their
underwriting standards when making those loans. The number and percent of the
loans in each pool that suffered EPDs are stated in Item 92 of the Schedules of this
Complaint. Plaintiff incorporates into this paragraph 92, and alleges as though fully
set forth in this paragraph, the contents of Item 92 of the Schedules.

- 30 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

93.   A high rate of delinquency at any time in a group of mortgage loans is also evidence that the originators of those loans may have disregarded their underwriting standards in making the loans. A common measure of serious delinquency is the number of loans on which the borrowers were ever 90 or more days delinquent in their payments. The mortgage loans in the collateral pools have experienced very high rates of delinquencies by this measure. These high rates of delinquencies are strong evidence that the originators of those loans may have disregarded their underwriting standards when making those loans. The number and percent of the loans in each pool that suffered delinquencies of 90 days or more are stated in Item 93 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 93, and alleges as though fully set forth in this paragraph, the contents of Item 93 of the Schedules.

94.   A second common measure of delinquency is the number of loans on which the borrowers are 30 or more days delinquent at a given point in time. The mortgage loans in the collateral pools have experienced very high rates of delinquencies by this measure. These high rates of delinquencies are strong evidence that the originators of those loans may have disregarded their underwriting standards when making those loans. The number and percent of the loans in each pool that were 30 or more days delinquent on January 31, 2012, are stated in Item 94 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 94, and alleges as though fully set forth in this paragraph, the contents of Item 94 of the Schedules.

### (c)   Other evidence shows that Countrywide Home Loans, Inc. disregarded its underwriting standards.

95.   In addition to the statistical data cited above, other evidence shows that CHL (which originated or acquired most of the loans in the collateral pools of the ten securitizations), did not follow its stated underwriting standards.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

96.     Many loans that Countrywide originated were outside its already lax underwriting standards, because Countrywide frequently disregarded even those standards and made loans that borrowers could not afford to pay. *See* Complaint at 4, *S.E.C. v. Mozilo*, No. CV 09–3994–JFW (MANx) (C.D. Cal. 2009). In a memorandum dated December 13, 2007, the enterprise risk assessment officer at Countrywide stated that "borrower repayment capacity was not adequately assessed by the bank during the underwriting process for home equity mortgage loans." *Id.* at 23-24. In an email dated June 1, 2006, Countrywide's Chairman and CEO Angelo Mozilo wrote that borrowers "are going to experience a payment shock which is going to be difficult if not impossible for them to manage." *Id.* at 37.

97.     Moreover, Countrywide "viewed borrowers as nothing more than the means for producing more loans, originating loans with little or no regard to borrowers' long-term ability to afford them." Complaint at 5, *California v. Countrywide Financial Corp.*, No. LC083076 (Cal. Super. 2008). Indeed, "to increase market share, [Countrywide] dispensed with many standard underwriting guidelines . . . to place unqualified borrowers in loans which ultimately they could not afford." Complaint at 5, *Washington v. Countrywide Financial Corp.*, No. 09-2-01690-6 (Wash. Super. 2009).

98.     Plaintiff is informed and believes, and based thereon alleges, that Countrywide did not adhere to its own underwriting standards, but instead abandoned, ignored, or disregarded them. According to internal Countrywide documents, Mozilo admitted that loans "had been originated 'through our channels with disregard for process [and] compliance with guidelines.'" Complaint at 20-21, *S.E.C. v. Mozilo*, No. CV 09–3994–JFW (MANx) (C.D. Cal. 2009). Moreover, Countrywide did whatever it took to sell as many loans as it could, as quickly as possible, including by disregarding its underwriting standards. *See* Complaint at 5, *California v. Countrywide Financial Corp.*, No. LC083076 (Cal. Super. 2008).

99.   Plaintiff is informed and believes, and based thereon alleges, that Countrywide made exceptions to its underwriting standards where no compensating factors existed, resulting in higher rates of default, and used as "compensating factors" variables such as a borrower's credit score and LTV, which had already been used to determine that the loan did not fall within the guidelines. Complaint at 20-21, *S.E.C. v. Mozilo*, No. CV 09–3994–JFW (MANx) (C.D. Cal. 2009). Such "compensating factors" did not actually compensate for anything and did not "offset" any risk.

100.   According to the Financial Crisis Inquiry Commission, Countrywide made loans that it knew borrowers could not afford to pay. In its final report, the FCIC noted that "Countrywide recognized that many of the loans they were originating could result in 'catastrophic consequences'" because the borrowers could not afford to pay. FINANCIAL CRISIS INQUIRY COMMISSION, THE FINANCIAL INQUIRY REPORT xxii (Public Affairs Reports, 2011).

101.   Finally, Plaintiff is informed and believes, and based thereon alleges, that Countrywide did not apply its underwriting standards in accordance with all federal, state, and local laws. Countrywide has entered into agreements to settle charges of violation of predatory lending, unfair competition, false advertising, and banking laws with the attorneys general of at least 38 states, including Alaska, Arizona, California, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Michigan, Mississippi, Montana, Nebraska, Nevada, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Dakota, Tennessee, Virginia, Washington, West Virginia, Wisconsin, and Wyoming. The attorneys general of these states alleged that Countrywide violated state predatory lending laws by (i) making loans it could not have reasonably expected borrowers to be able to repay; (ii) using high pressure sales and advertising tactics designed to steer borrowers towards high-risk loans; and (iii)

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

failing to disclose to borrowers important information about the loans, including the costs and difficulties of refinancing, the availability of lower cost products, the existence and nature of prepayment penalties, and that advertised low interest rates were merely "teaser" rates that would adjust upwards dramatically as soon as one month after closing. Eighty-eight percent of the mortgages that were covered by the settlement with the attorneys general were sold into securitization trusts, like the ten in which Colonial purchased the certificates.

102.   By each of the untrue and misleading statements referred to in paragraph 86 above, the defendants materially understated the risk of the certificates that they issued or underwrote. Moreover, Plaintiff is informed and believes, and based thereon alleges, that discovery will yield additional evidence that the originators disregarded their underwriting guidelines when making the mortgage loans in the collateral pools of these securitizations.

**D.    The Large Number of Mortgage Loans in the Collateral Pools About Which the Defendants Made Material Untrue or Misleading Statements Made Their Statements About the Ratings of Colonial's Certificates Untrue and Misleading.**

103.   In the prospectus supplements, the defendants made statements about the ratings of the certificates by ratings agencies. They stated that the ratings agencies rated each such certificate triple-A. Details of each such statement are stated in Item 103 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 103, and alleges as though fully set forth in this paragraph, the contents of Item 103 of the Schedules.

104.   The ratings were important to the decision of any reasonable investor whether to purchase the certificates. Many investors, including Colonial, have investment policies that require a certain minimum rating for all investments. The policy of Colonial was to purchase only certificates that were rated at least double-A.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

105.   These statements by the defendants about the ratings of the certificates they issued or underwrote were misleading because the defendants omitted to state that the ratings were affected by all of the material untrue or misleading statements about specific mortgage loans in the collateral pools. These include:

(a)   loans whose LTVs were materially understated as shown by the AVM;

(b)   loans whose LTVs were misleading as a result of undisclosed additional liens;

(c)   loans for which the properties were stated to be owner-occupied, but were not; and

(d)   loans that suffered EPDs, strong evidence that the originators may have disregarded the underwriting standards in making those loans.

106.   In Securitization No. 1, there were 139 loans whose LTVs were materially understated as shown by the AVM, 164 loans whose LTVs were misleading because of undisclosed additional liens, and 139 loans for which the properties were stated to be owner-occupied but were not. Eliminating duplicates, there were 312 loans (or 71.6% of the loans that backed the certificates that Colonial purchased) about which defendants made untrue or misleading statements. The numbers of such loans in the collateral pools of the securitizations are stated in Item 106 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 106, and alleges as though fully set forth in this paragraph, the contents of Item 106 of the Schedules.

107.   Plaintiff is informed and believes, and based thereon alleges, that loan files and other documents available only through discovery will prove that those statements were untrue or misleading with respect to many more loans as well.

108.   By these untrue and misleading statements, the defendants materially understated the risk of the certificates that they issued or underwrote.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

# VI.  LIABILITY OF CFC AS CONTROL PERSON

109.   CWALT and CWMBS were special purpose entities formed for the sole purpose of purchasing mortgage loans, filing registration statements with the SEC, forming issuing trusts, assigning mortgage loans and all of their rights and interests in such mortgage loans to the trustee for the benefit of the certificateholders, and depositing the underlying mortgage loans into the issuing trusts.

110.   CWALT was responsible for preparing and filing four of the shelf registration statements pursuant to which nine of the certificates were offered for sale. CWMBS was responsible for preparing and filing two of the shelf registration statements pursuant to which two of the certificates were offered for sale. CWALT and CWMBS were wholly-owned subsidiaries of Old CFC.

111.   Countrywide Securities was a securities broker-dealer and underwriter. It was a wholly-owned subsidiary of Countrywide Capital Markets, Inc., which in turn was a wholly-owned subsidiary of Old CFC.

112.   Old CFC was a publicly-traded holding company which, through its subsidiaries, engaged in mortgage lending, the securitization of mortgage loans, and other finance-related businesses. Old CFC managed its mortgage lending and securities businesses in an integrated fashion. These activities included Old CFC's practice of originating, purchasing, and warehousing mortgage loans, using certain Countrywide subsidiaries; securitizing those same loans into mortgage-backed securities, using depositors CWALT and CWMBS, among other subsidiaries; and underwriting and selling mortgage-backed securities to third parties, using Countrywide Securities.

113.   Countrywide Securities was part of Old CFC's Capital Markets Segment, which Old CFC used, among other things, to conduct conduit activities and to trade and underwrite securities. The operations, expenditures, and revenues of the Capital Markets Segment and Countrywide Securities were included in Old

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1   CFC's accounting statements and reflected in its filings with the SEC.

2        114.   At all relevant times, the offices of CWALT, CWMBS, and

3   Countrywide Securities were located in the same building as Old CFC's corporate

4   headquarters in Calabasas, California. Officers of Old CFC met frequently with

5   officers and directors of CWALT, CWMBS, and Countrywide Securities to direct

6   and coordinate the subsidiaries' securitization business and activities.

7        115.   Until September 2006, Stanford L. Kurland was the President and

8   Chief Operating Officer of Old CFC. He also served as Chairman of the Board and

9   as President and a director of CWALT and CWMBS. During the relevant time, N.

10   Joshua Adler was the President, Chief Executive Officer, and a director of CWALT

11   and CWMBS. In these roles, Kurland and Adler were able to control and exert

12   power over the general and day-to-day practices and policies of CWALT and

13   CWMBS, including the issuance of the certificates that are the subject of the

14   Complaint. Kurland signed the shelf registration statements pursuant to which

15   CWALT issued the certificates in Securitizations Nos. 1, 2, 3, 4, 6, 9, and 10.

16   Kurland also signed the shelf registration statements pursuant to which CWMBS

17   issued the certificate in Securitization No. 7. Adler signed the shelf registration

18   statement pursuant to which CWALT issued the certificate in Securitization No. 5.

19   Adler also signed the shelf registration statement pursuant to which CWMBS

20   issued the certificate in Securitization No. 8.

21        116.   Ranjit M. Kripalani served as Executive Vice President of Old CFC as

22   well as President and Executive Managing Director of Old CFC's Capital Markets

23   Segment. At the same time, Kripalani served as President of Countrywide Capital

24   Markets Inc. and as President and Chief Executive Officer of Countrywide

25   Securities, further ensuring Old CFC's control and power over the general and day-

26   to-day practices and policies of Countrywide Securities.

27        117.   Plaintiff is informed and believes, and based thereon alleges, that

28   additional officers and directors of Old CFC served as officers or directors of

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1  CWALT, CWMBS, and Countrywide Securities, and worked closely with those

2  subsidiaries in order to establish and maintain Old CFC's control and power over

3  the general and day-to-day practices and policies of the subsidiaries and

4  Countrywide's conduit business, including the issuance and sale of the certificates

5  that are the subject of the Complaint.

6     118.   In sum, as a result of its structure and the organization of its business,

7  as well as its ownership and placement of key personnel, Old CFC had the power to

8  control the general affairs and day-to-day practices and policies of CWALT,

9  CWMBS, and Countrywide Securities, including the power directly or indirectly to

10  control or influence those entities' policies related to the issuance, underwriting,

11  and sale of the certificates that are the subject of the Complaint.

12     119.   As a result, Old CFC, as control person, was liable to Plaintiff jointly

13  and severally with and to the same extent as CWALT, CWMBS, and Countrywide

14  Securities. This liability passed to CFC when Old CFC merged into CFC.

## VII. LIABILITY OF DEFENDANT BANK OF AMERICA CORPORATION AND ITS SUBSIDIARIES AS SUCCESSORS TO CFC, COUNTRYWIDE SECURITIES, CWALT, AND CWMBS

17     120.   Bank of America Corporation (**BAC**) and its subsidiaries (BAC and its

18  subsidiaries are referred to together in this Complaint as **Bank of America**) have

19  taken the assets of CFC and other Countrywide entities into the operating

20  companies of Bank of America while leaving their liabilities in moribund

21  companies that have few or no operations or assets. The full extent of BAC's and

22  Bank of America's conduct is not known because of the sparse public disclosures

23  that BAC has made about those transactions. Based on the facts alleged below,

24  BAC and its subsidiaries are liable for the claims asserted in this Complaint as

25  successors to CFC, Countrywide Securities, CWALT, and CWMBS, because (a)

26  the consideration that Bank of America paid to Countrywide for the latter's assets

27  was inadequate, (b) there was continuity of ownership between Bank of America

28  and Countrywide, (c) Countrywide ceased ordinary business soon after Bank of

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

America purchased its assets, (d) there was continuity of management, personnel, physical location, assets, and general business operations between Bank of America and Countrywide, and (e) Bank of America assumed the liabilities necessary for the uninterrupted continuation of Countrywide's business. In addition, Bank of America assumed Countrywide's mortgage repurchase and tort liabilities.

121.   At all relevant times, BAC was a public company whose stock was traded on the New York Stock Exchange.

122.   On January 11, 2008, BAC and Old CFC entered into an Agreement and Plan of Merger (referred to in this Complaint as the **Merger Agreement**) pursuant to which Old CFC would be merged into Red Oak Merger Corporation, a wholly-owned subsidiary of BAC formed to accomplish the merger. Old CFC would then cease to exist, and Red Oak would continue as the surviving company.

123.   Under the Merger Agreement, the shareholders of Old CFC would receive, and ultimately did receive, 0.1822 shares of BAC stock for each share of Old CFC, thereby maintaining those shareholders' ownership interest in the businesses of Old CFC.

124.   After the merger, Red Oak was to be renamed Countrywide Financial LLC but was in fact renamed Countrywide Financial Corporation (which is CFC), the same name as the publicly-traded Countrywide entity (Old CFC) that ceased to exist upon the completion of the merger.

125.   In a Form 8-K filing also dated January 11, 2008, BAC disclosed that the Merger Agreement was between Old CFC and BAC, the public company, not any subsidiary or affiliate of BAC.

126.   In a press release accompanying the Form 8-K, BAC stated that Bank of America intended initially to operate Countrywide separately under the Countrywide brand and that integration of Countrywide's operations with the operations of Bank of America would occur in 2009.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

127.   On February 22, 2008, an article appeared in the periodical *Corporate Counsel* about the litigation that Countrywide then faced and its possible implications for Bank of America. In the article, a spokesperson for Bank of America acknowledged that Bank of America had "bought the company [Old CFC] and all of its assets and liabilities[,] . . . was aware of the claims and potential claims against the company and [had] factored these into the purchase."

128.   On May 28, 2008, BAC filed a Form 8-K and issued a press release stating that Bank of America was creating a new banking management structure and that a long-time Bank of America officer, Barbara Desoer, would become president of the new consumer real estate operations of "Countrywide Financial Corporation and Bank of America when they are combined." The press release also stated that Desoer would be based in Countrywide's principal offices in Calabasas, California.

129.   BAC and Old CFC consummated the merger on July 1, 2008. As a result, Old CFC ceased to exist. By operation of law, as a consequence of the merger, Red Oak (soon thereafter renamed Countrywide Financial Corporation, which is defendant CFC) assumed the liabilities of Old CFC.

130.   In a July 1, 2008, Form 8-K and press release, Desoer, the president of Bank of America's consumer real estate unit, stated that it was time to "begin to combine the two companies and prepare to introduce our new name and way of operating." The release also confirmed that the combined entity would be based in Calabasas, California, the former principal offices of Countrywide. Plaintiff is informed and believes, and based thereon alleges, that Bank of America's consumer real estate unit has been and remains housed in the offices formerly occupied by Countrywide. For example, Desoer moved into the office formerly used by Angelo Mozilo, the former CEO of Old CFC. Moreover, Bank of America retained a substantial number of former employees of Countrywide to operate its consumer real estate unit. Indeed, in October 2008, Desoer stated that the combined company

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1   had named a mix of Bank of America and Countrywide executives to leadership

2   roles.

3       131.  On October 29, 2008, Countrywide Securities withdrew its registration

4   as a broker dealer from the Financial Industry Regulatory Authority. Without this

5   registration, Countrywide Securities was unable to continue in the business in

6   which it had primarily been engaged (securities dealing and underwriting).

7   Therefore, as of October 29, 2008, Countrywide Securities effectively ceased doing

8   business, too.

9       132.  In its annual report for the fiscal year ended December 31, 2008, BAC

10  disclosed that the fair value of the non-cash assets obtained and liabilities assumed

11  through the merger with Countrywide were $157.4 billion and $157.8 billion,

12  respectively.

13      133.  Contemporaneously with the merger, BAC announced that certain

14  Countrywide entities would sell specified assets to specific Bank of America

15  entities. According to BAC, the consideration paid for these assets was

16  approximately $32 billion in cash or cash equivalents. According to BAC's

17  disclosures, approximately $125 billion in non-cash assets would be left in CFC

18  and not conveyed pursuant to these asset sales, which were completed on or about

19  July 3, 2008.

20      134.  On October 6, 2008, BAC filed a Form 8-K announcing, among other

21  things, that CFC and another former subsidiary of Old CFC, Countrywide Home

22  Loans, Inc. (**CHL**), would transfer all or substantially all of their assets to unnamed

23  subsidiaries of BAC in exchange for the assumption of approximately $21 billion of

24  Countrywide debt. In contrast to the relatively detailed disclosures that BAC made

25  about the merger and the first round of asset sales, BAC and Bank of America

26  offered virtually no details about these contemplated asset sales. Plaintiff is

27  informed and believes, and based thereon alleges, that the intended effect of these

28  transactions was to further integrate into the operations of Bank of America the

- 41 -

1   Countrywide assets, while leaving the liabilities with CFC and CHL.

2        135.   On November 7, 2008, BAC filed a Form 8-K announcing, among

3   other things, that in connection with the integration of Countrywide's operations

4   into Bank of America's other business operations, CFC and CHL had transferred

5   substantially all of their assets to BAC. Again, Bank of America disclosed almost

6   no details of these transactions. Plaintiff is informed and believes, and based

7   thereon alleges, that, primarily as a result of these transfers of assets, CFC and CHL

8   are now moribund organizations, with few, if any, assets or operations. This

9   conclusion is confirmed by Bruce Bingham, a business valuation expert who

10  attempted to value CFC in a report sent to The Bank of New York Mellon, which is

11  the trustee of numerous trusts containing Countrywide-issued mortgage-backed

12  securities. Mr. Bingham concluded that CFC had negative earnings, minimal

13  operating revenues, and no viable operations. The operational status of

14  Countrywide Securities (as well as all other Countrywide entities) is comparable to

15  that of CFC and CHL.

16       136.   Plaintiff is informed and believes, and based thereon alleges, that

17  transferees of Countrywide's assets may have included other subsidiaries of BAC

18  rather than, or in addition to, BAC. Because of the sparse disclosures about these

19  transactions, it is impossible to be certain which Bank of America entities were

20  involved.

21       137.   As the principal consideration for the asset sales on November 7, 2008,

22  BAC assumed debt securities and related guarantees of Countrywide in an

23  aggregate amount of $16.6 billion. BAC assumed much of this debt through the

24  amendment of indenture agreements substituting BAC as the issuer and/or

25  guarantor of the securities subject to the indentures.

26       138.   According to Bank of America's own figures, Bank of America

27  obtained approximately $125 billion in assets in exchange for the assumption of

28  $16.6 billion in debt. Therefore, Plaintiff is informed and believes, and based

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1   thereon alleges, that the consideration given for Countrywide's assets was not

2   commensurate with the value of the assets that Bank of America obtained.

3   Presumably, Bank of America will contest these figures. Yet, Bank of America

4   itself has acknowledged the difficulty in proving the actual value transferred and

5   received. In *MBIA Insurance Corp. v. Countrywide Home Loans, Inc.*, Index No.

6   602825/08, pending in the Supreme Court of the State of New York for the County

7   of New York, at a hearing held on June 27, 2012, counsel for Bank of America

8   informed the court that to resolve the "difficult" and "complicated" valuation issue,

9   extensive expert testimony would be required.

10       139.   On April 27, 2009, Bank of America issued a press release announcing

11   the rebranding of CHL operations as Bank of America Home Loans. Bank of

12   America stated that the new brand would represent the combined operations of

13   Bank of America's mortgage and home equity business and CHL. Bank of America

14   further explained that it was in the process of rebranding Countrywide's "locations,

15   account statements, marketing materials and advertising" and that the "full systems

16   conversion" would be completed later that year.

17       140.   As of September 21, 2009, liability for the deposits in Countrywide

18   Bank, N.A. was assumed by Bank of America, N.A. On November 9, 2009, online

19   account services for Countrywide mortgages were consolidated with Bank of

20   America's Online Banking website. *See, e.g.*, Mortgage Loan Officer Locator,

21   http://www.home.countrywide.com (last visited August 9, 2012).

22       141.   Old CFC's website now redirects visitors to the Bank of America

23   website. *See* http://www.countrywide.com, *redirected to*

24   www8.bankofamerica.com/home-loans/overview.go (last visited August 9, 2012).

25       142.   By the complex and sparsely-disclosed transactions described above,

26   Bank of America has combined Countrywide's operations with its own business

27   operations and proceeded to operate them.

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- 43 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

143.   Bank of America operates its combined consumer real estate unit out of the common headquarters of Old CFC, CHL, Countrywide Securities, CWMBS, and CWALT. Plaintiff is informed and believes, and based thereon alleges, that Bank of America employs many former employees of Countrywide to operate this combined unit.

144.   Plaintiff is informed and believes, and based thereon alleges, that Bank of America's rebranded consumer real estate business, Bank of America Home Loans, now operates out of more than 1,000 former Countrywide offices nationwide.

145.   Public statements by Old CFC and Bank of America reflect that the companies intended that their business operations be combined and understood and anticipated that Bank of America would be responsible for the liabilities of Old CFC and Countrywide. In its press release announcing the merger, BAC declared that it planned to operate Countrywide separately under the Countrywide brand for a limited period only, with integration to occur in 2009. In its 2008 annual report, BAC stated that as a "combined company," Bank of America would be recognized as a responsible lender. Similarly, representatives of Old CFC stated that the "combination" with Bank of America would create one of the most powerful mortgage franchises in the world.

146.   On at least two occasions, two different Chief Executive Officers of BAC publicly acknowledged that BAC intended to assume the liabilities of Countrywide when it acquired Countrywide's assets. One CEO acknowledged in January 2008 that BAC "looked at every aspect of the deal, from their [Countrywide's] assets to potential lawsuits." On an earnings conference call on November 16, 2010, another CEO stated that BAC "would pay for the things that Countrywide did."

147.   Bank of America has, in fact, made a practice of taking responsibility for Countrywide liabilities. For example, on October 6, 2008, Bank of America

- 44 -

1  settled lawsuits brought against Countrywide companies by state attorneys general

2  by agreeing to modify loans for 390,000 borrowers, valued at more than $8 billion.

3  148.   Similarly, on January 3, 2011, Bank of America paid $2.8 billion to

4  Fannie Mae and Freddie Mac to settle claims for billions of dollars in hundreds of

5  thousands of loans that went sour after Fannie Mae and Freddie Mac bought them

6  from Countrywide. In exchange for the payments, Fannie Mae and Freddie Mac

7  agreed to drop their demands that Bank of America buy back Countrywide

8  mortgages.

9  149.   On May 26, 2011, Bank of America agreed to pay approximately $22

10 million to settle charges that it improperly had foreclosed on the homes of active-

11 duty members of the United States military. In a press release announcing the

12 settlement, Bank of America noted that most of the mortgage loans at issue had

13 been made by Countrywide before Bank of America's merger with Countrywide

14 and that most of the improper foreclosure activity also had been Countrywide's.

15 Nevertheless, Bank of America said that it was responsible to "make things right."

16 150.   In a proposed settlement of Countrywide liabilities announced on June

17 29, 2011, Bank of America agreed to pay $8.5 billion for the benefit of investors in

18 Countrywide trusts to resolve, among other things, claims against Countrywide for

19 breach of representations and warranties made about the mortgage loans in the

20 trusts and for violating prudent standards of care in servicing those loans. The

21 release of Bank of America contemplated by this settlement expressly includes

22 claims against Bank of America for successor liability.

23 151.   Because BAC continues to operate the businesses of Countrywide, it

24 had to assume the liabilities necessary to continue those operations, and Plaintiff is

25 informed and believes, and based thereon alleges, that it did so.

26 152.   In addition to paying for Countrywide's liabilities, Bank of America

27 also has asserted claims as the successor to Countrywide. For example, in a

28 proceeding in the United States Bankruptcy Court for the District of Nebraska, *In re*

- 45 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1    *Peter J. Kerby*, Case No. 97-81961, BAC's attorney-in-fact filed a motion on behalf

2    of "Bank of America Corporation successor to Countrywide Home Loans." In the

3    limited power of attorney by which BAC appointed that attorney-in-fact (which was

4    also submitted to the Bankruptcy Court), a Vice President and Senior Recovery

5    Manager of BAC executed the power of attorney on behalf of "Bank of America

6    Corporation successor to Countrywide Home Loans." Attached to the power of

7    attorney were several pages, including the signature page, of the Merger

8    Agreement. BAC later filed an amended motion and again submitted the power of

9    attorney to the Bankruptcy Court. This time, attached to the power of attorney was

10    a "Bank of America Corporation Hierarchy [R]eport," which listed 21 subsidiaries

11    of CFC. There is a handwritten star next to the entry for "Countrywide Home

12    Loans, Inc."

13       153.   Similarly, on September 9, 2010, an amended proof of claim for

14    approximately $21.5 million was filed in *In re Alliance Bancorp, Inc.*, Case No. 07-

15    10943, pending in the United States Bankruptcy Court for the District of Delaware.

16    In this amended proof of claim, the creditor is identified as "Countrywide Home

17    Loans, Inc. (through its successor, Bank of America, NA)." And in the Attachment

18    to the Amended Proof of Claim, which was also filed with the bankruptcy court, the

19    creditor is identified as "Countrywide Home Loans, Inc. ('Countrywide'), through

20    its successor by merger, Bank of America." Finally, footnote 1 of the Attachment

21    states that "[r]eference to 'Countrywide' includes reference to affiliates thereof and

22    who together have claims against Alliance Inc., through Countrywide's successor

23    by merger, Bank of America."

24       154.   Thus, Bank of America is trying to accomplish exactly what the

25    doctrine of successor liability is meant to prevent – claiming to be a successor to

26    Countrywide when asserting claims while simultaneously denying that it is a

27    successor to Countrywide when resisting claims against it.

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

# VIII.  STATUTE OF LIMITATIONS

155.   All of the claims in this Complaint are timely. Plaintiff became receiver for Colonial on August 14, 2009. Under 12 U.S.C. § 1821(d)(14), the statute of limitations on all of Colonial's claims asserted in this Complaint that had not expired as of August 14, 2009, is extended to no less than three years from that date. Plaintiff filed its initial Complaint less than three years from August 14, 2009.

156.   The statute of limitations applicable to the claims asserted in this Complaint had not expired as of August 14, 2009, because a reasonably diligent plaintiff would not have discovered until after August 14, 2008, facts that show that the particular statements referred to in Items 35, 44, 69, 75, 86, and 103 of the Schedules to this Complaint were untrue or misleading. Those are statements about the 24,685 specific mortgage loans in the collateral pools of the securitizations involved in this action, not about residential mortgage loans or any type of residential mortgage loan (e.g., prime, Alt-A, subprime, etc.) in general. A reasonably diligent plaintiff did not have access until after August 14, 2008, to facts about those specific loans that show that the statements that defendants made about those specific loans were untrue or misleading. A reasonably diligent plaintiff did not have access to the loan files compiled by the originators of those specific mortgage loans nor to records maintained by the servicers of those specific mortgage loans (from either or both of which a reasonably diligent plaintiff may have discovered facts that show that the statements that defendants made about those specific loans were untrue or misleading) because originators and servicers of loans and securitization trustees do not make those files available to certificateholders. Moreover, on and before August 14, 2008, there were not available to a reasonably diligent plaintiff, even at considerable expense, data about those specific loans that show that the statements that defendants made about those specific loans were untrue or misleading. Such data became available for the first time in early 2010. A reasonably diligent plaintiff thus could not have brought a

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1  complaint, before August 14, 2008, that would have withstood a motion to dismiss

2  under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

3      157.   All of the claims asserted in this Complaint are timely for an additional

4  reason. When Colonial purchased the certificates involved in this action, all of them

5  were rated triple-A, the highest possible rating, by at least two of Fitch, Moody's,

6  and Standard & Poor's, all Nationally Recognized Statistical Rating Organizations

7  (**NRSROs**) accredited by the Securities and Exchange Commission. Sponsors of

8  securitizations submitted to the NRSROs the same information about the loans in

9  the collateral pools of proposed securitizations that they included in the prospectus

10  supplements for those securitizations, including in particular statements of the type

11  referred to in Items 35, 44, 69, 75, 86, and 103 of the Schedules to this Complaint.

12  The NRSROs used and relied on that information in rating the certificates to be

13  issued in each securitization.

14      158.   The NRSROs monitored the certificates that they rated after those

15  certificates were issued. If an NRSRO discovers facts that show that there was an

16  untrue or misleading statement about a material fact in the information submitted to

17  it for its use in rating a certificate, then the NRSRO will withdraw its rating of that

18  certificate while it considers the impact of the untrue or misleading statement, or it

19  will downgrade the rating of the certificate, usually to a rating below investment

20  grade.

21      159.   As noted above, all of the certificates involved in this action were rated

22  triple-A at issuance by at least two of Fitch, Moody's, and Standard & Poor's. Not

23  one of those NRSROs withdrew any of those ratings, or downgraded any of them to

24  below investment grade, before August 14, 2008. The date on which each

25  certificate was first downgraded below investment grade is stated in Item 35 of the

26  Schedules.

27      160.   If a reasonably diligent plaintiff would have discovered before August

28  14, 2008, facts that show that the particular statements referred to in Items 35, 44,

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1   69, 75, 86, and 103 of the Schedules to this Complaint were untrue or misleading,

2   then the NRSROs, which were monitoring the certificates and are much more

3   sophisticated than a reasonably diligent plaintiff, would also have discovered such

4   facts and withdrawn or downgraded their ratings on the certificates to below

5   investment grade. The fact that none of the NRSROs did so demonstrates that,

6   before August 14, 2008, a reasonably diligent plaintiff could not have discovered

7   facts that show that those statements were untrue or misleading.

8       161.  Plaintiff's claims are timely for another reason.  As a purchaser of the

9   certificates, Colonial was, and Plaintiff as Receiver for Colonial is, a member of the

10  proposed class in *Luther v. Countrywide Financial Corporation*, Superior Court of

11  the State of California, County of Los Angeles, No. BC 380698, filed on November

12  14, 2007. The pendency of *Luther* has tolled the running of the statute of limitations

13  on the claims in this Complaint.

14      162.  Seven of the securitizations from which Colonial purchased

15  certificates, Securitizations Nos. 1 through 5, 9, and 10, were included in the

16  original Class Action Complaint filed in *Luther* on November 14, 2007. None of

17  those securitizations has been dismissed from *Luther*.

18      163.  Three of the securitizations from which Colonial purchased

19  certificates, Securitizations Nos. 6 through 8, were included in the original Class

20  Action Complaint filed in *Washington State Plumbing & Pipefitting Pension Trust*

21  *v. Countrywide Financial Corporation*, Superior Court for the State of California,

22  County of Los Angeles, No. BC 392571, filed on June 12, 2008. That action was

23  consolidated with *Luther*, and those securitizations are included in the Consolidated

24  Class Action Complaint filed on October 16, 2008. None of those securitizations

25  has been dismissed from *Luther*.

26      164.  One or more of the named plaintiffs in the *Luther* consolidated class

27  action purchased certificates that were issued pursuant to the same registration

28  statements as the certificates that Colonial purchased in Securitizations Nos. 1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

through 10, and the certificates purchased by Colonial and by the named plaintiffs in *Luther* were backed by mortgage loans originated by Countrywide Home Loans.

## IX.  CLAIMS FOR RELIEF

### A.    Untrue or Misleading Statements in a Registration Statement Under Section 11 of the 1933 Act

165.   Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 164.

166.   CWALT is the depositor of Securitizations Nos. 1 through 6, 9, and 10, and therefore is the issuer of nine of the certificates. In doing the acts alleged, CWALT violated Section 11 of the 1933 Act in connection with issuing the certificates in Securitizations Nos. 1 through 6, 9, and 10.

167.   CWMBS is the depositor of Securitizations Nos. 7 and 8 and therefore is the issuer of two of the certificates. In doing the acts alleged, CWMBS violated Section 11 of the 1933 Act in connection with issuing the certificates in Securitizations Nos. 7 and 8.

168.   Countrywide Securities underwrote the certificates in Securitizations Nos. 1 through 8. In doing the acts alleged, Countrywide Securities violated Section 11 of the 1933 Act in connection with underwriting the certificates in Securitizations Nos. 1 through 8.

169.   DBS underwrote the certificates in Securitizations Nos. 2 and 9. In doing the acts alleged, DBS violated Section 11 of the 1933 Act in connection with underwriting the certificates in Securitizations Nos. 2 and 9.

170.   Edward Jones underwrote the certificates in Securitizations Nos. 2 and 3. In doing the acts alleged, Edward Jones violated Section 11 of the 1933 Act in connection with underwriting the certificates in Securitizations Nos. 2 and 3.

171.   Bear Stearns underwrote the certificate in Securitization No. 3. In doing the acts alleged, Bear Stearns violated Section 11 of the 1933 Act in connection with underwriting the certificate in Securitization No. 3.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

172.   Credit Suisse underwrote the certificate in Securitization No. 5. In doing the acts alleged, Credit Suisse violated Section 11 of the 1933 Act in connection with underwriting the certificate in Securitization No. 5.

173.   Citigroup underwrote the certificate in Securitization No. 6. In doing the acts alleged, Citigroup violated Section 11 of the 1933 Act in connection with underwriting the certificate in Securitization No. 6.

174.   RBS underwrote the certificate in Securitization No. 8. In doing the acts alleged, RBS violated Section 11 of the 1933 Act in connection with underwriting the certificate in Securitization No. 8.

175.   JP Morgan underwrote the certificate in Securitization No. 9. In doing the acts alleged, JP Morgan violated Section 11 of the 1933 Act in connection with underwriting the certificate in Securitization No. 9.

176.   Barclays underwrote the certificate in Securitization No. 10. In doing the acts alleged, Barclays violated Section 11 of the 1933 Act in connection with underwriting the certificate in Securitization No. 10.

177.   BAS underwrote the certificate in Securitization No. 10. In doing the acts alleged, BAS violated Section 11 of the 1933 Act in connection with underwriting the certificate in Securitization No. 10.

178.   The certificates in these securitizations were issued pursuant or traceable to registration statements. Details of each registration statement and each certificate are stated in Item 35 of the Schedules.

179.   The registration statements, as amended by the prospectus supplements, contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. These untrue and misleading statements included all of the untrue and misleading statements described in paragraphs 39 through 108.

180.   Colonial purchased each certificate before the issuer made generally available an earning statement covering a period of at least twelve months.

181.   Plaintiff expressly excludes from this claim any allegation that could be construed as alleging fraud or intentional or reckless conduct. This claim is based solely on allegations of strict liability or negligence under the 1933 Act.

182.   Colonial did not know when it purchased the certificates that the statements in the registration statements, as amended by the prospectus supplements, were untrue or misleading.

183.   When it failed on August 14, 2009, Colonial had not discovered that the defendants made untrue or misleading statements about the certificates. Plaintiff discovered that the defendants made untrue or misleading statements about each security in the course of its investigation in 2012.

184.   Colonial has suffered a loss on each of these certificates.

185.   Plaintiff is entitled to recover damages as described in 15 U.S.C. § 77k(e).

**B.     Liability as a Controlling Person Under Section 15 of the 1933 Act**

186.   Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 185.

187.   Old CFC, by or through stock ownership, agency, and as otherwise described above, controlled CWALT, CWMBS, and Countrywide Securities within the meaning of Section 15 of the 1933 Act.

188.   In doing the acts alleged, CWALT and CWMBS violated Section 11 of the 1933 Act by issuing the certificates.

189.   In doing the acts alleged, Countrywide Securities violated Section 11 of the 1933 Act by underwriting nine of the certificates.

190.   As a result of the merger of Old CFC and Bank of America, Old CFC's control person liability passed to CFC.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1   191.   CFC is therefore jointly and severally liable with and to the same

2   extent as CWALT, CWMBS, and Countrywide Securities.

3   **C.   Liability as Successor to Countrywide Securities, CWALT, CWMBS, and CFC**

4

5   192.   This claim is alleged against defendant BAC.

6   193.   Plaintiff hereby incorporates by reference, as though fully set forth,

7   paragraphs 1 through 0 of this Complaint.

8   194.   For the reasons described above, BAC is jointly and severally liable

9   for any and all injury and damages resulting from the conduct of Countrywide

10   Securities, CWALT, CWMBS, and CFC, because BAC is the successor-in-interest

11   to Countrywide Securities, CWALT, CWMBS, and CFC.

12   195.   BAC became the successor-in-interest to Countrywide Securities,

13   CWALT, CWMBS, and CFC because (a) through the transactions that took place

14   between July 1, 2008, and November 7, 2008, it gave inadequate consideration to

15   Countrywide; (b) there was continuity of ownership between Bank of America and

16   Countrywide; (c) Countrywide ceased ordinary business soon after the merger

17   transaction was consummated; (d) there was continuity of management, personnel,

18   physical location, assets, and general business operations between Bank of America

19   and Countrywide; and (e) Bank of America assumed the liabilities ordinarily

20   necessary for the uninterrupted continuation of Countrywide's business. BAC is

21   also a successor-in-interest to Countrywide because Bank of America assumed

22   Countrywide's mortgage repurchase and tort liabilities.

23   196.   BAC is therefore jointly and severally liable with and to the same

24   extent as Countrywide Securities, CWALT, CWMBS, and CFC.

25   **PRAYER FOR RELIEF**

26   WHEREFORE, Plaintiff prays for judgment against defendants for damages

27   in an amount to be determined at trial, but not less than $125 million, plus

28   attorneys' fees, costs of court, and pre- and post-judgment interest at the

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- 53 -

1    appropriate allowable rates. Plaintiff further requests that the Court order any and

2    all other relief at law and in equity to which Plaintiff is entitled.

3    Dated: November 6, 2012                    BAKER & HOSTETLER LLP

4

5                                              Michael R. Matthias
                                               Gabriel E. Drucker

6                                              David J. Grais (*pro hac vice*)
7                                              Mark B. Holton (*pro hac vice*)
                                               Mary G. Menge (*pro hac vice*)
                                               GRAIS & ELLSWORTH LLP
8

9                                              *Attorneys for Federal Deposit Insurance*
                                               *Corporation as Receiver for Colonial Bank*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial of its claims by jury to the extent authorized by law.

Dated: November 6, 2012

BAKER & HOSTETLER LLP



Michael R. Matthias
Gabriel E. Drucker

David J. Grais (*pro hac vice*)
Mark B. Holton (*pro hac vice*)
Mary G. Menge (*pro hac vice*)
GRAIS & ELLSWORTH LLP

Attorneys for Plaintiff
Federal Deposit Insurance Corporation as
Receiver for Colonial Bank

# SCHEDULE 1

# SCHEDULE 1 OF THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CWALT, Countrywide Securities, CFC, and BAC.

**Item 35.     Details of trust and certificate(s).**

**(a)     Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2006-J5 was a securitization in July 2006 of 764 mortgage loans, in four groups.[1] CWALT was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by Countrywide Home Loans, Inc., American Home Mortgage Corp., MortgageIT, Inc., Decision One Mortgage Company LLC, Greenpoint Mortgage Funding Incorporated, and various undisclosed originators. Of the 402 initial mortgage loans in loan group 1, approximately 98.22% were originated by Countrywide Home Loans, Inc., approximately 1.02% were originated by American Home Mortgage Corp., approximately 0.06% were originated by MortgageIT, Inc., and approximately 0.69% were originated by Decision One Mortgage Company LLC. CWALT 2006-J5 Pros. Sup. S-4, S-38.

**(b)     Description of the certificate(s) that Colonial purchased:** Countrywide Securities was the underwriter of the securities that Colonial purchased. Colonial purchased two senior certificates in this securitization, in class 1-A-5, for which Colonial paid $24,316,747 plus accrued interest on December 19, 2006, and $25,554,688 plus accrued interest on February 16, 2007. Colonial's

---

[1]   CWALT 2006-J5 was a prefunded securitization. CWALT 2006-J5 Pros. Sup. S-5. On the closing date of the securitization there were 764 mortgage loans in the trust (the "Initial Mortgage Loans"), and 402 Initial Mortgage Loans in loan group 1. CWALT 2006-J5 Pros. Sup. S-38, S-46, S-54, S-62. After the closing date of the securitization, the trust purchased an additional 34 mortgage loans in group 1. The data contained in the charts and tables in this schedule include the additional 34 mortgage loans that were added to loan group 1, unless otherwise indicated.

certificates were primarily paid by the 436 mortgage loans in loan group 1.

     **(c)    Ratings of the certificate(s) when Colonial purchased them:**
Moody's: Aaa; Standard & Poor's: AAA.

     **(d)    Current ratings of the certificate(s):** Moody's: Caa3; Standard &
Poor's: D.

     **(e)    Date on which the certificate(s) were downgraded below
investment grade:** October 27, 2008.

     **(f)    URL of prospectus supplement for this securitization:**
http://sec.gov/Archives/edgar/data/1269518/000119312506158058/d424b5.htm

     **(g)    Registration statement pursuant or traceable to which the
certificate(s) were issued:** Certificates in this trust, including the certificates that
Colonial purchased, were issued pursuant or traceable to a registration statement
filed by CWALT with the SEC on form S-3 on February 7, 2006. Annexed to the
registration statement was a prospectus. The prospectus was amended from time to
time by prospectus supplements whenever a new series of certificates was issued
pursuant or traceable to that registration statement.

**Item 44.    Untrue or misleading statements about the LTVs of the mortgage
loans:**

     In the prospectus supplement, CWALT and Countrywide Securities made the
following statements about the LTVs of the mortgage loans in the collateral pool of
this securitization.

     As of the initial cut-off date, the weighted average original LTV ratio of the
mortgage loans in loan group 1 was 74.65%. CWALT 2006-J5 Pros. Sup. S-6.

     (a)    "No Initial Mortgage Loan in any loan group had a Loan-to-Value
Ratio at origination or on the closing date of more than 100%." CWALT 2006-J5
Pros. Sup. S-36.

(b)     On pages S-33 to S-67 of the prospectus supplement ("The Mortgage Pool"), CWALT and Countrywide Securities presented tables of statistics about the Initial Mortgage Loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000.00, $50,000.01 to $100,000.00, $100,000.01 to $150,000.00, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 12 such tables in "The Mortgage Pool" section for the Initial Mortgage Loans in loan group 1. In each table the number of categories into which the loans were divided ranged from 3 to 39. Thus, in "The Mortgage Pool" section, CWALT and Countrywide Securities made many untrue or misleading statements about the original LTVs of the Initial Mortgage Loans in loan group 1. CWALT 2006-J5 Pros. Sup. S-38 to S-45.

(c)     "As of the initial cut-off date, the weighted average original Loan-to-Value Ratio of the Initial Mortgage Loans in loan group 1 was approximately 74.65%." CWALT 2006-J5 Pros. Sup. S-41.

**Item 54.     Details of the results of the AVM analysis for the loans that backed the certificates:**

| | |
|---|---|
| Number of loans that backed the certificates (loan group 1) | 436 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 139 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $25,213,984 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 43 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $4,849,117 |
| Number of loans with LTVs over 100%, as stated by | 0 |

| defendants | |
|---|---:|
| Number of loans with LTVs over 100%, as determined by the model | 36 |
| Weighted-average LTV, as stated by defendants | 74.65% |
| Weighted-average LTV, as determined by the model | 92.3% |

**Item 60.**    **Undisclosed additional liens in loan group 1:**

    **(a)**    **Minimum number of properties with additional liens:** 164

    **(b)**    **Weighted average CLTV with additional liens:** 80.8%

**Item 69.**    **Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, CWALT and Countrywide Securities made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by Countrywide Home Loans, Inc.: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2006-J5 Pros. Sup. S-74.

In the prospectus supplement, CWALT and Countrywide Securities made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by American Home Mortgage Corp.: "Every mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation." CWALT 2006-J5 Pros. Sup. S-80.

In the prospectus supplement, CWALT and Countrywide Securities made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by MortgageIT, Inc.: "Every MortgageIT mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation." CWALT 2006-J5 Pros. Sup. S-82.

**Item 75.**    **Untrue or misleading statements about owner-occupancy of the
properties that secured the mortgage loans:**

In the prospectus supplement, CWALT and Countrywide Securities made the
following statements about the occupancy status of the properties that secured the
mortgage loans in the collateral pool of this securitization.

(a)    In "The Mortgage Pool" section of the prospectus supplement,
described in Item 44, CWALT and Countrywide Securities presented a table
entitled "Occupancy Types" for the Initial Mortgage Loans in loan group 1. This
table divided the Initial Mortgage Loans in Loan Group 1 into the categories
"Primary Residence," "Investment Property," and "Secondary Residence." This
table contained untrue or misleading statements about, among other data, the
number of Initial Mortgage Loans, the aggregate principal balance outstanding, and
the percent of the Initial Mortgage Loans in loan group 1 in each of these
categories. CWALT 2006-J5 Pros. Sup. S-44.

(b)    In the "Occupancy Types" table, CWALT and Countrywide Securities
stated that of the 402 Initial Mortgage Loans in loan group 1, 369 were secured by
primary residences and 33 were not. CWALT 2006-J5 Pros. Sup. S-44.

**Item 83.**    **Details of properties in loan group 1 that were stated to be owner-
occupied, but were not:**

(a)    **Number of loans for which the owner of the property instructed
tax authorities to send property tax bills to him or her at a
different address: 56**

(b)    **Number of loans for which the owner of the property could have,
but did not, designate the property as his or her homestead: 99**

(c)    **Number of loans for which the owner of the property did not
receive bills at the address of the mortgaged property but did
receive bills at a different address: 4**

(d)    **Eliminating duplicates, number of loans about which one or more
of statements (a) through (c) is true: 139**

**SCHEDULE 1 OF THE AMENDED COMPLAINT**                              **Page 5**

**Item 86.     Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-72 through S-78 of the prospectus supplement, CWALT and Countrywide Securities made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference.

One of these statements was that: "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWALT 2006-J5 Pros. Sup. S-73.

Another one of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2006-J5 Pros. Sup. S-73.

On pages S-78 through S-81 of the prospectus supplement, CWALT and Countrywide Securities made statements about the underwriting guidelines of American Home Mortgage Corp. All of those statements are incorporated herein by reference.

One of these statements was that: "American Home underwrites a borrower's creditworthiness based solely on information that American Home believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring." CWALT 2006-J5 Pros. Sup. S-79.

Another one of these statements was that: "Exceptions to the underwriting standards are permitted where compensating factors are present." CWALT 2006-J5 Pros. Sup. S-79.

Another one of these statements was that: "[E]xceptions to American Home's underwriting guidelines are allowed if sufficient compensating factors exist to

offset any additional risk due to the exception." CWALT 2006-J5 Pros. Sup. S-81.

On pages S-81 through S-84 of the prospectus supplement, CWALT and Countrywide Securities made statements about the underwriting guidelines of MortgageIT, Inc. All of those statements are incorporated herein by reference.

One of these statements was that: "MortgageIT underwrites a borrower's creditworthiness based solely on information that MortgageIT believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring." CWALT 2006-J5 Pros. Sup. S-82.

Another one of these statements was that: "[E]xceptions to these underwriting guidelines are considered, so long as the borrower has other reasonable compensating factors, on a case-by-case basis." CWALT 2006-J5 Pros. Sup. S-84.

**Item 93.     90+ days delinquencies in loan group 1:**

    **(a)     Number of the mortgage loans that suffered 90+ days delinquencies:** 201

    **(b)     Percent of the mortgage loans that suffered 90+ days delinquencies:** 46.1%

**Item 94.     30+ days delinquencies in loan group 1:**

    **(a)     Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 146

    **(b)     Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 33.5%

**Item 103.     Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-8 through S-9 and S-161 through S-162 of the prospectus supplement, CWALT and Countrywide Securities made statements about the ratings assigned to the certificates issued in this securitization. CWALT and Countrywide Securities stated that Colonial's certificates were rated Aaa by Moody's Investors Service, Inc., and AAA by Standard & Poor's. CWALT 2006-J5

Pros. Sup. S-8. These were the highest ratings available from these two rating agencies.

CWALT and Countrywide Securities also stated: "The offered certificates will not be offered unless they are assigned the indicated ratings by Standard & Poor's . . . and Moody's Investors Service, Inc. . . ." CWALT 2006-J5 Pros. Sup. S-9.

CWALT and Countrywide Securities also stated: "It is a condition to the issuance of the senior certificates . . . that they be rated 'AAA' by Standard & Poor's . . . and 'Aaa' by Moody's Investors Service, Inc. . . ." CWALT 2006-J5 Pros. Sup. S-161.

**Item 106.** **Summary of loans in loan group 1 about which the defendants made untrue or misleading statements:**

    **(a)** **Number of loans whose LTVs were materially understated as shown by the AVM:** 139

    **(b)** **Number of loans whose LTVs were misleading because of undisclosed additional liens:** 164

    **(c)** **Number of loans for which the properties were stated to be owner-occupied but were not:** 139

    **(d)** **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 312

    **(e)** **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 71.6%

# SCHEDULE 2

# SCHEDULE 2 OF THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CWALT, DBS, Countrywide Securities, Edward Jones, CFC, and BAC.

**Item 35.     Details of trust and certificate(s).**

(a)     **Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2005-52CB was a securitization in September 2005 of 2,223 mortgage loans, in one pool.[1] CWALT was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by Countrywide Home Loans, Inc. CWALT 2005-52CB Pros. Sup. S-4, S-16; S-28.

(b)     **Description of the certificate(s) that Colonial purchased:** Countrywide Securities, DBS, and Edward Jones were the underwriters of the security that Colonial purchased. Colonial purchased a senior certificate in this securitization, in class 1-A-4, for which Colonial paid $36,706,674 plus accrued interest on January 12, 2006.

(c)     **Ratings of the certificate(s) when Colonial purchased them:** Fitch: AAA; Moody's: Aaa; Standard & Poor's: AAA.

(d)     **Current ratings of the certificate(s):** Fitch: CC; Moody's: Caa1; Standard & Poor's: CCC.

(e)     **Date on which the certificate(s) were downgraded below investment grade:** February 20, 2009.

---

[1]     CWALT 2005-52CB was a securitization with a supplemental loan account that enabled it to purchase additional mortgage loans. CWALT 2005-52CB Pros. Sup. S-5; S-27. On the closing date of the securitization there were 2,223 mortgage loans in the trust (the "Initial Mortgage Loans"). After the closing date of the securitization, the trust purchased an additional 614 mortgage loans. The data contained in the charts and tables in this schedule include the additional 614 mortgage loans that were added to the trust, unless otherwise indicated.

(f)      **URL of prospectus supplement for this securitization:**

http://www.sec.gov/Archives/edgar/data/1269518/000095013605006200/file001.htm.

(g)      **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by CWALT with the SEC on form S-3 on June 17, 2005. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 44.      Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, CWALT, Countrywide Securities, DBS, and Edward Jones made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)      "No Initial Mortgage Loan had a Loan-to-Value Ratio at origination of more than 100.00%." CWALT 2005-52CB Pros. Sup. S-17.

(b)      In the section of the prospectus supplement entitled "The Mortgage Pool," CWALT, Countrywide Securities, DBS, and Edward Jones presented tables of statistics about the Initial Mortgage Loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000.00, $50,000.01 to $100,000.00, $100,000.01 to $150,000.00, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 10 such tables in "The Mortgage Pool" section for the Initial Mortgage Loans in the collateral pool. In

each table the number of categories into which the loans were divided ranged from 3 to 41. Thus, in "The Mortgage Pool" section, CWALT, Countrywide Securities, DBS, and Edward Jones made many untrue or misleading statements about the original LTVs of the Initial Mortgage Loans in the collateral pool. CWALT 2005-52CB Pros. Sup. S-19 to S-25.

    (c)    "As of the initial cut-off date, the weighted average original Loan-to-Value Ratio of the Initial Mortgage Loans was approximately 71.22%." CWALT 2005-52CB Pros. Sup. S-22.

**Item 54.** **Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---|
| Number of loans that backed the certificate | 2,837 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 1,631 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $39,270,435 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 340 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $16,772,927 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 177 |
| Weighted-average LTV, as stated by defendants | 71.22% |
| Weighted-average LTV, as determined by the model | 78.9% |

**Item 60.** **Undisclosed additional liens:**

    **(a)**    **Minimum number of properties with additional liens:** 915

    **(b)**    **Weighted-average CLTV with additional liens:** 75.8%

**Item 69.**     **Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, CWALT, Countrywide Securities, DBS, and Edward Jones made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by Countrywide Home Loans, Inc.: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2005-52CB Pros. Sup. S-30.

**Item 75.**     **Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, CWALT, Countrywide Securities, DBS, and Edward Jones made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)     In "The Mortgage Pool" section of the prospectus supplement, described in Item 44, CWALT, Countrywide Securities, DBS, and Edward Jones presented a table entitled "Occupancy Types." This table divided the Initial Mortgage Loans in the collateral pool into the categories "Primary Residence," "Investment Property," and "Secondary Residence." This table contained untrue or misleading statements about, among other data, the number of Initial Mortgage Loans, the aggregate principal balance outstanding, and the percent of the Initial Mortgage Loans in each of these categories. CWALT 2005-52CB Pros. Sup. S-25.

(b)     In the "Occupancy Types" table, CWALT, Countrywide Securities, DBS, and Edward Jones stated that of the 2,223 Initial Mortgage Loans in the collateral pool, 1,900 were secured by primary residences and 323 were not. CWALT 2005-52CB Pros. Sup. S-25.

**Item 83.**     **Details of properties that were stated to be owner-occupied, but were not:**

(a)     **Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a**

**different address:** 184

    **(b)**    **Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 305

    **(c)**    **Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 213

    **(d)**    **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 574

**Item 86.**    **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-28 through S-33 of the prospectus supplement, CWALT, Countrywide Securities, DBS, and Edward Jones made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference.

One of these statements was that: "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWALT 2005-52CB Pros. Sup. S-29.

Another one of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2005-52CB Pros. Sup. S-29.

**Item 92.**    **Early payment defaults:**

    **(a)**    **Number of the mortgage loans that suffered EPDs:** 5

    **(b)**    **Percent of the mortgage loans that suffered EPDs:** 0.2 %

**Item 93.**    **90+ days delinquencies:**

    **(a)**    **Number of the mortgage loans that suffered 90+ days delinquencies:** 508

    **(b)**    **Percent of the mortgage loans that suffered 90+ days delinquencies:** 18%

**Item 94.**    **30+ days delinquencies in this securitization:**

   (a)    **Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 446

   (b)    **Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 15.7%

**Item 103.**    **Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-3 and S-87 through S-88 of the prospectus supplement, CWALT, Countrywide Securities, DBS, and Edward Jones made statements about the ratings assigned to the certificates issued in this securitization. CWALT, Countrywide Securities, DBS, and Edward Jones stated that Colonial's certificate was rated AAA by Fitch Ratings, Aaa by Moody's Investors Service, Inc., and AAA by Standard & Poor's Ratings Services. CWALT 2005-52CB Pros. Sup. S- 3. These were the highest ratings available from these three rating agencies.

CWALT, Countrywide Securities, DBS, and Edward Jones also stated: "The classes of certificates listed below will not be offered unless they are assigned the following ratings by Fitch, Inc. . . . Moody's . . . and   . . . Standard & Poor's . . ." CWALT 2005-52CB Pros. Sup. S-3.

CWALT, Countrywide Securities, DBS, and Edward Jones also stated: "It is a condition to the issuance of the offered certificates that they be rated the respective ratings set forth on page S-3 of the Summary of this prospectus supplement . . . . " CWALT 2005-52CB Pros. Sup. S-87.

**Item 106.**    **Summary of loans about which the defendants made untrue or misleading statements:**

   (a)    **Number of loans whose LTVs were materially understated as shown by the AVM:** 1,631

   (b)    **Number of loans whose LTVs were misleading because of undisclosed additional liens:** 915

   (c)    **Number of loans for which the properties were stated to be owner-occupied but were not:** 574

(d)    **Number of loans that suffered EPDs:** 5

(e)    **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 1,716

(f)    **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 60.5%

# SCHEDULE 3

# SCHEDULE 3 OF THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CWALT, Bear Stearns, Countrywide Securities, Edward Jones, CFC, and BAC.

**Item 35.     Details of trust and certificate(s).**

(a)     **Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2005-13CB was a securitization in March 2005 of 3,241 mortgage loans, in one pool[1], as of the closing date. CWALT was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by Countrywide Home Loans, Inc. CWALT 2005-13CB Pros. Sup. S-26.

(b)     **Description of the certificate(s) that Colonial purchased:** Bear Stearns, Countrywide Securities, and Edward Jones were the underwriters of the security that Colonial purchased. Colonial purchased a senior certificate in this securitization, in class A-8, for which Colonial paid $23,357,419 plus accrued interest on February 6, 2007.

(c)     **Ratings of the certificate(s) when Colonial purchased them:** Moody's: Aaa; Standard & Poor's: AAA.

(d)     **Current ratings of the certificate(s):** Moody's: Caa1; Standard & Poor's: CC.

(e)     **Date on which the certificate(s) were downgraded below investment grade:** April 12, 2010.

---

[1] CWALT 2005-13CB was a securitization with a supplemental loan account that enabled it to purchase additional mortgage loans. CWALT 2005-13CB Pros. Sup. S-4, S-14. On the closing date of the securitization there were 3,241 mortgage loans in the trust (the "Initial Mortgage Loans"). After the closing date of the securitization, the trust purchased an additional 799 mortgage loans. The data contained in the charts and tables in this schedule include the additional 799 mortgage loans.

      **(f)**     **URL of prospectus supplement for this securitization:**

http://sec.gov/Archives/edgar/data/1269518/000095012905002842/v07117b5e424b

5.txt

      **(g)**     **Registration statement pursuant or traceable to which the
certificate(s) were issued:** Certificates in this trust, including the certificate that
Colonial purchased, were issued pursuant or traceable to a registration statement
filed by CWALT with the SEC on form S-3 on August 5, 2004. Annexed to the
registration statement was a prospectus. The prospectus was amended from time to
time by prospectus supplements whenever a new series of certificates was issued
pursuant or traceable to that registration statement.

**Item 44.**     **Untrue or misleading statements about the LTVs of the mortgage
loans:**

      In the prospectus supplement, CWALT, Bear Stearns, Countrywide
Securities, and Edward Jones made the following statements about the LTVs of the
mortgage loans in the collateral pool of this securitization.

      (a)     "As of the initial cut-off date, the weighted average original Loan-to-
Value ratio of the Initial Mortgage Loans was approximately 69.99%." CWALT
2005-13CB Pros. Sup. S-20.

      (b)     "No Initial Mortgage Loan had a Loan-to-Value Ratio at origination of
more than 100.00%." CWALT 2005-13CB Pros. Sup. S-15.

      (c)     In the section of the prospectus supplement entitled "The Mortgage
Pool," CWALT, Bear Stearns, Countrywide Securities, and Edward Jones
presented tables of statistics about the Initial Mortgage Loans in the collateral pool.
Each table focused on a certain characteristic of the loans (for example, current
principal balance) and divided the loans into categories based on that characteristic
(for example, loans with current principal balances of $0.01 to $50,000.00,
$50,000.01 to $100,000.00, $100,000.01 to $150,000.00, etc.). Each table then

presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratios." There were 10 such tables in "The Mortgage Pool" section for the Initial Mortgage Loans in the collateral pool. In each table the number of categories into which the loans were divided ranged from 3 to 66. Thus, in "The Mortgage Pool" section, CWALT, Bear Stearns, Countrywide Securities, and Edward Jones made many untrue or misleading statements about the original LTVs of the Initial Mortgage Loans in the collateral pool. CWALT 2005-13CB Pros. Sup. S-17 to S-23.

**Item 54.** **Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate | 4,040 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 939 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $55,402,834 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 657 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $45,274,542 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 131 |
| Weighted-average LTV, as stated by defendants | 69.99% |
| Weighted-average LTV, as determined by the model | 73.8% |

**Item 60.** **Undisclosed additional liens:**

    **(a)** **Minimum number of properties with additional liens:** 747

    **(b)** **Weighted average CLTV with additional liens:** 70.6%

**Item 69.    Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, CWALT, Bear Stearns, Countrywide Securities, and Edward Jones made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by Countrywide Home Loans, Inc.: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2005-13CB Pros. Sup. S-28.

**Item 75.    Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, CWALT, Bear Stearns, Countrywide Securities, and Edward Jones made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)    In "The Mortgage Pool" section of the prospectus supplement, described in Item 44, CWALT, Bear Stearns, Countrywide Securities, and Edward Jones presented a table entitled "Occupancy Types." This table divided the Initial Mortgage Loans in the collateral pool into the categories "Primary Residence," "Investment Property," and "Secondary Residence." This table contained untrue or misleading statements about, among other data, the number of Initial Mortgage Loans, the aggregate principal balance outstanding, and the percent of Initial Mortgage Loans in each of these categories. CWALT 2005-13CB Pros. Sup. S-22.

(b)    In the "Occupancy Types" table, CWALT, Bear Stearns, Countrywide Securities, and Edward Jones stated that of the 3,241 Initial Mortgage Loans in the initial collateral pool, 2,797 were secured by primary residences and 444 were not. CWALT 2005-13CB Pros. Sup. S-22.

**Item 83.**     **Details of properties that were stated to be owner-occupied, but were not:**

    **(a)**     **Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 323

    **(b)**     **Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 586

    **(c)**     **Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 253

    **(d)**     **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 960

**Item 86.**     **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-26 through S-31 of the prospectus supplement, CWALT, Bear Stearns, Countrywide Securities, and Edward Jones made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference.

One of these statements was that: "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWALT 2005-13CB Pros. Sup. S-27.

Another one of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2005-13CB Pros. Sup. S-27.

**Item 92.**     **Early payment defaults:**

    **(a)**     **Number of the mortgage loans that suffered EPDs:** 6

    **(b)**     **Percent of the mortgage loans that suffered EPDs:** 0.1%

**Item 93.**     **90+ days delinquencies:**

    **(a)**     **Number of the mortgage loans that suffered 90+ days delinquencies:** 485

    **(b)**     **Percent of the mortgage loans that suffered 90+ days delinquencies:** 12.0%

**Item 94.**     **30+ days delinquencies in this securitization:**

    **(a)**     **Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 424

    **(b)**     **Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 10.5%

**Item 103.**     **Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-3 and S-81 through S-82 of the prospectus supplement, CWALT, Bear Stearns, Countrywide Securities, and Edward Jones made statements about the ratings assigned to the certificates issued in this securitization. CWALT, Bear Stearns, Countrywide Securities, and Edward Jones stated that Colonial's certificate was rated AAA by Standard & Poor's and Aaa by Moody's. CWALT 2005-13CB Pros. Sup. S-3. These were the highest ratings available from these two rating agencies.

CWALT, Bear Stearns, Countrywide Securities, and Edward Jones also stated: "The classes of certificates listed below will not be offered unless they are assigned the following ratings by Standard & Poor's . . . and Moody's . . . ." CWALT 2005-13CB Pros. Sup. S-3.

CWALT, Bear Stearns, Countrywide Securities, and Edward Jones also stated: "It is a condition to the issuance of the senior certificates that they be rated AAA by Standard & Poor's . . . and 'Aaa' by Moody's . . . ." CWALT 2005-13CB Pros. Sup. S-81.

**Item 106.**   **Summary of loans about which the defendants made untrue or misleading statements:**

   **(a)**   **Number of loans whose LTVs were materially understated as shown by the AVM:** 939

   **(b)**   **Number of loans whose LTVs were misleading because of undisclosed additional liens:** 747

   **(c)**   **Number of loans for which the properties were stated to be owner-occupied but were not:** 960

   **(d)**   **Number of loans that suffered EPDs:** 6

   **(e)**   **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 2,111

   **(f)**   **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 52.3%

# SCHEDULE 4

# SCHEDULE 4 OF THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CWALT, Countrywide Securities, CFC, and BAC.

**Item 35.    Details of trust and certificate(s).**

(a)    **Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2006-2CB was a securitization in January 2006 of 3,307 mortgage loans, in one pool. CWALT was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by Countrywide Home Loans, Inc. CWALT 2006-2CB Pros. Sup. S-4 and S-24.

(b)    **Description of the certificate(s) that Colonial purchased:** Countrywide Securities was the underwriter of the security that Colonial purchased. Colonial purchased a senior certificate in this securitization, in class A-9, for which Colonial paid $9,608,000 plus accrued interest on September 5, 2007.

(c)    **Ratings of the certificate(s) when Colonial purchased them:** Fitch: AAA; Moody's: Aaa.

(d)    **Current ratings of the certificate(s):** Fitch: D; Moody's: Caa2.

(e)    **Date on which the certificate(s) were downgraded below investment grade:** December 17, 2008.

(f)    **URL of prospectus supplement for this securitization:** http://sec.gov/Archives/edgar/data/1269518/000095012906000810/v16185b5e424b5.txt

(g)    **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement

filed by CWALT with the SEC on form S-3 on June 17, 2005. Annexed to the
registration statement was a prospectus. The prospectus was amended from time to
time by prospectus supplements whenever a new series of certificates was issued
pursuant or traceable to that registration statement.

**Item 44.      Untrue or misleading statements about the LTVs of the mortgage
loans:**

In the prospectus supplement, CWALT and Countrywide Securities made the
following statements about the LTVs of the mortgage loans in the collateral pool of
this securitization.

(a)      The weighted-average original LTV ratio as of the cut-off date of all of
the loans in the collateral pool was 76.57%. CWALT 2006-2CB Pros. Sup. S-5.

(b)      "No mortgage loan had a Loan-to-Value Ratio at origination of more
than 95.00%." CWALT 2006-2CB Pros. Sup. S-25.

(c)      In the section of the prospectus supplement entitled "The Mortgage
Pool," CWALT and Countrywide Securities presented tables of statistics about the
mortgage loans in the collateral pool. Each table focused on a certain characteristic
of the loans (for example, current principal balance) and divided the loans into
categories based on that characteristic (for example, loans with current principal
balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000,
etc.). Each table then presented various data about the loans in each category.
Among these data was the "Weighted Average Original Loan-to-Value Ratio."
There were 12 such tables in "The Mortgage Pool" section for all of the loans in the
collateral pool. In each table the number of categories into which the loans were
divided ranged from 2 to 40. Thus, in "The Mortgage Pool" section, CWALT and
Countrywide Securities made many untrue or misleading statements about the
original LTVs of all of the loans in the collateral pool. CWALT 2006-2CB Pros.
Sup. S-27 to S-35.

(d)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the mortgage loans was approximately 76.57%." CWALT 2006-2CB Pros. Sup. S-31.

**Item 54.    Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---|
| Number of loans that backed the certificate | 3,307 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 1,199 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $69,312,570 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 446 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $19,442,673 |
| Number of loans with LTVs over 95%, as stated by defendants | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 372 |
| Weighted-average LTV, as stated by defendants | 76.57% |
| Weighted-average LTV, as determined by the model | 83.9% |

**Item 60.    Undisclosed additional liens:**

(a)    **Minimum number of properties with additional liens:** 1,414

(b)    **Weighted-average CLTV with additional liens:** 82.7%

**Item 69.    Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, CWALT and Countrywide Securities made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by Countrywide Home Loans, Inc.: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2006-2CB Pros. Sup. S-39.

**Item 75.     Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, CWALT and Countrywide Securities made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)     In "The Mortgage Pool" section of the prospectus supplement, described in Item 44, CWALT and Countrywide Securities presented a table entitled "Occupancy Types." This table divided all of the mortgage loans in the collateral pool into the categories "Primary Residence," "Investment Property," and "Secondary Residence." This table contained untrue or misleading statements about, among other things, the number of mortgage loans, the aggregate principal balance outstanding, and the percent of the mortgage pool in each of these categories. CWALT 2006-2CB Pros. Sup. S-33.

(b)     In the "Occupancy Types" table, CWALT and Countrywide Securities stated that of the 3,307 mortgage loans in the collateral pool, 2,760 were secured by primary residences and 547 were not. CWALT 2006-2CB Pros. Sup. S-33.

**Item 83.     Details of properties that were stated to be owner-occupied, but were not:**

(a)     **Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 256**

(b)     **Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead: 356**

(c)     **Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address: 157**

(d)     **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 595**

**Item 86.**      **Untrue or misleading statements about the underwriting
standards of the originators of the mortgage loans:**

On pages S-37 through S-42 of the prospectus supplement, CWALT and
Countrywide Securities made statements about the underwriting process of
Countrywide Home Loans, Inc. All of those statements are incorporated herein by
reference.

One of these statements was that: "Countrywide Home Loans' underwriting
standards are applied by or on behalf of Countrywide Home Loans to evaluate the
prospective borrower's credit standing and repayment ability and the value and
adequacy of the mortgaged property as collateral." CWALT 2006-2CB Pros. Sup.
S-38.

Another one of these statements was that: "Exceptions to Countrywide Home
Loans' underwriting guidelines may be made if compensating factors are
demonstrated by a prospective borrower." CWALT 2006-2CB Pros. Sup. S-38.

**Item 92.**      **Early payment defaults:**

    **(a)**      **Number of the mortgage loans that suffered EPDs:** 10

    **(b)**      **Percent of the mortgage loans that suffered EPDs:** 0.3%

**Item 93.**      **90+ days delinquencies:**

    **(a)**      **Number of the mortgage loans that suffered 90+ days
delinquencies:** 1,233

    **(b)**      **Percent of the mortgage loans that suffered 90+ days
delinquencies:** 37.3%

**Item 94.**      **30+ days delinquencies:**

    **(a)**      **Number of the mortgage loans that were 30+ days delinquent on
January 31, 2012:** 1,043

    **(b)**      **Percent of the mortgage loans that were 30+ days delinquent on
January 31, 2012:** 31.5%

**Item 103.    Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-6 through S-7 and S-92 of the prospectus supplement, CWALT and Countrywide Securities made statements about the ratings assigned to the certificates issued in this securitization. CWALT and Countrywide Securities stated that Colonial's certificate was rated AAA by Fitch Ratings and Aaa by Moody's Investors Service, Inc. CWALT 2006-2CB Pros. Sup. S-6. These were the highest ratings available from these two rating agencies.

CWALT and Countrywide Securities also stated: "The offered certificates will not be offered unless they are assigned the indicated ratings by Fitch Ratings . . . [and] by. . . Moody's Investors Service, Inc." CWALT 2006-2CB Pros. Sup. S-7.

CWALT and Countrywide Securities also stated: "It is a condition to the issuance of the senior certificates . . . that they be rated 'AAA' by Fitch Ratings, Inc. . . . and 'Aaa' by Moody's Investors Service, Inc. . . . " CWALT 2006-2CB Pros. Sup. S-92.

**Item 106.    Summary of loans about which the defendants made untrue or misleading statements:**

(a)    **Number of loans whose LTVs were materially understated as shown by the AVM:** 1,199

(b)    **Number of loans whose LTVs were misleading because of undisclosed additional liens:** 1,414

(c)    **Number of loans for which the properties were stated to be owner-occupied but were not:** 595

(d)    **Number of loans that suffered EPDs:** 10

(e)    **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 2,365

(f)    **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 71.5%

# SCHEDULE 5

## SCHEDULE 5 OF THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CWALT, Countrywide Securities, Credit Suisse, CFC, and BAC.

**Item 35.      Details of trust and certificate(s).**

(a)      **Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2007-15CB was a securitization in May 2007 of 2,841 mortgage loans, in one pool. CWALT was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by Countrywide Home Loans, Inc. CWALT 2007-15CB Pros. Sup. S-4, S-33.

(b)      **Description of the certificate(s) that Colonial purchased:** Countrywide Securities and Credit Suisse were the underwriters of the security that Colonial purchased. Colonial purchased a senior certificate in this securitization, in class A-12, for which Colonial paid $12,255,818 plus accrued interest on September 11, 2007.

(c)      **Ratings of the certificate(s) when Colonial purchased them:** Moody's: Aaa; Standard & Poor's: AAA.

(d)      **Current ratings of the certificate(s):** Moody's: Caa3; Standard & Poor's: CCC.

(e)      **Date on which the certificate(s) were downgraded below investment grade:** February 20, 2009.

(f)      **URL of prospectus supplement for this securitization:** http://sec.gov/Archives/edgar/data/1269518/000114420407031131/v077843_424b5 .htm

(g)    **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by CWALT with the SEC on form S-3 on February 28, 2007. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

## Item 44.    Untrue or misleading statements about the LTVs of the mortgage loans:

In the prospectus supplement, CWALT, Countrywide Securities, and Credit Suisse made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)    As of the cut-off date, the weighted average original LTV ratio of the mortgage loans was 61.99%. CWALT 2007-15CB Pros. Sup. S-5.

(b)    "No mortgage loan had a Loan-to-Value Ratio at origination of more than 100%." CWALT 2007-15CB Pros. Sup. S-30.

(c)    In Annex A of the prospectus supplement ("The Mortgage Pool"), CWALT, Countrywide Securities, and Credit Suisse presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000.00, $50,000.01 to $100,000.00, $100,000.01 to $150,000.00, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 13 such tables in "The Mortgage Pool" section for the loans in the collateral pool. In each table the number of categories into which the loans were divided ranged from 3 to 49. Thus, in "The Mortgage Pool" section, CWALT,

Countrywide Securities, and Credit Suisse made many untrue or misleading statements about the original LTVs of the loans in the collateral pool. CWALT 2007-15CB Pros. Sup. A-1 to A-11.

(d)   "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the mortgage loans was approximately 61.99%." CWALT 2007-15CB Pros. Sup. A-5.

(e)   "As of the cut-off date, the weighted average original Combined Loan-to-Value Ratio of the mortgage loans was approximately 66.63%." CWALT 2007-15CB Pros. Sup. A-6.

**Item 54.    Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate | 2,841 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 1,136 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $76,155,520 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 185 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $15,426,698 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 142 |
| Weighted-average LTV, as stated by defendants | 61.99% |
| Weighted-average LTV, as determined by the model | 74.3% |

**Item 69.    Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, CWALT, Countrywide Securities, and Credit Suisse made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by Countrywide Home Loans,

Inc.: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2007-15CB Pros. Sup. S-35.

**Item 75.      Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, CWALT, Countrywide Securities, and Credit Suisse made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)      In "The Mortgage Pool" section of the prospectus supplement, described in Item 44, CWALT, Countrywide Securities, and Credit Suisse presented a table entitled "Occupancy Types." This table divided all of the mortgage loans in the collateral pool into the categories "Primary Residence," "Investment Property," and "Secondary Residence." This table contained untrue or misleading statements about, among other data, the number of mortgage loans, the aggregate principal balance outstanding, and the percent of the mortgage loans in each of these categories. CWALT 2007-15CB Pros. Sup. A-8.

(b)      In the "Occupancy Types" table, CWALT, Countrywide Securities, and Credit Suisse stated that of the 2,841 mortgage loans in the collateral pool, 2,499 were secured by primary residences and 342 were not. CWALT 2007-15CB Pros. Sup. A-8.

**Item 83.      Details of properties that were stated to be owner-occupied, but were not:**

(a)      **Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 227**

(b)      **Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead: 440**

(c)      **Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address: 249**

    **(d)**   **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 760

**Item 86.**   **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-33 through S-38 of the prospectus supplement CWALT, Countrywide Securities, and Credit Suisse made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference.

One of these statements was that: "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWALT 2007-15CB Pros. Sup. S-34.

Another one of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2007-15CB Pros. Sup. S-34.

**Item 92.**   **Early payment defaults:**

    **(a)**   **Number of the mortgage loans that suffered EPDs:** 6

    **(b)**   **Percent of the mortgage loans that suffered EPDs:** 0.2%

**Item 93.**   **90+ days delinquencies:**

    **(a)**   **Number of the mortgage loans that suffered 90+ days delinquencies:** 715

    **(b)**   **Percent of the mortgage loans that suffered 90+ days delinquencies:** 25.2%

**Item 94.**   **30+ days delinquencies:**

    **(a)**   **Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 585

    **(b)**   **Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 20.6%

**Item 103.    Statements about the ratings of the certificate(s) that Colonial
purchased:**

On pages S-6 through S-8 and S-99 of the prospectus supplement, CWALT,
Countrywide Securities, and Credit Suisse made statements about the ratings
assigned to the certificates issued in this securitization. CWALT, Countrywide
Securities, and Credit Suisse stated that Colonial's certificate was rated Aaa by
Moody's Investors Service, Inc., and AAA by Standard and Poor's. CWALT 2007-
15CB Pros. Sup. S-6. These were the highest ratings available from these two rating
agencies.

CWALT, Countrywide Securities, and Credit Suisse also stated: "The offered
certificates will not be offered unless they are assigned the indicated ratings by
Standard and Poor's . . . and Moody's Investors Service, Inc. . . . ." CWALT 2007-
15CB Pros. Sup. S-8.

CWALT, Countrywide Securities, and Credit Suisse also stated: "It is a
condition to the issuance of the offered certificates that they be assigned the
respective ratings set forth in the Summary of this prospectus supplement."
CWALT 2007-15CB Pros. Sup. S-99.

**Item 106.    Summary of loans about which the defendants made untrue or
misleading statements:**

    **(a)    Number of loans whose LTVs were materially understated as
shown by the AVM:** 1,136

    **(b)    Number of loans for which the properties were stated to be owner-
occupied but were not:** 760

    **(c)    Number of loans that suffered EPDs:** 6

    **(d)    Eliminating duplicates, number of loans about which the
defendants made untrue or misleading statements:** 1,598

    **(e)    Eliminating duplicates, percent of loans about which the
defendants made untrue or misleading statements:** 56.2%

# SCHEDULE 6

# SCHEDULE 6 OF THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CWALT, Countrywide Securities, Citigroup, CFC, and BAC.

**Item 35.      Details of trust and certificate(s).**

(a)      **Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2007-5CB was a securitization in February 2007 of 7,174 mortgage loans, in two groups. CWALT was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by Countrywide Home Loans, Inc. CWALT 2007-5CB Pros. Sup. S-4 and S-38.

(b)      **Description of the certificate(s) that Colonial purchased:** Countrywide Securities and Citigroup were the underwriters of the security that Colonial purchased. Colonial purchased a senior certificate in this securitization, in class 1-A-4, for which Colonial paid $28,950,000 plus accrued interest on September 28, 2007. Colonial's certificate was primarily paid by the 6,528 mortgage loans in loan group 1.

(c)      **Ratings of the certificate(s) when Colonial purchased them:** Fitch: AAA; Moody's: Aaa; Standard & Poor's: AAA.

(d)      **Current ratings of the certificate(s):** Fitch: D; Moody's: Caa3; Standard & Poor's: CCC.

(e)      **Date on which the certificate(s) were downgraded below investment grade:** December 16, 2008.

(f)      **URL of prospectus supplement for this securitization:** http://www.sec.gov/Archives/edgar/data/1269518/000114420407010851/v067214_424b5.htm

(g)     **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by CWALT with the SEC on form S-3 on February 7, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 44.     Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, CWALT, Countrywide Securities, and Citigroup made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)     As of the cut-off date, the weighted average original LTV ratio of the mortgage loans in loan group 1 was 70.09%. CWALT 2007-5CB Pros. Sup. S-5.

(b)     "No mortgage in loan [sic] any loan group had a Loan-to-Value Ratio at origination of more than 100%." CWALT 2007-5CB Pros. Sup. S-35.

(c)     In Annex I of the prospectus supplement ("The Mortgage Pool"), CWALT, Countrywide Securities, and Citigroup presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000.00, $50,000.01 to $100,000.00, $100,000.01 to $150,000.00, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 13 such tables in "The Mortgage Pool" section for the loans in loan group 1. In each table the number of categories into which the loans were divided ranged from 3 to 90. Thus, in "The Mortgage Pool" section, CWALT,

Countrywide Securities, and Citigroup made many untrue or misleading statements about the original LTVs of the loans in loan group 1. CWALT 2007-5CB Pros. Sup. A-1 to A-12.

(d)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the mortgage loans in loan group 1 was approximately 70.09%." CWALT 2007-5CB Pros. Sup. A-6.

(e)    "As of the cut-off date, the weighted average original Combined Loan-to-Value Ratio of the mortgage loans in loan group 1 was approximately 76.12%." CWALT 2007-5CB Pros. Sup. A-7.

**Item 54.      Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---|
| Number of loans that backed the certificate (loan group 1) | 6,528 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 2,366 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $131,477,058 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 473 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $30,270,220 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 359 |
| Weighted-average LTV, as stated by defendants | 70.09% |
| Weighted-average LTV, as determined by the model | 79.7% |

**Item 69.      Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, CWALT, Countrywide Securities, and Citigroup made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by Countrywide Home Loans, Inc.: "All appraisals are required to conform to Fannie Mae or Freddie Mac

appraisal standards then in effect." CWALT 2007-5CB Pros. Sup. S-39.

**Item 75.    Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, CWALT, Countrywide Securities, and Citigroup made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)    In Annex I of the prospectus supplement, described in Item 44, CWALT, Countrywide Securities, and Citigroup presented a table entitled "Occupancy Types" for loan group 1. This table divided the mortgage loans in loan group 1 into the categories "Primary Residence," "Investment Property," and "Secondary Residence." This table contained untrue or misleading statements about, among other data, the number of mortgage loans, the aggregate principal balance outstanding, and the percent of the mortgage loans in loan group 1 in each of these categories. CWALT 2007-5CB Pros. Sup. A-10.

(b)    In the "Occupancy Types" table, CWALT, Countrywide Securities, and Citigroup stated that of the 6,528 mortgage loans in loan group 1, 5,309 were secured by primary residences and 1,219 were not. CWALT 2007-5CB Pros. Sup. A-10.

**Item 83.    Details of properties in loan group 1 that were stated to be owner-occupied, but were not:**

(a)    **Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 490

(b)    **Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 881

(c)    **Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 506

    **(d)**    **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 1,485

**Item 86.**    **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-38 through S-43 of the prospectus supplement, CWALT, Countrywide Securities, and Citigroup made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference.

One of these statements was that: "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWALT 2007-5CB Pros. Sup. S-39.

Another one of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2007-5CB Pros. Sup. S-39.

**Item 92.**    **Early payment defaults in loan group 1:**

    **(a)**    **Number of the mortgage loans that suffered EPDs:** 39

    **(b)**    **Percent of the mortgage loans that suffered EPDs:** 0.6%

**Item 93.**    **90+ days delinquencies in loan group 1:**

    **(a)**    **Number of the mortgage loans that suffered 90+ days delinquencies:** 2,230

    **(b)**    **Percent of the mortgage loans that suffered 90+ days delinquencies:** 34.2%

**Item 94.**    **30+ days delinquencies in loan group 1:**

    **(a)**    **Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 1,903

    **(b)**    **Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 29.2%

**Item 103.   Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-6 through S-9 and S-129 through S-130 of the prospectus supplement, CWALT, Countrywide Securities, and Citigroup made statements about the ratings assigned to the certificates issued in this securitization. CWALT, Countrywide Securities, and Citigroup stated that Colonial's certificate was rated AAA by Fitch Ratings, Aaa by Moody's Investors Service, Inc., and AAA by Standard & Poor's. CWALT 2007-5CB Pros. Sup. S-6. These were the highest ratings available from these three rating agencies.

CWALT, Countrywide Securities, and Citigroup also stated: "The offered certificates will not be offered unless they are assigned the indicated ratings by Fitch Ratings, Moody's Investors Service, Inc. and Standard & Poor's. . . ." CWALT 2007-5CB Pros. Sup. S-9.

CWALT, Countrywide Securities, and Citigroup also stated: "It is a condition to the issuance of the offered certificates that they be assigned the respective ratings set forth in the Summary of this prospectus supplement." CWALT 2007-5CB Pros. Sup. S-129.

**Item 106.   Summary of loans in loan group 1 about which the defendants made untrue or misleading statements:**

    (a)    **Number of loans whose LTVs were materially understated as shown by the AVM:** 2,366

    (b)    **Number of loans for which the properties were stated to be owner-occupied but were not:** 1,485

    (c)    **Number of loans that suffered EPDs:** 39

    (d)    **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 3,329

    (e)    **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 51.0%

# SCHEDULE 7

## SCHEDULE 7 OF THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CWMBS, Countrywide Securities, CFC, and BAC.

**Item 35.     Details of trust and certificate(s).**

(a)     **Description of the trust:** CHL Mortgage Trust, Pass-Through Certificates, Series 2006-14 was a securitization in July 2006 of 589 mortgage loans, in one pool. CWMBS was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by Countrywide Home Loans, Inc. CWHL 2006-14 Pros. Sup. S-32.

(b)     **Description of the certificate(s) that Colonial purchased:** Countrywide Securities was the underwriter of the security that Colonial purchased. Colonial purchased a senior certificate in this securitization, in class A-5, for which Colonial paid $37,697,000 plus accrued interest on December 5, 2006.

(c)     **Ratings of the certificate(s) when Colonial purchased them:** Fitch: AAA; Moody's: Aaa.

(d)     **Current ratings of the certificate(s):** Fitch: C; Moody's: Caa2.

(e)     **Date on which the certificate(s) were downgraded below investment grade:** May 5, 2009.

(f)     **URL of prospectus supplement for this securitization:** http://sec.gov/Archives/edgar/data/906410/000095013406014475/v22484b5e424b5.txt

(g)     **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by CWMBS with the SEC on form S-3 on February 8, 2006. Annexed to the

registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 44.     Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, CWMBS and Countrywide Securities made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)     As of the cut-off date, the weighted average original LTV ratio of the mortgage loans was 73.78%. CWHL 2006-14 Pros. Sup. S-5.

(b)     "No mortgage loan had a Loan-to-Value Ratio at origination or on the closing date of more than 95.00%." CWHL 2006-14 Pros. Sup. S-23.

(c)     In the section of the prospectus supplement entitled "the Mortgage Pool," CWMBS and Countrywide Securities presented a table entitled "Original Loan-to-Value Ratios." This table divided the loans in the collateral pool into 10 categories of original LTV (for example, 50.00% and below, 50.01% to 55.00%, 55.01% to 60.00%, 60.01% to 65.00%, etc.). The table contained untrue or misleading statements about the number of mortgage loans, the unpaid principal balance, and the percent of principal balance outstanding in each of these categories. CWHL 2006-14 Pros. Sup. S-27.

(d)     "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the mortgage loans was approximately 73.78%." CWHL 2006-14 Pros. Sup. S-27.

**Item 54.     Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---|
| Number of loans that backed the certificate | 589 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 211 |

| | |
|---|---|
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $35,720,772 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 32 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $6,736,684 |
| Number of loans with LTVs over 95%, as stated by defendants | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 71 |
| Weighted-average LTV, as stated by defendants | 73.78% |
| Weighted-average LTV, as determined by the model | 87.3% |

**Item 60.      Undisclosed additional liens:**

      **(a)      Minimum number of properties with additional liens:** 196

      **(b)      Weighted average CLTV with additional liens:** 76.8%

**Item 69.      Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, CWMBS and Countrywide Securities made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by Countrywide Home Loans, Inc.: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWHL 2006-14 Pros. Sup. S-34.

**Item 75.      Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, CWMBS and Countrywide Securities made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

      (a)      In the "Mortgage Pool" section of the prospectus supplement, described in Item 44, CWMBS and Countrywide Securities presented a table entitled "Occupancy Types." This table divided all of the mortgage loans in the

collateral pool into the categories "Primary Residence" and "Secondary Residence." This table contained untrue or misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of mortgage loans in each of these categories. CWHL 2006-14 Pros. Sup. S-29.

      (b)    In the "Occupancy Types" table, CWMBS and Countrywide Securities stated that of the 589 mortgage loans in the collateral pool, 543 were secured by primary residences and 46 were not. CWHL 2006-14 Pros. Sup. S-29.

**Item 83.**    **Details of properties that were stated to be owner-occupied, but were not:**

    **(a)**    **Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 57**

    **(b)**    **Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead: 109**

    **(c)**    **Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address: 31**

    **(d)**    **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 153**

**Item 86.**    **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-32 through S-33 of the prospectus supplement, CWMBS and Countrywide Securities made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference.

One of these statements was that: "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWHL 2006-14 Pros. Sup. S-33.

**SCHEDULE 7 OF THE AMENDED COMPLAINT**                **Page 4**

Another one of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWHL 2006-14 Pros. Sup. S-33.

**Item 93.     90+ days delinquencies:**

    **(a)     Number of the mortgage loans that suffered 90+ days delinquencies:** 99

    **(b)     Percent of the mortgage loans that suffered 90+ days delinquencies:** 16.8%

**Item 94.     30+ days delinquencies:**

    **(a)     Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 73

    **(b)     Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 12.4%

**Item 103.     Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-6 and S-80 of the prospectus supplement, CWMBS and Countrywide Securities made statements about the ratings assigned to the certificates issued in this securitization. CWMBS and Countrywide Securities stated that Colonial's certificate was rated AAA by Fitch Ratings, and Aaa by Moody's. These were the highest ratings available from these two rating agencies.

CWMBS and Countrywide Securities also stated: "The offered certificates will not be offered unless they are assigned the indicated ratings by Fitch Ratings . . . and Moody's Investor Services, Inc. . . ." CWHL 2006-14 Pros. Sup. S-6.

CWMBS and Countrywide Securities also stated: "It is a condition to the issuance of the senior certificates . . . that they be rated 'AAA' by Fitch Ratings . . . and 'Aaa' by Moody's Investors Service, Inc. . . . ." CWHL 2006-14 Pros. Sup. S-80.

**Item 106.** **Summary of loans about which the defendants made untrue or misleading statements:**

    **(a)** **Number of loans whose LTVs were materially understated as shown by the AVM:** 211

    **(b)** **Number of loans whose LTVs were misleading because of undisclosed additional liens:** 196

    **(c)** **Number of loans for which the properties were stated to be owner-occupied but were not:** 153

    **(d)** **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 405

    **(e)** **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 68.8%

# SCHEDULE 8

# SCHEDULE 8 OF THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CWMBS, Countrywide Securities, RBS, CFC, and BAC.

**Item 35.**     **Details of trust and certificate(s).**

(a)     **Description of the trust:** CHL Mortgage Trust, Pass-Through Certificates, Series 2007-7 was a securitization in April 2007 of 1,208 mortgage loans, in one pool. CWMBS was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by Countrywide Home Loans, Inc. CWHL 2007-7 Pros. Sup. S-29.

(b)     **Description of the certificate(s) that Colonial purchased:** Countrywide Securities and RBS were the underwriters of the security that Colonial purchased. Colonial purchased a senior certificate in this securitization, in class A-9, for which Colonial paid $8,298,281 plus accrued interest on August 21, 2007.

(c)     **Ratings of the certificate(s) when Colonial purchased them:** Fitch: AAA; Standard & Poor's: AAA.

(d)     **Current ratings of the certificate(s):** Fitch: CC; Standard & Poor's: CCC.

(e)     **Date on which the certificate(s) were downgraded below investment grade:** April 8, 2009.

(f)     **URL of prospectus supplement for this securitization:** http://sec.gov/Archives/edgar/data/906410/000095012407002585/v29637e424b5.htm

(g)     **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement

filed by CWMBS with the SEC on form S-3 on February 28, 2007. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 44.     Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, CWMBS, Countrywide Securities, and RBS made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)     As of the cut-off date, the weighted average original LTV ratio of the mortgage loans was 72.19%. CWHL 2007-7 Pros. Sup. S-5.

(b)     In Annex A of the prospectus supplement entitled "The Mortgage Pool," CWMBS, Countrywide Securities, and RBS presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, current mortgage loan principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $400,000.01 to $450,000, $450,000.01 to $500,000, $500,000.01 to $550,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 12 such tables in Annex A for all of the loans in the collateral pool. In each table the number of categories into which the loans were divided ranged from 2 to 11. Thus, in Annex A, CWMBS, Countrywide Securities, and RBS made many untrue or misleading statements about the original LTVs of all of the loans in the collateral pool. CWHL 2007-7 Pros. Sup. A-1 to A-8.

(c)     "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the mortgage loans was approximately 72.19%." CWHL 2007-7 Pros. Sup.

A-3.

(d)   "As of the cut-off date, the weighted average original Combined Loan-to-Value Ratio of the mortgage loans was approximately 74.87%." CWHL 2007-7 Pros. Sup. A-4.

(e)   "No mortgage loan had a Loan-to-Value Ratio at origination of more than 100.00%." CWHL 2007-7 Pros. Sup. S-26.

**Item 54.**   **Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate | 1,208 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 492 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $83,271,085 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 42 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $7,222,565 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 94 |
| Weighted-average LTV, as stated by defendants | 72.19% |
| Weighted-average LTV, as determined by the model | 85.3% |

**Item 69.**   **Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, CWMBS, Countrywide Securities, and RBS made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by Countrywide Home Loans, Inc.: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWHL 2007-7 Pros. Sup. S-31.

**Item 75.   Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, CWMBS, Countrywide Securities, and RBS made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)   In Annex A of the prospectus supplement, described in Item 44, CWMBS, Countrywide Securities, and RBS presented a table entitled "Occupancy Types." This table divided all of the mortgage loans in the collateral pool into the categories "Primary Residence" and "Secondary Residence." This table contained untrue or misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of mortgage loans in each of these categories. CWHL 2007-7 Pros. Sup. A-6.

(b)   In the "Occupancy Types" table, CWMBS, Countrywide Securities, and RBS stated that of the 1,208 mortgage loans in the collateral pool, 1,156 were secured by primary residences and 52 were not. CWHL 2007-7 Pros. Sup. A-6.

**Item 83.   Details of properties that were stated to be owner-occupied, but were not:**

(a)   **Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 79

(b)   **Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 208

(c)   **Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 82

(d)   **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 302

**Item 86.    Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-29 through S-31 of the prospectus supplement, CWMBS, Countrywide Securities, and RBS made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference.

One of these statements was that: "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWHL 2007-7 Pros. Sup. S-30.

Another one of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWHL 2007-7 Pros. Sup. S-30.

**Item 93.    90+ days delinquencies:**

    **(a)    Number of the mortgage loans that suffered 90+ days delinquencies:** 242

    **(b)    Percent of the mortgage loans that suffered 90+ days delinquencies:** 20%

**Item 94.    30+ days delinquencies:**

    **(a)    Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 179

    **(b)    Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 14.8%

**Item 103.    Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-6 through S-7 and S-86 of the prospectus supplement, CWMBS, Countrywide Securities, and RBS made statements about the ratings assigned to the certificates issued in this securitization. CWMBS, Countrywide Securities, and RBS stated that Colonial's certificate was rated AAA by Fitch Ratings and AAA by Standard & Poor's. CWHL 2007-7 Pros. Sup. S-6. These were the highest ratings

available from these two rating agencies.

CWMBS, Countrywide Securities, and RBS also stated: "The offered certificates will not be offered unless they are assigned the indicated ratings by Fitch Ratings . . . and Standard & Poor's . . ." CWHL 2007-7 Pros. Sup. S-7.

CWMBS, Countrywide Securities, and RBS also stated: "It is a condition to the issuance of the offered certificates that they be assigned the respective ratings set forth in the Summary of this prospectus supplement." CWHL 2007-7 Pros. Sup. S-86.

**Item 106.   Summary of loans about which the defendants made untrue or misleading statements:**

    **(a)   Number of loans whose LTVs were materially understated as shown by the AVM:** 492

    **(b)   Number of loans for which the properties were stated to be owner-occupied but were not:** 302

    **(c)   Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 858

    **(d)   Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 71.0%

# SCHEDULE 9

## SCHEDULE 9 OF THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CWALT, DBS, JP Morgan, CFC, and BAC.

**Item 35.      Details of trust and certificate(s).**

(a)      **Description of the trust:** Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2005-65CB was a securitization in November 2005 of 4,983 mortgage loans, in two groups. CWALT was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by Countrywide Home Loans, Inc. CWALT 2005-65CB Pros. Sup. S-4; S-15 and S-36.

(b)      **Description of the certificate(s) that Colonial purchased:** DBS and JP Morgan were underwriters of the security that Colonial purchased. Colonial purchased a senior certificate in this securitization, in class 2-A-4, for which Colonial paid $23,426,741 plus accrued interest on January 12, 2006. Colonial's certificate was primarily paid by the 2,440 mortgage loans in loan group 2.

(c)      **Ratings of the certificate(s) when Colonial purchased them**: Moody's: Aaa; Standard & Poor's: AAA; Dominion Bond Rating Service: AAA.

(d)      **Current ratings of the certificate(s):** Moody's: Caa2; Standard & Poor's: CC; Dominion Bond Rating Service: C.

(e)      **Date on which the certificate(s) were downgraded below investment grade:** February 20, 2009.

(f)      **URL of prospectus supplement for this securitization:** http://www.sec.gov/Archives/edgar/data/1269518/000095012905011497/v14709e424b5.txt.

(g)      **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that

Colonial purchased, were issued pursuant or traceable to a registration statement filed by CWALT with the SEC on form S-3 on June 17, 2005. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 44.     Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, CWALT, DBS, and JP Morgan made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)     "No mortgage loan in any loan group had a Loan-to-Value Ratio at origination of more than 100.00%." CWALT 2005-65CB Pros. Sup. S-16.

(b)     In the section of the prospectus supplement entitled "The Mortgage Pool," CWALT, DBS, and JP Morgan presented tables of statistics about the mortgage loans in the collateral pool. CWALT 2005-65CB Pros. Sup. S-18 to S-34. Each table focused on a certain characteristic of the loans (for example, current mortgage loan principal balance) and divided the loans into categories based on that characteristic (for example, loans with a range of current mortgage loan principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 10 such tables in "The Mortgage Pool" section for the mortgage loans in loan group 2. In each table, the number of categories into which the loans were divided ranged from 3 to 35. Thus, in "The Mortgage Pool" section, CWALT, DBS, and JP Morgan made many untrue or misleading statements about the original LTVs of the loans in loan group 2. CWALT 2005-65CB Pros. Sup. S-26 to S-34.

(c)    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the mortgage loans in loan group 2 is approximately 70.57%." CWALT 2005-65CB Pros. Sup. S-30.

**Item 54.    Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---|
| Number of loans that backed the certificate (loan group 2) | 2,440 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 695 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $36,679,073 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 250 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $15,980,015 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 128 |
| Weighted-average LTV, as stated by defendants | 70.57% |
| Weighted-average LTV, as determined by the model | 78.3% |

**Item 60.    Undisclosed additional liens in loan group 2:**

(a)    **Minimum number of properties with additional liens:** 567

(b)    **Weighted-average CLTV with additional liens:** 73.9%

**Item 69.    Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, CWALT, DBS, and JP Morgan made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by Countrywide Home Loans, Inc.: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2005-65CB Pros. Sup. S-38.

**SCHEDULE 9 OF THE AMENDED COMPLAINT**                                   **Page 3**

**Item 75.     Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, CWALT, DBS, and JP Morgan made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)     In "The Mortgage Pool" section of the prospectus supplement, described in Item 44, CWALT, DBS, and JP Morgan presented a table entitled "Occupancy Types." This table divided all of the mortgage loans in loan group 2 into the categories "Primary Residence," "Investment Property," and "Secondary Residence." This table contained untrue or misleading statements about, among other data, the number of mortgage loans, the aggregate principal balance outstanding, and the percent of mortgage loans in loan group 2 in each of these categories. CWALT 2005-65CB Pros. Sup. S-33.

(b)     In the "Occupancy Types" table, CWALT, DBS, and JP Morgan stated that of 2,440 mortgage loans in loan group 2, 2,008 were secured by primary residences, and 432 were not. CWALT 2005-65CB Pros. Sup. S-33.

**Item 83.     Details of properties in loan group 2 that were stated to be owner-occupied, but were not:**

(a)     **Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 201

(b)     **Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 323

(c)     **Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 146

(d)     **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 592

**Item 86.**   **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-36 to S-41 of the prospectus supplement, CWALT, DBS, and JP Morgan made statements about the underwriting guidelines of Countrywide Home Loans, Inc., which originated or acquired all of the mortgage loans in the collateral pool of this securitization. All of those statements are incorporated herein by reference.

One of these statements was that: "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWALT 2005-65CB Pros. Sup. S-37.

Another one of those statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2005-65CB Pros. Sup. S-37.

**Item 93.**   **90+ days delinquencies in loan group 2:**

   (a)   **Number of the mortgage loans that suffered 90+ days delinquencies:** 475

   (b)   **Percent of the mortgage loans that suffered 90+ days delinquencies:** 19.5%

**Item 94.**   **30+ days delinquencies in loan group 2:**

   (a)   **Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 431

   (b)   **Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 17.7%

**Item 103.**   **Statements about the ratings of the certificate(s) that the Colonial purchased:**

On page S-3 through S-4, and S-98 through S-99 of the prospectus supplement, CWALT, DBS, and JP Morgan made statements about the ratings assigned to the certificates issued in this securitization. CWALT, DBS, and JP

Morgan stated that Colonial's certificate was rated AAA by Standard & Poor's, Aaa by Moody's Investors Service, and AAA by Dominion Bond Rating Service. CWALT 2005-65CB Pros. Sup. S-3. These were the highest ratings available from these three rating agencies.

CWALT, DBS, and JP Morgan also stated that: "The classes of certificates listed below will not be offered unless they are assigned the following ratings by Standard & Poor's . . . Moody's . . . and Dominion Bond Rating Service . . . ." CWALT 2005-65CB Pros. Sup. S-3.

CWALT, DBS, and JP Morgan also stated that: "It is a condition to the issuance of the senior certificates that they be rated "AAA" each by Standard and Poor's . . . and Dominion Bond Rating Service . . . and 'Aaa' by Moody's . . . ." CWALT 2005-65CB Pros. Sup. S-98.

**Item 106.** **Summary of loans in loan group 2 about which the defendants made untrue or misleading statements:**

    **(a)** **Number of loans whose LTVs were materially understated as shown by the AVM:** 695

    **(b)** **Number of loans whose LTVs were misleading because of undisclosed additional liens:** 567

    **(c)** **Number of loans for which the properties were stated to be owner-occupied but were not:** 592

    **(d)** **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 1,446

    **(e)** **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 59.3%

# SCHEDULE 10

# SCHEDULE 10 OF THE AMENDED COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations
in the Complaint, those allegations are made against defendants CWALT, BAS,
Barclays, CFC, and BAC.

**Item 35.     Details of trust and certificate(s).**

(a)     **Description of the trust:** Alternative Loan Trust, Mortgage Pass-
Through Certificates, Series 2006-29T1 was a securitization in August 2006 of
1,083 mortgage loans, in three groups.[1] CWALT was the issuer of the securities in
the trust. The mortgage loans in the collateral pool of this securitization were
originated or acquired by Countrywide Home Loans, Inc. CWALT 2006-29T1
Pros. Sup. S-4; S-66.

(b)     **Description of the certificate(s) that Colonial purchased:** BAS and
Barclays were underwriters of the security that Colonial purchased. Colonial
purchased a senior certificate in class 3-A-7 of this securitization, for which
Colonial paid $28,487,879 plus accrued interest on June 5, 2007. Colonial's
certificate was primarily paid by the 459 mortgage loans in loan group 3.

(c)     **Ratings of the certificate(s) when Colonial purchased them:** Fitch:
AAA; S&P: AAA.

(d)     **Current ratings of the certificate(s):** Fitch: D; Standard & Poor's: D.

(e)     **Date on which the certificate(s) were downgraded below
investment grade:** September 22, 2008.

---

[1]     CWALT 2006-29T1 was a prefunded securitization. CWALT 2006-29T1
Pros. Sup. S-5. On the closing date of the securitization there were 1,083 mortgage
loans in the trust (the "Initial Mortgage Loans"), and 374 Initial Mortgage Loans in
loan group 3. CWALT 2006-29T1 Pros. Sup. S-40 to S-62. After the closing date of
the securitization, the trust purchased an additional 85 mortgage loans in loan group
3. The data contained in the charts and tables in this schedule include those
additional 85 mortgage loans that were added to loan group 3, unless otherwise
indicated.

(f)    **URL of prospectus supplement for this securitization:**

http://www.sec.gov/Archives/edgar/data/1269518/000095012406005015/v23274b5 e424b5.txt

(g)    **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by CWALT with the SEC on form S-3 on February 7, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 44.    Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement, CWALT, BAS, and Barclays made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)    "No Initial Mortgage Loan in any loan group had a Loan-to-Value Ratio at origination or on the closing date of more than 100.00%." CWALT 2006-29T1 Pros. Sup. S-37.

(b)    In the section of the prospectus supplement entitled "The Mortgage Pool," CWALT, BAS, and Barclays presented tables of statistics about the Initial Mortgage Loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $400,000.01 to $450,000.00, $450,000.01 to $500,000.00, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio." There were 12 such tables in "The Mortgage Pool" section for the Initial Mortgage Loans in loan

group 3. In each table the number of categories into which the loans were divided ranged from 2 to 14. Thus, in "The Mortgage Pool" section, CWALT, BAS, and Barclays made many untrue or misleading statements about the original LTVs of the Initial Mortgage Loans in loan group 3. CWALT 2006-29T1 Pros. Sup. S-56 to S-62.

(c)     "As of the initial cut-off date, the weighted average original Loan-to-Value Ratio of the Initial Mortgage Loans in loan group 3 was approximately 75.10%." CWALT 2006-29T1 Pros. Sup. S-58.

**Item 54.     Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate (loan group 3) | 459 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 196 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $38,463,334 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 22 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $2,694,133 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 66 |
| Weighted-average LTV, as stated by defendants | 75.10% |
| Weighted-average LTV, as determined by the model | 98.8% |

**Item 60.     Undisclosed additional liens in loan group 3:**

**(a)     Minimum number of properties with additional liens:** 233

**(b)     Weighted average CLTV with additional liens:** 83.3%

**Item 69.     Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, CWALT, BAS, and Barclays made the following statement about the appraisals of the properties that secured the mortgage

loans originated or acquired by Countrywide Home Loans, Inc.: "All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect." CWALT 2006-29T1 Pros. Sup. S-68.

**Item 75.     Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, CWALT, BAS, and Barclays made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)     In "The Mortgage Pool" section of the prospectus supplement, described in Item 44, CWALT, BAS, and Barclays presented a table entitled "Occupancy Types." This table divided the mortgage loans in loan group 3 into the categories "Primary Residence," "Investment Property," and "Secondary Residence." This table contained untrue or misleading statements about, among other data, the number of initial mortgage loans, the aggregate principal balance outstanding, and the percent of the mortgage loans in loan group 3 in each of these categories. CWALT 2006-29T1 Pros. Sup. S-60.

(b)     In the "Occupancy Types" table, CWALT, BAS, and Barclays stated that of the 374 Initial Mortgage Loans in loan group 3, 317 were secured by primary residences, and 57 were not. CWALT 2006-29T1 Pros. Sup. S-60.

**Item 83.     Details of properties that were stated to be owner-occupied, but were not:**

(a)     **Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 30**

(b)     **Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead: 66**

(c)     **Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address: 42**

    **(d)**    **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 113

**Item 86.**    **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-66 through S-72 of the prospectus supplement, CWALT, BAS, and Barclays made statements about the underwriting guidelines of Countrywide Home Loans, Inc. All of those statements are incorporated herein by reference.

One of these statements was that: "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CWALT 2006-29T1 Pros. Sup. S-67.

Another one of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2006-29T1 Pros. Sup. S-68.

**Item 92.**    **Early payment defaults in loan group 3:**

    **(a)**    **Number of the mortgage loans that suffered EPDs:** 14

    **(b)**    **Percent of the mortgage loans that suffered EPDs:** 3.1%

**Item 93.**    **90+ days delinquencies in loan group 3:**

    **(a)**    **Number of the mortgage loans that suffered 90+ days delinquencies:** 217

    **(b)**    **Percent of the mortgage loans that suffered 90+ days delinquencies:** 47.3%

**Item 94.**    **30+ days delinquencies in loan group 3:**

    **(a)**    **Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 178

    **(b)**    **Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 38.8%

**Item 103.    Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-7 through S-10 and S-164 through S-165 of the prospectus supplement, CWALT, BAS, and Barclays made statements about the ratings assigned to the certificates issued in this securitization. CWALT, BAS, and Barclays stated that Colonial's certificate was rated AAA by Fitch Ratings and AAA by Standard & Poor's.

CWALT, BAS, and Barclays also stated: "The offered certificates will not be offered unless they are assigned the indicated ratings by Fitch Ratings . . . Standard & Poor's . . . and Moody's . . . ." CWALT 2006-29T1 Pros. Sup. S-10.

CWALT, BAS, and Barclays also stated: "It is a condition to the issuance of the offered certificates that they be assigned the respective ratings set forth in the Summary of this prospectus supplement." CWALT 2006-29T1 Pros. Sup. S-164.

**Item 106.    Summary of loans in loan group 3 about which the defendants made untrue or misleading statements:**

    **(a)    Number of loans whose LTVs were materially understated as shown by the AVM:** 196

    **(b)    Number of loans whose LTVs were misleading because of undisclosed additional liens:** 233

    **(c)    Number of loans for which the properties were stated to be owner-occupied but were not:** 113

    **(d)    Number of loans that suffered EPDs:** 14

    **(e)    Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 363

    **(f)    Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 79.1%

# PROOF OF SERVICE

***In Re: Countrywide Financial Corp. Mortgage-Backed Securities Litigation
Federal Deposit Insurance Corporation as Receiver for Colonial Bank v. Countrywide
Securities Corporation; et al.***
**USDC, CADC Case No. CV 12-06911-MRP (MANx)**

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is 12100 Wilshire Boulevard, 15th Floor, Los Angeles, California 90025. On **November 6, 2012** I served the foregoing document(s) described as:

## FIRST AMENDED COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933 (15 U.S.C. §§ 77k AND 77o)

## DEMAND FOR JURY TRIAL

**[X]  BY MAIL:  I caused the foregoing document to be deposited in the care and custody of the US Postal Service upon the following:**

SEE SERVICE LIST

I declare under penalty pursuant to the laws of the United States that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on **November 6, 2012** in Los Angeles, California.

Lisa M. Lovullo

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

601714948

SERVICE LIST

Lloyd Winawer
Goodwin Procter LLP
10250 Constellation Boulevard, 21st Floor
Los Angeles, CA 90067
310-788-5177
Fax: 310-286-0992
Attorneys for Defendants
Countrywide Securities Corporation,
CWALT Inc., CWMBS Inc., and
Countrywide Financial Corporation


Achyut Jayant Phadke
David H Fry
Munger, Tolles & Olson LLP
560 Mission St 27th Floor
San Francisco, CA 94105
415-512-4026
Fax: 415-644-6926

Erin J Cox
James C Rutten
Marc S T Dworsky
Munger Tolles and Olson LLP
355 South Grand Avenue 35th Floor
Los Angeles, CA 90071-1560
213-683-9100
Fax: 213-687-3702

Attorneys for Defendants
Bank of America Corporation
and Merrill Lynch Pierce Fenner and Smith Inc


Alexander K Mircheff
Christopher Anthony Nowlin
Dean J Kitchens
Gibson Dunn and Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
213-229-7000
Fax: 213-229-7520
Attorneys for Defendants
Barclays Capital Inc., RBS Securities Inc.,
Citigroup Global Markets Inc.,
Credit Suisse Securities USA LLC,
Deutsche Bank Securities Inc.,
Edward D Jones and Co L P, J P Morgan Securities LLC

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

601714948

- 2 -